Michael J. Gottlieb (SBN 261434)
mgottlieb@willkie.com
Marina A. Torres (SBN 259576)
mtorres@willkie.com
Logan M. Elliott (SBN 268105)
lelliott@willkie.com
WILLKIE FARR & GALLAGHER LLP
2029 Century Park East, Suite 2900
Los Angeles, California 90067
Telephone:  (310) 855-3000
Facsimile:  (310) 855-3099

Samuel G. Hall (**Admitted** *Pro* ~~hac vice forthcoming~~**Hac Vice**)
shall@willkie.com
WILLKIE FARR & GALLAGHER LLP
1875 K Street~~, N.W.~~ **NW**
Washington, D.C. 20006
Telephone: (202) 303-1000
Facsimile:  (202) 303-2000

*Attorneys for Plaintiffs Patrick McKillen and
Hume Street Management Consultants Limited*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Patrick McKillen and Hume Street Management Consultants Limited,<br><br>Plaintiffs,<br><br>v.<br><br>Sheikh Hamad bin Khalifa bin Hamad bin Abdullah bin Jassim bin Mohammed Al Thani, Sheikh Hamad bin Jassim bin Jaber bin Mohammed bin Thani Al Thani, Sheikha Lulwah bint Hamad bin Khalifa Al Thani, Michele Faissola, Marc Socker, Dilmon LLC, Maybourne Hotels Limited, **and** Beverly Hills Acquisition LLC,~~ and John Does,~~<br><br>Defendants. | ~~CASE NO.:~~ **Case No. 2:25-cv-09178-MCS-AGR**<br><br>**FIRST AMENDED** COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. §§ 1962, 1964~~, AND FEDERAL COMPUTER FRAUD ABUSE ACT ("CFAA"), 18 U.S.C. § 1030 ET SEQ~~.<br><br>**DEMAND FOR JURY TRIAL** |

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CALIFORNIA 90067
(310) 229-9900

–1–

Plaintiffs Patrick McKillen ("Mr. McKillen") and Hume Street Management Consultants Limited ("HSMC"), by their undersigned counsel, hereby bring this action under 18 ~~United States Code Sections~~U.S.C. §§ 1962(c), 1962(d), 1964(c)~~, and 1030 *et seq.*~~ against defendants Sheikh Hamad bin Khalifa bin Hamad bin Abdullah bin Jassim bin Mohammed Al Thani ("Sheikh Hamad bin Khalifa" and commonly known as "HBK"), Sheikh Hamad bin Jassim bin Jaber bin Mohammed bin Thani Al Thani ("Sheikh Hamad bin Jassim" and commonly known as "HBJ," and together with Sheikh Hamad bin Khalifa, the "Qatari Royals"), Sheikha Lulwah bint Hamad bin Khalifa Al Thani ("Sheikha Lulwah"), Michele Faissola, Marc Socker,[1] Dilmon LLC ("Dilmon"), Maybourne Hotels Limited, Beverly Hills Acquisition LLC,~~,~~.[2] ~~and John Does.~~ Plaintiffs allege, on information and belief, as follows:

## SUMMARY OF THE ACTION

1. Over the past seven years, members of the Qatari royal family, Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim, orchestrated, directed, and participated in a global scheme to defraud their former business partner, Patrick McKillen, and his company, HSMC. The Qatari Royals effectuated this lawless plot using individuals and entities within their control to defraud Mr. McKillen and HSMC, causing Mr. McKillen and HSMC to expend significant resources on the Qatari Royals' behalf under false pretenses and without remuneration. These schemes to defraud their business partner and his company for, put crudely, free labor are part of a years-long pattern of

---

[1] The Qatari Royals, Sheikha Lulwah, Michele Faissola, and Marc Socker are referred to herein as the "Individual Defendants."

[2] Dilmon, Maybourne Hotels Limited, and Beverly Hills Acquisition LLC are referred to herein as the "Entity Defendants."

1

illegal racketeering orchestrated by the Qatari Royals, and are in line with a history of illicit actions.

2.    Mr. McKillen is a renowned hotelier, property investor, developer, and entrepreneur with decades of experience managing and redeveloping ultra-luxury hotels.  Mr. McKillen provides management and redevelopment services through his company, HSMC.

3.    In 2004, Mr. McKillen acquired shares in a group of luxury hotels that then became known as the Maybourne Hotel Group (or "Maybourne"). Mr. McKillen dedicated nearly twenty years to transforming the Maybourne hotels, elevating them to top ultra-luxury destinations around the globe.

4.    In 2015, Mr. McKillen sold his shares in Coroin Limited, the holding company of the Maybourne Hotel Group, to Séléné S.À R.L., a company owned by Sheikh Hamad bin Jassim.[3]  The sale of Mr. McKillen's shares was subject to arrangements for him to receive further consideration based on any net increase in the value of the Maybourne Hotel Group over a period ending at the latest in April 2022 through a deferred payment (the "Deferred Payment").   The Deferred Payment ~~is~~was the subject of a confidential arbitration in London **resolved** in ~~which~~ Mr. ~~McKillen alleges~~**McKillen's favor, in which he alleged** that a very substantial sum ~~is~~was owed to him by ~~the Qatari Royals~~**Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim**.

5.    During that period following the sale, Mr. McKillen and, later, his company, HSMC, continued to manage and redevelop the Maybourne hotels, at the direction of ~~the Qatari Royals~~**Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim**, including such hotels as Claridge's, The Connaught, The

---

[3] Sheikh Hamad bin Khalifa acquired an interest in the Maybourne Hotel Group in 2017.

**FIRST AMENDED** COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ~~AND FEDERAL COMPUTER FRAUD ABUSE ACT~~

Berkeley, and a property adjacent to The Berkeley that had been purchased in 2005, and which was later developed into a new hotel, The Emory. Mr. McKillen, and later HSMC, managed and redeveloped Claridge's, The Connaught, and The Berkeley for an agreed-upon management fee (which was separate from and in addition to Mr. McKillen's entitlement to the Deferred Payment for his shares). Mr. McKillen led the expansion and transformation of these hotels into ultra-luxury properties fit for the 21st century with a new generation of guests, while preserving their individual character and distinctive history fit for kings, queens, royal families, and celebrities.

6. However, ~~it was not long before~~ Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim developed, implemented, and participated in several schemes to defraud Mr. McKillen. Having seen the value their business partner brought to the table, ~~the Qatari Royals~~**Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim** calculated that they could steal **tens of** millions of dollars in Mr. McKillen's and HSMC's services to further their own personal and investment ends with respect to upcoming hotel projects for which they knew they would need Mr. McKillen's expertise~~, and~~**. They then** conspired to do ~~so~~**just that: induce Mr. McKillen into providing costly work on a variety of projects through misrepresentations and omissions and then refuse to compensate him**.

7. The schemes were straightforward. ~~Starting in 2018, the Qatari Royals~~**Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim**, using the Entity Defendants, Sheikha Lulwah, Mr. Faissola, Mr. Socker, and various other individuals and entities within their control, engaged Mr. McKillen and his companies to manage and/or completely redevelop ~~four~~**five** additional luxury properties: (1) the Maybourne Riviera hotel in 2018; (2) a Manhattan mansion owned by Sheikh Hamad bin Jassim in 2018; (3) the historic Îlot Saint-Germain building in 2019; ~~and~~(4) the Maybourne Beverly Hills hotel in

3

2019; and (5) a London mansion owned by Sheikh Hamad bin Jassim.  For each project, ~~the Qatari Royals~~Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim, acting with and through other members of the enterprise, represented to Mr. McKillen at the outset that he would be compensated via fees for services performed.  But ~~at some time in the course of Mr. McKillen's and/or HSMC's work, the Qatari Royals~~Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim decided, in secret, that they would not, in fact, be compensating Mr. McKillen or HSMC for services performed on the ~~four~~five projects~~,~~ and would instead fraudulently induce him and/or his company to provide and continue work.  In accordance, and under false pretenses, Mr. McKillen and/or HSMC ~~thereafter~~ worked hard and expended significant time and resources on these projects for the benefit of ~~the Qatari Royals~~Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim.  And once millions of dollars in benefit to the Qatari Royals had been realized—and expended by Mr. McKillen and/or HSMC—~~the Defendants~~Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim, through their agents and members of the enterprise, refused to compensate Mr. McKillen or HSMC for nearly all their efforts and absconded with their vision and hard work, essentially free of charge (the "Riviera Fraud," the "California Fraud," the "Saint-Germain Fraud," ~~and~~ the "New York Fraud," and the "London Fraud" discussed *infra*).

8.    To date, ~~the Qatari Royals~~Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim have refused to pay Mr. McKillen or HSMC the fees they are rightfully owed, accounting for years of labor by Mr. McKillen and/or HSMC.  Indeed, rather than pay Mr. McKillen the fees he is owed, ~~the Qatari Royals~~Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim have instead engaged in additional schemes to pressure him into dropping his demands.  ~~The Qatari Royals~~They used a bank beneficially owned by Sheikh

4

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CALIFORNIA 90067
(310) 229-9900

Hamad bin Jassim in an attempt to intimidate Mr. McKillen into abandoning his attempts at recourse related to the frauds described herein (the "Quintet Scheme," discussed *infra*).  ~~Further, on information and belief, certain of the named Defendants, with the assistance of yet unknown agents (together the "John Does"), hacked Mr. McKillen's devices, retrieved personal, sensitive, and protected information, and then publicized and distorted the materials obtained therefrom to further intimidate and harm Mr. McKillen (the "Hacking Scheme," discussed *infra*).~~

9. ~~8. Although Mr. McKillen once believed he had a good-faith business relationship with the Qatari Royals, he now believes that, once the projects were underway, the Qatari Royals decided not to pay him~~**Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim did not intend to pay Mr. McKillen** and/or HSMC the fees under the agreed-upon terms, and instead sought to trick them into ~~continuing to provide~~**providing** services for years under false pretenses, only to systematically fabricate reasons ~~not to pay them~~ out of whole cloth **not to pay them** and attack ~~him~~**Mr. McKillen** for his efforts to obtain his rightful ~~renumeration~~**remuneration**.

10. ~~9.~~ What is more, these acts are part of a larger, global pattern of unlawful activities perpetrated by ~~the Qatari Royals~~**Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim and their agents** in their business and political dealings to unfairly reap rewards on the backs of free laborers, evidencing that ~~the Qatari Royals~~**Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim** consider themselves to be above the law.[4]  The defrauding

[4] *See, e.g.*, *Qatar: Six Months Post-World Cup, Migrant Workers Suffer, FIFA/Qatari Authorities Paid No Compensation, Silent on Wage Theft*, HUMAN RIGHTS WATCH (June 16, 2023), https://www.hrw.org/news/2023/06/16/qatar-six-months-post-world-cup-migrant-workers-suffer.

__FIRST AMENDED__ COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ~~AND FEDERAL COMPUTER FRAUD ABUSE ACT~~

of Mr. McKillen takes its place in line next to a laundry list of illegal acts directed and facilitated by the Qatari Royals and the entities and individuals they control to grow their wealth or advance their geopolitical interests.  Mr. McKillen fell victim to these tactics in good faith.

### PARTIES

11.    ~~10.~~ Plaintiff Patrick McKillen is a citizen of Ireland and the United Kingdom.  He is a world-renowned hotelier, property investor and developer, and businessman with significant experience in the ultra-luxury hotel sector.  He is also the owner and company director of HSMC.  **Mr. McKillen has decades of experience in the California market and has completed multiple successful projects in Los Angeles.**

12.    ~~11.~~ Plaintiff HSMC is an Irish corporation with its principal place of business in Dublin, Ireland.  HSMC manages a portfolio of properties on Mr. McKillen's behalf and has successfully provided hotel and project management services in respect of multiple hotels in the Maybourne Hotel Group.

13.    ~~12.~~ Defendant Sheikh Hamad bin Khalifa is a citizen of Qatar who resides in Doha, Qatar.  Sheikh Hamad bin Khalifa was the Emir of Qatar from 1995 to 2013 and is a member of the Qatari royal family of Al Thani.  Sheikh Hamad bin Khalifa is the ultimate beneficial owner of the Maybourne Beverly Hills.  Through the hotel, he regularly transacts business in California and enjoys the privileges of transacting business in Los Angeles County.  Sheikh Hamad bin Khalifa, alongside his business partner Sheikh Hamad bin Jassim, directly or through his agents and/or representatives, devised, orchestrated, directed, facilitated, and participated in the schemes to defraud Mr. McKillen described herein.

14.    ~~13.~~ Defendant Sheikh Hamad bin Jassim is a citizen of Qatar who has a dwelling in Los Angeles, California (the "California Residence").

6

Sheikh Hamad bin Jassim regularly transacts business in California and enjoys the privileges of transacting business in Los Angeles County through the Maybourne Beverly Hills and other ventures. Sheikh Hamad bin Jassim served as Foreign Minister of Qatar from 1992 until 2013 and as Prime Minister from 2007 to 2013. Sheikh Hamad bin Jassim is also a member of the Al Thani royal family and holds official diplomatic positions for Qatar. Sheikh Hamad bin Jassim, alongside his business partner Sheikh Hamad bin Khalifa, directly or through his agents and/or representatives, devised, orchestrated, directed, facilitated, and participated in the schemes to defraud Mr. McKillen described herein.

15. 14. Defendant Sheikha Lulwah is a citizen of Qatar who resides in Doha, Qatar. Sheikha Lulwah is the daughter of Sheikh Hamad bin Khalifa and assists her father with his hotel investments. Sheikha Lulwah regularly transacts business in California and enjoys the privileges of transacting business in Los Angeles County through the Maybourne Beverly Hills. Sheikha Lulwah, directly or through her agents and/or representatives, directed, facilitated, and participated in at least one of the schemes to defraud Mr. McKillen described herein, including by engaging Plaintiffs for their services, directing and approving their work even after the Qatari Royals Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim decided to refuse them compensation, and ultimately refusing them compensation once a material benefit to the Qatari Royals had been realized.

16. 15. Defendant Michele Faissola is a citizen of Italy who resides in London, England. Mr. Faissola is Chief Executive Officer of Dilmon and has worked as an advisor to the Al Thani family since January 2018. At all times relevant herein, Mr. Faissola acted as an agent of Sheikh Hamad bin Khalifa, Sheikha Lulwah, and the Entity Defendants with respect to the Qatari Royals' hotel investments. Mr. Faissola directed, facilitated, and participated in

7

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND FEDERAL COMPUTER FRAUD ABUSE ACT

schemes to defraud Mr. McKillen on behalf of the Qatari Royals, including by engaging Plaintiffs for their services, falsely representing to Mr. McKillen that he would be compensated for work performed, and refusing Plaintiffs compensation once a material benefit to the Qatari Royals had been realized.

17. 16. Defendant Marc Socker is a citizen of Great Britain who resides in London, England.  Mr. Socker is the Head of Real Estate of Dilmon and Co-Chief Executive Officer of the Maybourne Hotel Group, which is ultimately owned by Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim. At all times relevant herein, Mr. Socker acted as an agent of Sheikh Hamad bin Khalifa, Sheikha Lulwah, and the Entity Defendants with respect to the Qatari Royals' hotel investments.  Mr. Socker directed, facilitated, and participated in schemes to defraud Mr. McKillen on behalf of the Qatari Royals, including by facilitating the installation of Plaintiffs as project leaders and directing and approving their work even after the Qatari Royals decided to refuse them compensation.

18. 17. Defendant Dilmon is a Qatari company, with its principal place of business in Doha, Qatar.  Dilmon is the Al Thani family office of Sheikh Hamad bin Khalifa.  Dilmon regularly transacts business in California on behalf of the Al Thani family, including with respect to the Maybourne Beverly Hills.  Dilmon facilitated and participated in the Riviera Fraud and the California Fraud described herein on behalf of the Qatari Royals, including by, through its officers: (i) engaging Plaintiffs for their services and installing Plaintiffs as project leaders; (ii) falsely representing to Mr. McKillen that he would be compensated for work performed; (iii) serving as Plaintiffs' primary point of contact throughout the redevelopment projects; (iv) directing and approving Plaintiffs' work even after the Qatari Royals decided to refuse them compensation; and (v) refusing Plaintiffs compensation once a material benefit to the Qatari Royals had been realized.

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CALIFORNIA 90067
(310) 229-9900

8

19.   18. Defendant Maybourne Hotels Limited is an English company with its principal place of business in London, England.  Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim are the ultimate controlling parties of Maybourne Hotels Limited.  Maybourne Hotels Limited provides centralized back-office support services to the Maybourne Hotel Group's hotel assets and receives a portion of each hotel's revenue.  Maybourne Hotels Limited regularly transacts business in California on behalf of Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim with respect to the Maybourne Beverly Hills.  Maybourne Hotels Limited participated in schemes to defraud Mr. McKillen described herein on behalf of Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim, including by refusing Plaintiffs compensation once a material benefit to the Qatari Royals had been realized.

20.   19. Defendant Beverly Hills Acquisition LLC is a Delaware limited liability company, which is registered to do business in the State of California.  Upon information and belief, Beverly Hills Acquisition LLC operates solely in Beverly Hills, California, with an address at 225 N. Canon Drive, Beverly Hills, CA 90210.  Beverly Hills Acquisition LLC is the direct owner of the Maybourne Beverly Hills.  Sheikh Hamad bin Khalifa is the ultimate beneficial owner of Beverly Hills Acquisition LLC.  Beverly Hills Acquisition LLC owns and operates the Maybourne Beverly Hills and thereby is essentially at home in California.  Beverly Hills Acquisition LLC participated in a scheme to defraud Mr. McKillen described herein on behalf of Sheikh Hamad bin Khalifa, including by refusing Plaintiffs compensation once a material benefit to the Qatari Royals had been realized.

20. Defendants John Does are associated with the effort to access Plaintiffs' private data without authorization.  At least one of the John Does is associated with a public IPv4 Internet Protocol ("IP") address that has been traced to GCI Network Solutions, a United Kingdom-based

9

managed service provider. Plaintiff can potentially identify the John Does' names and physical addresses through the John Does' service provider using their IP address. The John Does participated in, developed, executed, and/or assisted with the development and execution of an illegal cybersecurity operation to obtain Plaintiffs' highly confidential and protected materials (the "Hacking Scheme"). The materials obtained through the Hacking Scheme (the "Hacked Materials") included information and communications related to Mr. McKillen's legal representation in California, vendor engagement in California, vendor activities in California, and legal proceedings in California. Because of the John Does' participation in the Hacking Scheme, several online news outlets published distorted versions of sensitive and personal information that could only have come from the Hacked Materials. The publications sought to harm Mr. McKillen in California and focused on portraying his actions in California as nefarious.

## NON-PARTY MEMBERS OF THE ENTERPRISE

21. SEDHV is a French company beneficially owned by Sheikh Hamad bin Khalifa. SEDHV is the direct owner of the Maybourne Riviera, a hotel complex located in the Alpes-Maritimes, at 1551, Route de la Turbie, Roquebrune-Cap-Martin (06190). SEDHV facilitated and participated in a scheme to defraud Mr. McKillen described herein on behalf of Sheikh Hamad bin Khalifa, including by engaging Plaintiffs for their services, falsely representing to Plaintiffs that they would be compensated for work performed, unilaterally terminating its working relationship with Plaintiffs by interfering with the completion of Plaintiffs' work, and refusing Plaintiffs full compensation once a material benefit to the Qatari Royals had been realized.

22. Gilles de Boissieu is the chairman of SEDHV. Mr. de Boissieu facilitated and participated in a scheme to defraud Mr. McKillen described

10

herein on behalf of Sheikh Hamad bin Khalifa, including by engaging Plaintiffs for their services, falsely representing to Plaintiffs that they would be compensated for work performed, and refusing Plaintiffs full compensation once a material benefit to the Qatari Royals had been realized.

23.    Constellation Paris is a French company beneficially owned by Sheikh Hamad bin Jassim.  Sheikh Hamad bin Jassim created Constellation Paris to purchase the historic Îlot Saint-Germain building, located at 231 Boulevard Saint-Germain, 75007 Paris.  Constellation Paris facilitated and participated in a scheme to defraud Mr. McKillen described herein on behalf of Sheikh Hamad bin Jassim, including by engaging Plaintiffs for their services, directing and approving their work, and refusing Plaintiffs compensation once a material benefit to the Qatari Royals had been realized.

24.    Fady Bakhos is Chairman of Constellation Paris and a longtime advisor to the Al Thani royal family.  Bakhos facilitated and participated in a scheme to defraud Mr. McKillen described herein on behalf of Sheikh Hamad bin Jassim, including by engaging Plaintiffs for their services, directing and approving their work, and refusing Plaintiffs compensation once a material benefit to the Qatari Royals had been realized.

25.    **Karin Cooper is Sheikh Hamad bin Jassim's residential property manager.  Cooper facilitated and participated in multiple schemes on behalf of Sheikh Hamad bin Jassim, including by engaging Plaintiffs for their services, directing and approving their work, and refusing Plaintiffs compensation once a material benefit to the Qatari Royals had been realized.**

26.    **Qaya Limited ("Qaya") is a company beneficially owned by Sheikh Hamad bin Jassim that manages his affairs in relation to his residential property portfolio.  Qaya facilitated and participated in multiple schemes on behalf of Sheikh Hamad bin Jassim, including by**

11

engaging Plaintiffs for their services, directing and approving their work, and refusing Plaintiffs compensation once a material benefit to the Qatari Royals had been realized.

27.    Lomakx Limited ("Lomakx") is a corporate entity beneficially owned by Sheikh Hamad bin Jassim.  Lomakx was incorporated for the redevelopment of Forbes House.  Lomakx facilitated and participated in a scheme to defraud Plaintiffs on behalf of Sheikh Hamad bin Jassim, including by engaging Plaintiffs for their services, directing and approving their work, and refusing Plaintiffs compensation once a material benefit to the Qatari Royals had been realized.

28.    Forbes House Limited ("FHL") is a corporate entity that is the legal owner of Forbes House.  FHL has been beneficially owned by Sheikh Hamad bin Jassim since May 2016.  FHL facilitated and participated in a scheme to defraud Plaintiffs on behalf of Sheikh Hamad bin Jassim, including by engaging Plaintiffs for their services, directing and approving their work, and refusing Plaintiffs compensation once a material benefit to the Qatari Royals had been realized.

29.    ~~25.~~  Quintet Private Bank SA ("Quintet" or the "Bank") is a Luxembourg company, beneficially owned by Sheikh Hamad bin Jassim since 2011.  The Qatari Royals utilized Quintet to induce Mr. McKillen into a refinancing only to pull the offer in bad faith after Mr. McKillen and his company were effectively deprived of the ability to pursue other refinancing options in the market to attempt to intimidate Mr. McKillen into dropping his efforts to obtain the fees he and HSMC are owed.

## JURISDICTION AND VENUE

### A.    Subject Matter Jurisdiction

30.    ~~26.~~  This Court has original subject matter jurisdiction over the claims for relief asserted in this complaint pursuant to 28 ~~United States Code~~

12

~~Section~~U.S.C. § 1331, as **claims pursuant to** 18 ~~United States Code Section~~U.S.C. § 1964(c) ~~and 18 United States Code Section 1030 *et seq.*~~ arise under the laws of the United States.

### B. Personal Jurisdiction
#### 1. Sheikh Hamad bin Khalifa, Sheikh Hamad bin Jassim, Sheikha Lulwah, and Dilmon

31. ~~27.~~ This Court has **general** personal jurisdiction over Sheikh Hamad bin Khalifa, Sheikha Lulwah, and Dilmon on the basis of their substantial, continuous, and systematic contacts with California.  On information and belief, each of these defendants owns, operates, and/or manages properties in California and continuously transacts business in the forum.  These contacts with the forum are so wide-ranging that they take the place of physical presence in the forum.

32.  In addition, or in the alternative, this Court has **specific** personal jurisdiction over Sheikh Hamad bin Khalifa, Sheikha Lulwah, and Dilmon because, among other contacts in the state, they devised, orchestrated, directed, facilitated, and/or participated in the schemes to defraud and steal from Mr. McKillen that were centered in and directed at California.  In furtherance of these schemes, Sheikh Hamad bin Khalifa, Sheikha Lulwah, and Dilmon, directly or through their officers, agents, or representatives, intentionally directed their unlawful acts at California and ultimately derived the fruits of their unlawful acts in California.  Plaintiffs' action here arises out of Sheikh Hamad bin Khalifa, Sheikha Lulwah, and Dilmon's contacts with this forum: their ownership of and/or financial interest in the Maybourne Beverly Hills, which is located in California; their engaging Mr. McKillen to perform services in California; and their refusal to compensate Plaintiffs for work performed for the Qatari Royals' enrichment in California.

**FIRST AMENDED** COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ~~AND FEDERAL COMPUTER FRAUD ABUSE ACT~~

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CALIFORNIA 90067
(310) 229-9900

33. ~~28.~~ This Court has **general** personal jurisdiction over Sheikh Hamad bin Jassim because he maintains a dwelling in Los Angeles, California~~.~~ ~~In~~ **, and can be considered "at home" in this District.**

a. **Sheikh Hamad bin Jassim, through corporate entities, is the owner of a home in California (the "California Residence"). The California Residence is not just another property in Sheikh Hamad bin Jassim's portfolio. It has devoted living quarters for Sheikh Hamad bin Jassim and his wife, comprehensive security measures, and most of Sheikh Hamad bin Jassim's art collection. The California residence was designed by a world-renowned architect over the course of years. Sheikh Hamad bin Jassim employs a property manager and other staff, including cleaners, gardeners, and security at the California Residence.**

b. **Sheikh Hamad bin Jassim has referred to the custom-designed mansion as "my home" on social media and spent ~~expended~~ periods of time at the California Residence.**

c. **He has demonstrated an intent to remain at the residence by inquiring about the viability of purchasing neighboring lots to create a family "compound."**

d. **Mr. McKillen has repeatedly visited with Sheikh Hamad bin Jassim at the California Residence, where he has been given tours of the estate. Mr. McKillen and his son have also advised Sheikh Hamad bin Jassim regarding the estate, including on the viability of purchasing neighboring land, possible repairs or replacements, and other issues involving facilities. HBJ has also relied on Mr. McKillen to find household staff, including gardeners, cleaners, and security.**

e. **It was publicly reported that Sheikh Hamad bin Jassim was residing at the California Residence and planned to relocate to Los Angeles in part for business reasons.**

14

**f.      Sheikh Hamad bin Jassim frequently conducts business in the Central District of California, including with respect to the Maybourne Beverly Hills.**

**g.      The Los Angeles Superior Court has already rejected arguments from Sheikh Hamad bin Jassim that he is not a Los Angeles resident with a "dwelling" in the city.  *See* Minute Order at 17, *Hume Street Mgmt. Consultants Ltd. v. Sheikh Hamad bin Khalifa bin Hamad bin Abdullah bin Jassim bin Mohammed Al Thani*, Case No. 22-SMC-cv-02646 (La. Super. Ct. Apr. 28, 2023).  In that case, service of process was delivered to a security guard at the California Residence.**

34.      **In** addition, or in the alternative, this Court has **specific** personal jurisdiction over Sheikh Hamad bin Jassim because, among other contacts in the state, he devised, orchestrated, directed, facilitated, and/or participated in the scheme to defraud and steal from Mr. McKillen described herein that was centered in and directed at California.  In furtherance of these schemes, Sheikh Hamad bin Jassim, directly or through his agents or representatives, intentionally directed his unlawful acts at California and ultimately derived the fruits of his unlawful acts in California. Plaintiffs' action here arises out of Sheikh Hamad bin Jassim's contacts with this forum: his financial interest in the Maybourne Beverly Hills, which is located in California, his meetings with Mr. McKillen concerning the California Fraud in California, and his refusal to compensate Plaintiffs for work performed for his own enrichment in California.

35.      ~~29.~~ In addition, or in the alternative, this Court has personal jurisdiction over ~~the Qatari Royal family, including HBK and HBJ,~~**Sheikh Hamad bin Khalifa, Sheikh Hamad bin Jassim, Sheikha Lulwah, and Dilmon** pursuant to Federal Rule of Civil Procedure 4(k)(2)~~, for their participation in the development and execution of the Hacking Scheme~~

15

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CALIFORNIA 90067
(310) 229-9900

against Mr. McKillen. On information and belief, by targeting Mr. McKillen based on his California activities, his relationships with California residents, and his California-based business activities, and by publishing in United States-based news outlets as outlined *infra*, the Qatari Royal family intentionally directed their conduct at because of their contacts with the United States and knew that the brunt of the injury would be felt inas a whole with respect to the RICO claims. These Defendants have sufficient ties to the United States in the form of lost revenues and additional costs for Plaintiffs.relevant to the subject-matter of this case through, *inter alia*, their ownership of the Maybourne Beverly Hills and the Jassim Residence and associated ventures and activities, such that the exercise of personal jurisdiction would comport with due process.

### 2. Faissola and Socker

36. This Court has personal jurisdiction over Mr. Faissola because, among other contacts in the state, he directed, facilitated, and/or participated in the scheme to defraud Mr. McKillen described herein that was centered in and directed at California. In furtherance of this scheme, Mr. Faissola directly and/or through his agents or representatives, intentionally directed his unlawful acts at California. Plaintiffs' action here arises out of Mr. Faissola's contacts with this forum: his engaging Mr. McKillen to perform services in California, his affirmative representations to Mr. McKillen that Mr. McKillen would be compensated for his work on the Maybourne Beverly Hills; his directing Mr. McKillen to perform services in California and approving such services on false pretenses; and/or his refusal to compensate Plaintiffs for work performed in California for the Qatari Royals' enrichment.

37. 30. This Court has personal jurisdiction over Mr. Faissola and Mr. Socker because, among other contacts in the state, eachhe directed,

16

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND FEDERAL COMPUTER FRAUD ABUSE ACT

facilitated, and/or participated in the scheme to defraud Mr. McKillen described herein that was centered in and directed at California. In furtherance of this scheme, Mr. ~~Faissola and Mr.~~ Socker, directly and/or through ~~their~~his agents or representatives, intentionally directed ~~their~~his unlawful acts at California. Plaintiffs' action here arises out of Mr. ~~Faissola and Mr.~~ Socker's contacts with this forum: ~~their~~his engaging Mr. McKillen to perform services in California; ~~their~~**his repeated communications and meetings with Mr. McKillen in California; his** directing Mr. McKillen to perform services in California and approving such services on false pretenses; and/or ~~their~~his refusal to compensate Plaintiffs for work performed in California for the Qatari Royals' enrichment.

### 3. Maybourne Hotels Limited and Beverly Hills Acquisition

38. ~~31.~~ This Court has personal jurisdiction over Maybourne Hotels Limited because Maybourne Hotels Limited, among other contacts in the state, participated in the scheme to defraud Mr. McKillen described herein that was centered in and directed at California. Maybourne Hotels Limited purposefully directed its unlawful acts at California, derived benefits from its unlawful acts in California, and availed itself of the privilege of conducting business in California. Plaintiffs' action here arises out of Maybourne Hotels Limited's contacts with this forum, including its refusal to compensate Plaintiffs for work performed in California for the Qatari Royals' enrichment.

39. ~~32.~~ This Court has personal jurisdiction over Beverly Hills Acquisition LLC because it directly owns the Maybourne Beverly Hills and operates its business solely in Beverly Hills, California. Beverly Hills Acquisition LLC, through the hotel it owns and operates in California, maintains a continuous presence in this forum, offers accommodations and services to people in this forum, and profits from its activities in this forum.

17

Beverly Hills Acquisition LLC's affiliation with this forum is so continuous and systemic that it is essentially at home in this forum. In addition, or in the alternative, this Court has personal jurisdiction over Beverly Hills Acquisition LLC because, among other contacts in the state, Beverly Hills Acquisition LLC participated in a scheme to defraud Mr. McKillen that was centered in and directed at California. In furtherance of this scheme, Beverly Hills Acquisition LLC participated in the unlawful scheme in California and ultimately derived the fruits of its unlawful acts in California. Plaintiffs' action here arises out of Beverly Hills Acquisition LLC's contacts with this forum: its ownership of and financial interest in the Maybourne Beverly Hills, which is located in California, and its refusal to compensate Plaintiffs for work performed in California for the Qatari Royals' enrichment.

## C.    Venue and Forum

33. This Court has personal jurisdiction over the John Does because they directed, facilitated, and/or participated in the scheme to hack Mr. McKillen described herein that was centered in and directed at California. In furtherance of this scheme, the John Does intentionally directed their unlawful acts at California. Plaintiffs' action arises out of the John Does' contacts with this forum: stealing information from Mr. McKillen about his California activities, his relationship with California residents, and his California-based business activities, and publishing that information in United States-based news outlets available in California and intended to influence a California readership.

34. In addition, or in the alternative, this Court has personal jurisdiction over the John Does pursuant to Federal Rule of Civil Procedure 4(k)(2) for their participation in the development and execution of the Hacking Scheme against Mr. McKillen. On information and belief, by targeting Mr. McKillen based on his California activities, his

18

relationships with California residents, and his California-based business activities, and by publishing in United States-based news outlets as outlined *infra*, the John Does intentionally directed their conduct at the United States and knew that the brunt of the injury would be felt in the United States in the form of lost revenues and additional costs for Plaintiffs.

40. 35. Venue is proper in the Central District of California under 28 United States Code Section U.S.C. § 1391(b)(2) because a substantial part of Plaintiffs' injuries and the events or omissions giving rise to them occurred in Beverly Hills, California. Defendants engaged in unlawful acts with the aim and effect of injuring Plaintiffs in Beverly Hills, California, where Plaintiffs accrued expenses and performed services for which they did not receive compensation. Plaintiffs' cause of action arises out of Defendants' unlawful actions in, and intentionally aimed at, California with respect to Plaintiffs' services rendered in California, wherein Defendants realized the benefits of their unlawful activities.

41. **Many of the relevant witnesses and evidence in this case will be located in California (and, to a lesser extent, elsewhere in the United States), including witnesses to the Beverly Hills Fraud and victims of the fraud located in California.**

## BACKGROUND

42. 36. The Maybourne Hotel Group is a group of companies that owns and operates ultra-luxury hotels worldwide under the Maybourne brand. Mr. McKillen's involvement with the Maybourne Hotel Group began in 2004 when a consortium of British and Irish investors, including Mr. McKillen, acquired shares in a group of luxury hotels previously known as the Savoy Group. Following this acquisition, and the sale of the Savoy Hotel, the group

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CALIFORNIA 90067
(310) 229-9900

19

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND FEDERAL COMPUTER FRAUD ABUSE ACT

became known as the Maybourne Hotel Group, then comprising three hotels: Claridge's, The Connaught, and The Berkeley.

43. ~~37.~~ Shortly thereafter, Mr. McKillen undertook the expansion, renovation, and redevelopment of the Maybourne Hotel Group's hotels, beginning with The Connaught. Over the next few years, Mr. McKillen invested significant time, resources, and care into planning the transformation of additional Maybourne hotels, including Claridge's and The Berkeley, with the aim of cementing them as world-leading ultra-luxurious hotels fit for royalty.

44. **In the wake of the 2008 financial crisis, wealthy investors David Rowat Barclay and Frederick Hugh Barclay tried to seize the whole Maybourne Hotel Group. To thwart this, Mr. McKillen allied with Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim. Together, they were able to defeat the Barclay brothers' attempt to seize control over the Maybourne Hotel Group.**

45. ~~38. In~~**As part of this corporate battle, in** 2015, Mr. McKillen sold his shares in the Maybourne Hotel Group to Séléné S.À R.L., a company owned by Sheikh Hamad bin Jassim. The sale of Mr. McKillen's shares was (i) in exchange for initial consideration and (ii) subject to arrangements for him to receive further consideration based on any net increase in the value of the Maybourne Hotel Group over a period ending at the latest in April 2022 (i.e., the Deferred Payment).

46. ~~39.~~ Later, Sheikh Hamad bin Jassim and Sheikh Hamad bin Khalifa split ownership of the Maybourne Hotel Group between themselves.

47. ~~40.~~ Over the next few years, Mr. McKillen continued to manage and redevelop the Maybourne Hotel Group and its hotels. During this period, Mr. McKillen managed, expanded, and redeveloped Claridge's, The

Connaught, and The Berkeley, in addition to developing a new hotel, The Emory, and elevated these hotels to top ultra-luxury destinations worldwide.[5]

48. ~~41.~~ These projects were extremely successful, and there is ample evidence that the value of the Group soared due to Mr. McKillen's efforts.  As just one example, Mr. McKillen transformed Claridge's, doubling the size of the hotel by hiring a team of engineers and miners to construct multiple subterranean floors beneath the hotel complete with a health club, gym, spa, pools, shops, and kitchens and adding two new floors of guest suites and a penthouse suite to the roof of the hotel.[6]  This also included the addition of many new restaurants, guest suites and room refurbishments, and luxurious redevelopment of the hotel's common areas.  The penthouse suite now has a going rate of approximately £60,000 per night.[7]

49. ~~42.~~ Although Mr. McKillen and the Qatari Royals enjoyed a productive business relationship for several years, it was not long before the Qatari Royals changed course.

50. **Despite the astronomical increase in value** of the Maybourne Hotel Group **properties, the Deferred Payment became the subject of a dispute between Mr. McKillen and the Qatari Royals, leading the parties into a confidential arbitration in London in May 2025.   Publicly available**

---

[5] *See, e.g., The Mayfair Hotel Megabuild*, BBC, https://www.bbc.co.uk/programmes/m001gqnm (last visited ~~Nov~~**Mar**. ~~14~~**16**, ~~2024~~**2026**).

[6] *See* Nick Foulkes, *The man behind the most spectacular makeover in Claridge's history*, FINANCIAL TIMES (Dec. 16, 2020), https://www.ft.com/content/0b6d50b6-6f2e-430c-a6a0-13c67349f703.

[7] *See* Claire Wrathall, *Revolving sofas, a 100-inch TV and 75 Damien Hirsts: inside London's most expensive hotel suite*, FINANCIAL TIMES (Oct. 19, 2023), https://www.ft.com/content/8ef079e4-e143-4b9b-91b1-de2a58748c4c.

__FIRST AMENDED__ COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ~~AND FEDERAL COMPUTER FRAUD ABUSE ACT~~

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CALIFORNIA 90067
(310) 229-9900

account statements filed by entities ultimately owned by Sheikh Hamad bin Khalifa indicate that Mr. McKillen was awarded £567.2 million in the arbitration.[8]  Notwithstanding its confidential nature, the arbitration was the subject of widespread press coverage, where it was reported that the London Court of International Arbitration awarded Mr. McKillen between £700 and £800 million.[9]

51.    In February 2026, Mr. McKillen won a second arbitration against the Qatari Royals based on management fees from Claridge's and other hotels.

52.    43. The dispute over the Deferred Payments was just the tip of the iceberg.  By 2018, Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim had seen the value of Mr. McKillen's and HSMC's services and their capacity to generate wealth for the Qatari Royalsthem.  Starting that year, the Qatari RoyalsSheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim affirmatively engaged Mr. McKillen and/or HSMC on four new projects: the management and redevelopment of the Maybourne Riviera, the management and redevelopment of the newly branded Maybourne Beverly Hills, the construction and development of a new Parisian hotel on the site of the historic Îlot Saint-Germain building, and the refurbishment of a mansion in Manhattan

_____

[8] The account statements are accessible through the website of the Luxembourg Business Registers, http://www.lbr.lu/, and were located by entering the RCS numbers of the entities at issue.

[9] See, e.g., Linda Daly, *Developer Wins £700m in battle with Qataris over London hotels*, The Sunday Times (Aug. 23, 2025), https://www.thetimes.com/world/ireland-world/article/paddy-mckillen-qataris-hbj-luxury-london-hotels-700m-t5vx9dhws?gaa_at=eafs&gaa_n=AWEtsqcdHkIxWvN99RcHeT06sV5Xu-xcTK-ZRC-pvIZnq3dfn1WEfbjJOrj8&gaa_ts=69b59e72&gaa_sig=HDDyE2MXua8hhfl3YNvDITP0Mcf1ZV1mOx3vCwD1eLGi66vnwg4mU4ZoQNqEOGXJ5jwySWTG0Z-EMhwtNnxlKw%3D%3D.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND FEDERAL COMPUTER FRAUD ABUSE ACT

to serve as the personal residence of Sheikh Hamad bin Jassim. **Sheikh Hamad bin Jassim also engaged** Mr. McKillen **to refurbish a mansion in London called Forbes House.**

53. **Mr. McKillen** and/or HSMC accepted each engagement on the understanding that they would be compensated through fees for services rendered—in line, of course, with normal business practices, as well as the historical business relationship with **Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim. Over the course of years, Mr. McKillen and/or HSMC had forged what they thought was a mutually beneficial partnership with** the Qatari Royals~~.~~**, and, as such, never anticipated that the Qatari Royals would fraudulently induce them to provide work for no pay. They did not question the "agreement-first-payment-details-later" approach used by the Qatari Royals because of their prior experiences with the Qatari Royals in which they performed work and got paid for it. In short, a trusting relationship had developed between Mr. McKillen and/or HSMC on the one hand and the Qatari Royals on the other due to their longstanding partnership.**

54. ~~44. Once these oft-simultaneous projects began, however, the Qatari Royals saw an opportunity to increase their profits thereon—and took it. They~~**But Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim** calculated that they could defraud Mr. McKillen for years' worth of free services in relation to these ongoing projects by stringing him and HSMC along under false representations that they would be compensated for services performed, when in fact ~~the Qatari Royals now~~**they** had no intention of paying Mr. McKillen or his companies fair compensation. Accordingly, the Qatari Royals orchestrated a series of schemes to defraud their business partner that would allow them to secure Mr. McKillen's and HSMC's world-class

23

management and redevelopment expertise on a series of new luxury redevelopment projects at little to no cost.

55. 45. To carry out this larger plan, the Qatari Royals Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim fraudulently engaged and/or continued to engage Mr. McKillen and HSMC for their services, through false representations that they would be compensated in fees for the fair value of their services. Taking advantage of their trusting business partner, the Qatari Royals thereby fraudulently induced Mr. McKillen and HSMC to provide services and. Sheikh Hamad Bin Khalifa and Sheikh Hamad Bin Jassim then denied payment based on wholly fabricated excuses. And once the Qatari Royals they realized a benefit from Plaintiffs' services on each project, they systematically stonewalled Mr. McKillen and HSMC, refusing to compensate them for many millions of dollars in services in bad faith. Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim did not carry out these schemes alone; rather, they relied on a large network of family members, agents, representatives, and controlled entities to effectuate the schemes.

56. 46. Thus far, the Qatari Royals' schemes have gone according to plan, and they continue to operate above the law. Indeed, to this day, the Qatari Royals Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim wrongfully maintain their systematic refusal to fairly compensate Mr. McKillen and/or HSMC for services rendered on each of these projects and have, thus far, successfully absconded with his free labor. The Riviera, Saint-Germain, California, and New York, and London Frauds, as described below, are each ongoing, and Plaintiffs' injuries only build. And, instead of paying him the fees he and his companies are owed, the Qatari Royals have instead met Mr. McKillen's demands with additional schemes intended to

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND FEDERAL COMPUTER FRAUD ABUSE ACT

intimidate him and his companies into ceasing their efforts to collect what they are owed.

57.    **The Qatari Royals and their agents acted in concert to achieve the ends of their fraudulent schemes.  Multiple individuals, including Sheikh Hamad bin Jassim, worked together to induce Mr. McKillen and/or HSMC into performing work by failing to disclose that they would not get paid and by fraudulently misrepresenting that payment would be forthcoming.**

58.    **It was not just Mr. McKillen and/or HSMC that were victimized by this fraud.  Projects like this involve private contractors, designers, and artists, who were all harmed as well.**

59.    ~~47.~~ It is now clear that these fraudulent schemes perpetrated against Mr. McKillen are consistent with a broader pattern of unlawful activities carried out by, and at the direction of, the Qatari Royals through their business partners, agents, representatives, and controlled entities for their financial benefit.  Indeed, the frauds perpetrated against Mr. McKillen bear certain structural similarities to prior allegations against the Qatari Royals related to unfair labor practices, including wage theft, and data theft to retaliate against the perceived opponents of the Qatari Royal family.  It is in this broader context of the Qatari Royals' lawless means of conducting business that the schemes against Plaintiffs were orchestrated and carried out by the Qatari Royals.

### THE RIVIERA FRAUD

60.    ~~48.~~ The Maybourne Riviera, a luxury hotel located in France, was the object of the Qatari Royals' first fraud.

61.    ~~49.~~ The Maybourne Riviera was purchased by SEDHV in 2014. SEDHV's beneficial owner is Sheikh Hamad bin Khalifa and its chairman is Gilles de Boissieu.

25

62. 50. In 2016, SEDHV, with the support of Dilmon, undertook a complete rebuild of the hotel's existing infrastructure (the "Maybourne Riviera Project") and entered into an agreement with a general contractor, Vinci Construction France. From the beginning, however, the renovation project was plagued with difficulties that delayed progress, such as strikes, legal actions, and unexpected costs.

63. 51. Given these difficulties and the slow progress of the redevelopment, Sheikh Hamad bin Khalifa required the aid of someone who could be trusted to not only turn the Maybourne Riviera site around, but also to elevate it to a top luxury destination worldwide. As a result, the Qatari Royals sought out Mr. McKillen's services.

64. 52. Accordingly, in 2018, Michele Faissola, Chief Executive Officer of Sheikh Hamad bin Khalifa's family office, Dilmon, approached Mr. McKillen and HSMC on behalf of Sheikh Hamad bin Khalifa to engage them to take over the Maybourne Riviera redevelopment project. Mr. McKillen had previously declined to manage the Maybourne Riviera Project on two occasions. This time, though, Mr. McKillen accepted the engagement, feeling some sympathy for Sheikh Hamad bin Jassim, whose daughter, Sheikha Lulwah, was ill at that time.

65. 53. HSMC and SEDHV entered into a project management agreement dated September 20, 2019 (the "Riviera Agreement"), and SOF Construction SAS ("SOF"), a French company beneficially owned by Mr. McKillen and set up for the purposes of the project, entered into a general contractor agreement with SEDHV on February 5, 2021.

66. 54. Under the Riviera Agreement, SEDHV entrusted HSMC with the responsibility to oversee the redevelopment of the Maybourne Riviera until completion of the work in November 2022, in exchange for compensation under a delineated fee structure. The fee structure provided for scheduled

26

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CALIFORNIA 90067
(310) 229-9900

fixed payments throughout the duration of the project alongside a result fee, the value of which was to be determined at the conclusion of the project. The result fee owed to HSMC was to be calculated at half of the difference between the budget for the project and the actual costs incurred.

67. **At the insistent request of the Qatari Royals, Mr. McKillen put his and HSMC's expertise toward getting the development project back on track. Among other things, he set up a construction company to ensure that high-quality standards were met.**

68. ~~55.~~ But Mr. McKillen certainly did not expect that the Qatari Royals would falsely utilize the variable nature of a major portion of this amount due to HSMC as a hook upon which to withhold payment of fees in bad faith. Indeed, upon information and belief, the Qatari Royals decided not to fully compensate Mr. McKillen and HSMC upon conclusion of the project and instead sought to mislead him into providing services for free. **Mr. McKillen and/or HSMC would not have provided the requisite work on the hotel absent the Qatari Royals' fraudulent misrepresentation regarding compensation.**

69. ~~56.~~ Based on a false pretense of compensation and good-faith dealings, for over three years, Mr. McKillen and HSMC poured extensive time and resources into the renovation of the Maybourne Riviera, regularly reporting on their progress to Mr. Faissola, and Marc Socker, Head of Real Estate at Dilmon. They directed, supervised, and approved the selection of contractors, the design of the hotel, and construction efforts on the site. Mr. McKillen and HSMC also worked closely to improve the hotel's structure, the conception and design of the hotel, the furnishing of guest rooms, and the future profitability of the hotel by, for example, converting non-guest rooms into event spaces and adding rooftops, bars, and pools.

27

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CALIFORNIA 90067
(310) 229-9900

70.    57. The Qatari Royals Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim and their enterprise were pleased with this work and continued to affirm it.  For instance, on September 13, 2021, Mr. Socker told Liam Cunningham, Mr. McKillen's advisor, via email, "We are delighted as always with your team's extraordinary efforts and project management."

71.    58. Despite these efforts, Mr. McKillen's attempts to get his fees paid by the Qatari Royals were stonewalled.  As early as January 22, 2021, Mr. McKillen emailed Sheikh Hamad bin Jassim and Mr. Faissola to express his frustration with the difficulty he was having in obtaining payment of outstanding hotel management fees owed to him at the time.

72.    59. Nonetheless, continuing in good faith, Mr. McKillen and HSMC successfully completed the renovation project ahead of schedule—despite unforeseen difficulties, including uncooperative subcontractors and scheduling difficulties brought about by the COVID-19 pandemic.  Mr. McKillen and HSMC also made substantial improvements to the Maybourne Riviera to optimize the quality of service provided, and their work was recognized and met with praise by the media, noting, as one example, that the "transformation . . . redefined the whole area"[810] and praising Mr. McKillen for converting the site into a "dramatically beautiful property."[911],[1012]

[8] Lanie Goodman, *First look at*[10] *The Maybourne Riviera: the South of France's latest star*, CONDÉ NAST TRAVELER (Jan. 10, 2022), https://www.entraveller.com/article/the-maybourne-riviera-south-of-france-hotel-reviewcntraveler.com/hotels/roquebrune-cap-martin/the-maybourne-riviera (last visited Mar. 16, 2026).

[911] John O'Ceallaigh, *A new icon: Maybourne Riviera stakes its claim as one of the Mediterranean's most spectacular hotels*, LUTE (Feb. 1, 2022), https://lute.co/maybourne-riviera-hotel-review-south-of-france/.

[1012] The Maybourne Riviera went on to win numerous awards as early as 2022. *See*    Our    Awards,    THE    MAYBOURNE    RIVIERA,

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND FEDERAL COMPUTER FRAUD ABUSE ACT

73. 60. Despite this feat, in April 2022, Mr. McKillen and HSMC's delivery of the work was affected by a series of hostile acts undertaken by SEDHV and Maybourne Hotels Limited on behalf of the Qatari Royals**Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim**, in accordance with their fraudulent scheme.

74. 61. The hostilities on the Maybourne Riviera Project began when Mr. McKillen and Mr. Cunningham were removed, without warning or reason, from Maybourne Hotels Limited's board of directors on April 1, 2022.  Shortly thereafter, on April 13, 2022, Maybourne Hotels Limited informed Mr. McKillen via letter of its decision to prohibit SOF's legal representative and the individual in charge of the Maybourne Riviera site, Frank Sinton, from accessing the site with immediate effect and without explanation.  At this time, SOF was in the process of implementing substantial resources to complete the project ahead of its November 2022 conclusion.

75. 62. Then, on April 21, 2022, Mr. de Boissieu informed Mr. Sinton via letter that SEDHV was terminating its agreement with SOF on the nonsensical grounds of SOF's abandonment of the site.  Only a few days later, on April 25, 2022 and over six months ahead of schedule, SEDHV unilaterally decided to pronounce early acceptance of the work on the Maybourne Riviera. The Maybourne Riviera was opened to the public thereafter.

76. 63. Upon SEDHV terminating HSMC's contract, and despite the acclaim Mr. McKillen and HSMC's work received, SEDHV refused to pay HSMC the balance of fees owed for work performed on the Maybourne Riviera.  Instead, SEDHV fabricated disputes over payment that lacked any

---

*See* Our Awards, THE MAYBOURNE RIVIERA, https://www.maybourneriviera.com/awards/ (last visited ~~Nov~~**Mar**. ~~14~~**16**, ~~2024~~**2026**).

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ~~AND FEDERAL COMPUTER FRAUD ABUSE ACT~~

basis in fact.  On information and belief, SEDHV has acted in this manner at the direction of the ~~Qatari Royals~~**Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim and in keeping with the overall scheme to bilk Mr. McKillen out of his labor and money**.

77.    ~~64.~~ Upon completion of the project, HSMC was due a final installment of the fixed fee, as provided for under the Riviera Agreement. Accordingly, on May 12, 2022, HSMC sent SEDHV an invoice for €2,000,000, representing the final installment.  On June 30, 2022, Mr. Cunningham provided final notice of payment to SEDHV via letter to Mr. de Boissieu.  On July 29, 2022, Diarmaid Mullarkey, Mr. McKillen's advisor and Finance Director at HSMC, reiterated final notice to SEDHV via email.

78.    ~~65.~~ But SEDHV refused to pay HSMC the balance of the fixed fee owed.  On information and belief, this refusal was made at the direction of Sheikh Hamad bin Khalifa.  On August 5, 2022, Mr. de Boissieu indicated to Mr. Cunningham via letter that SEDHV would not be paying the final installment of the fixed fee and fabricated issues with the quality of HSMC's work.  Knowing these complaints to be fabricated, HSMC reiterated its formal notice of payment of the fixed fee to SEDHV in a response letter dated September 7, 2022.  SEDHV refused to change its position.

79.    ~~66.~~ It soon became clear that SEDHV did not intend to pay its **remaining** obligations to HSMC**, either**.  HSMC was also due a result fee upon completion of the project under the Riviera Agreement.  On June 30, 2022, Mr. Cunningham sent Mr. de Boissieu formal notice of payment along with HSMC's final work report detailing the result fee owed via letter.  The result fee noticed was for the amount of €17,623,119.60, calculated on the basis of half the value of cost savings in comparison to the project's budget as provided for under the Riviera Agreement and to be paid upon completion of

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CALIFORNIA 90067
(310) 229-5900

30

the project.  On July 1, 2022, HSMC sent SEDHV a formal invoice for this amount.

80.  ~~67.~~ But again, SEDHV refused to pay HSMC any portion of the result fee owed.  On information and belief, this refusal was made at the direction of Sheikh Hamad bin Khalifa.  On August 1, 2022, Mr. de Boissieu responded to Mr. Cunningham via letter indicating that SEDHV would not be paying the result fee and fabricating issues involving the quality of HSMC's work and improvements made.  Mr. de Boissieu, on behalf of SEDHV, proposed an "alternative" calculation by inserting additional costs incurred, without providing any supporting evidence that these costs were actually incurred.  These fabricated costs, including a fraudulent invoice from Claridge's, conveniently wiped out the prospect of any result fee being owed to HSMC.  **This alternative fee application shows that the Defendants were not acting in good faith did not intend to pay Mr. McKillen.**

81.  Knowing the costs to be fabricated, HSMC reiterated its formal notice of payment of the result fee to SEDHV in its response letter dated September 7, 2022.

~~68. At this time, an asset seizure order is in place in France against SEDHV~~ and for the benefit of ~~SOF in an amount of €12.5 million.~~

82.  **SOF, which is also owned by Mr. McKillen, was likewise not paid.  It brought an action in French Court and obtained an asset seizure order in the amount of €12.5 million.  This was based on SEDHV's failure to pay SOF for the work that SOF had performed even though the parties had never reduced their general statement of the account to writing.[13]**

---

[13] **The asset seizure order was withdrawn by the appellate court upon SEDHV's recourse because SEDHV also had claims against SOF.  But this ruling did not indicate that SOF's claims lacked merit.**

31

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CALIFORNIA 90067
(310) 229-9900

83.   ~~69.~~ To date, ~~the Qatari Royals~~**Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim** and their business partners, agents, representatives, and controlled entities have refused to make Mr. McKillen and HSMC whole via fees for over three years of work on the Maybourne Riviera, choosing instead to hide behind clearly fabricated excuses.  And ~~the Qatari Royals~~**they** have no intent to do so, having increased the value of their investments through the theft of Mr. McKillen and HSMC's services.

84.   **As can be seen from their actions and communications (or lack thereof), Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim did not intend to pay HSMC for its work on the Maybourne Riviera and induced it to provide or continue to provide work through material misstatements and omissions.**

85.   ~~70.~~ The Qatari Royals furthered the Riviera Fraud through phone communications terminating in California between the Qatari Royals and/or their agents, on the one hand, and Plaintiffs and/or their agents, on the other hand.  For instance, on March 9, 2021 and again on November 15, 2021, Sheikh Hamad bin Jassim sent Mr. McKillen voice notes via WhatsApp when both were located in California to arrange meetings at which work on the Maybourne Riviera was discussed and furthered, among other hotel projects. What is more, throughout the Riviera Fraud, Dilmon utilized an email server located in the United States through which it routed its emails to further the scheme.~~11~~14

---

~~11~~14 Dilmon.com is maintained on an Amazon server, whose emails appear to be routed through Princeton, New Jersey.  The domain registrar, GoDaddy.com, is based in Arizona.

32

<u>FIRST AMENDED</u> COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ~~AND FEDERAL COMPUTER FRAUD ABUSE ACT~~

## THE SAINT-GERMAIN FRAUD

86. ~~71.~~ The Îlot Saint-Germain, the historic headquarters of the French Ministry of Defense located in Paris, France, was the object of the Qatari Royals' second fraud on Mr. McKillen and HSMC.

87. ~~72.~~ On September 18, 2018, Sheikh Hamad bin Jassim met with Mr. McKillen in London to discuss the Sheikh's interest in acquiring the Îlot Saint-Germain building and transforming it into a luxury hotel (the "Saint-Germain Project"). Sheikh Hamad bin Jassim requested Mr. McKillen's expert opinion on whether it was a prudent investment. Shortly thereafter, Mr. McKillen visited the Îlot Saint-Germain site and advised Sheikh Hamad bin Jassim that, indeed, it was a good investment opportunity.

88. ~~73.~~ Trusting Mr. McKillen's counsel, Sheikh Hamad bin Jassim purchased the Îlot Saint-Germain building in 2019 through his company created specifically for the transaction, Constellation Paris. Constellation Paris is chaired by Fady Bakhos, a longtime advisor to the Al Thani family.

89. ~~74.~~ Immediately following the purchase, Sheikh Hamad bin Jassim returned to Mr. McKillen to ask whether Mr. McKillen would manage the project. Sheikh Hamad bin Jassim represented to Mr. McKillen that the Saint-German project would be rendered and fees paid in accordance with prior hotel projects, and Mr. McKillen accepted the engagement in reliance on those representations. ~~However, at some time during the project~~

90. **Mr. McKillen and/or HSMC did not take issue with having the specific fees hashed out at a later date or having no written contract, a practice permissible under French law. That was based on their past practice of doing business with Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim, including on the Maybourne Riviera where work began before formal projects were signed. Their history of collaboration lead to trust in Sheikh Hamad bin Khalifa and Sheikh Hamad Bin Jassim**

33

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CALIFORNIA 90067
(310) 229-9900

**and that they would operate in good faith. Additionally, Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim never indicated that fees would *not* be paid. If they had, Mr. McKillen and/or HSMC would not have taken on the project.**

91. **However**, the Qatari Royals saw another opportunity through which to effectuate their larger scheme and acquire Mr. McKillen's world-class services for free by inducing him to continue his services under the false representation that he would be paid. In reality, the Qatari Royals again sought to obtain as much work from Mr. McKillen and HSMC as possible before denying payment **fraudulently and** in bad faith.

92. ~~75.~~ The volume of work the Qatari Royals were able to obtain from Mr. McKillen and HSMC with respect to planning the Saint-Germain Project (planning hereinafter referred to as "Phase 1") was significant. Sheikh Hamad bin Jassim engaged Mr. McKillen and HSMC as project managers and consultants for the project. In that role and pursuant to the agreement, Mr. McKillen and HSMC oversaw all aspects of planning to construct a new hotel in the building, complete with lounges, luxury boutiques, a wellness center, swimming pools, and a restaurant and bar. Mr. McKillen and HSMC's Phase 1 work included developing plans for the creation of the new hotel, providing input and guidance for all aspects of the Saint Germain Project, and supervising any Phase 1 tasks that occurred on-site. Further, immediately following their engagement until September 2021, Mr. McKillen and HSMC reviewed and selected contractors for the project, reviewed and provided feedback on the design and structure of the hotel, provided feedback on the project's business plan and other financial aspects, obtained administrative authorizations for the project, and played an instrumental role in presenting the project to the public on September 14, 2021. All of this preparation was essential to the actual construction of the Saint Germain Project.

34

**FIRST AMENDED** COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ~~AND FEDERAL COMPUTER FRAUD ABUSE ACT~~

93. 76. As one example of Mr. McKillen and HSMC's centrality in the hotel's development, in an email dated March 24, 2021 to Gleeds Project & Construction Management Services ("Gleeds")—the cost consultant on the project—and Vinci Immobilier, the real estate developer, Mr. Bakhos relayed "instructions given by [Sheikh Hamad bin Jassim]" for Gleeds and Vinci Immobilier to develop the hotel "under Mr. McKillen's advice and guidance" and noting that the housing scheme is to be developed "in accordance with the plan to be determined by Mr. McKillen." What is more, Sheikh Hamad bin Jassim and Constellation Paris postponed meetings if Mr. McKillen was not available and took care to ensure his availability ahead of other stakeholders, given his critical role on the project. **Mr. Bakhos also indicated that although Sheikh Hamad bin Jassim wanted to hire a specific architect for the development, the "ultimate decision" lay with Mr. McKillen.**

94. 77. The Qatari Royals continually acknowledged and affirmed Mr. McKillen and HSMC's work. For instance, on September 14, 2021, Mr. McKillen messaged Sheikh Hamad bin Jassim via WhatsApp concerning progress on the Saint-Germain Project. He said, in relevant part, "As you probably know I'm going to Paris today to present Maybourne to the Local Mayor[.]" Sheikh Hamad bin Jassim affirmed and thanked him for his work, saying, "Well, good luck Paddy and I hope we see you soon either in Doha or in London. Thank you."

95. 78. Notwithstanding Mr. McKillen's and HSMC's central role in the project, soon after the ~~hotel's public unveiling, the Qatari Royals~~**project was presented to the local community, Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim, through their agents and other members of the Enterprise,** indicated to Mr. McKillen that they did not intend to compensate him for services rendered, once again fabricating excuses out of whole cloth.

96.    79. On September 16, 2021, two days following Mr. McKillen's participation in the presentation of the new hotel project to the public, Mr. McKillen, proceeding in good faith, sent Mr. Bakhos a letter containing fees owed for work performed in relation to the Saint-Germain Project. **In the letter, Mr. McKillen explained that he envisioned employing dozens of designers, artists, and artisans to completely rework the Maybourne St. Germaine. Mr. McKillen explained that he believed his proposal was "fair and reasonable" and reflected "the level of commitment that will be required to deliver a world class project." He noted, though, that if the proposal didn't meet the expectations of Sheikh Hamad bin Khalifa and Mr. Bakhos, he and HSMC "are happy to pass and have no hard feelings."**

97.    On September 26, 2021, Mr. Bakhos sent an email to Mr. Cunningham refusing to compensate Mr. McKillen and HSMC for **any project management** work performed, boldly stating that "no project management work [in relation to the Saint-Germain Project] is required other than that currently being carried out by Gleeds." This response was especially disingenuous in light of an email from Gleeds to HSMC sent three days earlier in which Gleeds highlighted "a number of important points relating to the planning application and detailed design development, which require [HSMC's] input."

98.    80. Once it became clear that the Qatari Royals had no intention of paying Mr. McKillen or HSMC for **his project-management** work on the Saint-Germain Project, Mr. McKillen and HSMC withdrew from the project.

81. At this time, an asset seizure order is in place in France against Constellation Paris and for the benefit of HSMC in an amount of €20 million.

99.    **HSMC then brought an action against Constellation Paris in which the Paris Judicial Court authorized an *ex parte* asset seizure against**

36

Constellation Paris in the amount of €20 million.  HMSC enforced the order against Constellation Paris and managed to freeze approximately €7.5 million in Constellation Paris's only French bank account—before such account was emptied and no further freezing could proceed.  Constellation Paris asked the Paris Judicial Court to reverse the order and lift the freezing, which was denied.  Constellation Paris appealed this judgment, which was upheld by the Paris Court of Appeal.  In arguing against that requested relief, HSMC contended that the parties did not draw up a written contract due to the trusting and long-term business relationship between the parties, including their collaboration on the Maybourne Riviera, but that HSMC was directed to perform management work and did, in fact, perform that work.  For its part, Constellation Paris tried to argue that HSMC had not been entrusted with any management work, which was the responsibility of Gleeds.

100.    The appellate court agreed with HSMC, concluding that HSMC had shown a viable claim for compensation based on project management work.  For support, it pointed to evidence adduced by HSMC showing that it was authorized to carry out that work, including communications between Gleeds and/or officers of Constellation Paris and Mr. McKillen and/or officers of HSMC.  In relevant part, the appellate court reasoned that the director of Constellation Paris, Bakhos, and others had solicited Mr. McKillen and Mr. Cunningham at the ultimate request of Sheikh Hamad bin Khalifa for work consistent with an ongoing project management role.  The court also found it noteworthy that the directors of the various companies had, on other occasions, acted along similar lines by reaching an agreement and beginning work before a formal written contract could be prepared.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND FEDERAL COMPUTER FRAUD ABUSE ACT

101. **Additionally, the appellate court rejected Constellation Paris's argument that seizure of assets was not necessary because it could pay its debts in the ordinary course. The appellate court reasoned that, given Constellation Paris's financial difficulties, lack of income-generating work, absence of real employees, and complete dependence on Sheikh Hamad bin Khalifa, it could not rule out the risk that HSMC would not be able to recover absent immediate asset seizure.**

102. **After the appellate court's ruling, HSMC obtained new orders authorizing asset freezing up to approximately €12.6 million (the amount of unfrozen assets under the first orders) and attempted to enforce them. However, it appeared that Constellation Paris had willingly emptied its only French bank account in order to thwart enforcement. The duplicity of these maneuvers is all the more obvious when one considers that Constellation Paris has still been required to pay its suppliers and servicers for the construction of the hotel, which implies that payments are either made through a third party or a foreign bank account. HSMC then requested, and received, permission to put a lien on the Maybourne Saint-Germain itself. The lien was placed without reaction, to date, from Constellation Paris.**

103. ~~82. To date~~**In spite of the clear ruling rendered by the Paris Court of Appeal in the asset-freezing litigation**, the Qatari Royals and their business partners, agents and representatives, and controlled entities have refused to pay Mr. McKillen or HSMC any fees ~~whatsoever~~ for **their project-management** work on the Saint-Germain Project.

104. **These actions show that Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim did not intend to pay Mr. McKillen for his work on the hotel and induced him to provide or continue to provide work through material misstatements and omissions.**

38

105. 83. The Qatari Royals furthered the Saint-Germain Fraud through phone and video communications terminating in California between the Qatari Royals and/or their agents, on the one hand, and Plaintiffs and/or their agents, on the other hand. For instance, on March 12, 2021, while Mr. McKillen and Sheikh Hamad bin Jassim were both in Los Angeles, Mr. McKillen messaged Sheikh Hamad bin Jassim via WhatsApp concerning progress on the Saint-Germain Project. He said, in relevant part, "Thanks for delicious lunch with your family. Spoke to Fady [Bakhos] and getting all Paris info today. Will meet team in person on 18 th [sic] in Paris . . . Let me know if you need any help with Gehry meeting." Sheikh Hamad bin Jassim responded via voice note. Further, on May 26, 2021, Sheikh Hamad bin Jassim attended a presentation concerning the Saint-Germain Project virtually via Zoom from his home in Los Angeles.

## THE CALIFORNIA FRAUD

106. 84. The now-branded Maybourne Beverly Hills, a luxury hotel in California, was the object of the Qatari Royals' third fraud.

107. 85. In the summer of 2019, Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim took interest in expanding the Maybourne Hotel Group's portfolio with the addition of a luxury hotel in California. At that time, Sheikh Hamad bin Khalifa identified a hotel then known as the Montage Beverly Hills to add to the Maybourne Hotel Group's collection. Sheikh Hamad bin Khalifa enlisted the aid of Marc Socker, Michele Faissola, and his daughter and right-hand operative for his hotel investments, Sheikha Lulwah, to evaluate the opportunity.

108. 86. Accordingly, in June 2019, Mr. Socker contacted Mr. McKillen to request that he and Mr. Cunningham carry out a financing analysis surrounding the potential acquisition of the Montage Beverly Hills. This was a sensible request, given Mr. McKillen's relationship with the Qatari

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND FEDERAL COMPUTER FRAUD ABUSE ACT

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CALIFORNIA 90067
(310) 229-9900

Royals and the fact that his family has had a house in Los Angeles for over thirty years, during which time Mr. McKillen has been involved in multiple redevelopment projects there. Mr. Socker told Mr. McKillen that Ohana Real Estate, owners of the Montage Beverly Hills, had expressed interest in providing Maybourne Hotel Group with an opportunity to bid for the hotel, alongside other bidders. According to Mr. Socker, a key reason behind Ohana's extending this opportunity to Maybourne Hotel Group was Mr. McKillen's personal relationship with Ohana's CEO, Chris Smith.

109. **Another reason for seeking Mr. McKillen's involvement was his substantial experience in California. Mr. McKillen had worked on many projects in California over the course of years.**

110. 87. In the summer of 2019, Mr. Faissola, acting on behalf of Sheikh Hamad bin Khalifa and Sheikha Lulwah, reached out to Mr. McKillen to relay that Sheikha Lulwah would approve her father's purchase of the Montage Beverly Hills only on the condition that Mr. McKillen affirmed that the purchase price accurately reflected the hotel's value *and* that Mr. McKillen and HSMC would oversee the redevelopment and management of the hotel (the "Maybourne Beverly Hills Project"). Mr. McKillen proceeded in keeping with their business relationship and affirmed to Sheikha Lulwah via telephone call that the California property was a good investment opportunity and that he and his team would manage and redevelop the new hotel upon purchase.

111. 88. On August 22, 2019, Mr. Socker emailed Mr. Cunningham to inform him that the Maybourne Hotel Group had been awarded exclusivity in connection with the acquisition of the Montage Beverly Hills two days earlier, and singled out "relationships (including Paddy's with Chris Smith)" as a key factor supporting their success. Mr. Socker then made clear that Mr. McKillen and his team were expected to be responsible for operational due diligence and formulating a business and renovation plan.

40

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND FEDERAL COMPUTER FRAUD ABUSE ACT

112. 89. So important was Mr. McKillen's assessment of the hotel and his vision for its redevelopment that Sheikh Hamad bin Khalifa wanted to hear about it for himself. In October 2019, Mr. McKillen flew to Doha, Qatar for a face-to-face meeting held on October 9th with Sheikh Hamad bin Khalifa, Sheikha Lulwah, Mr. Faissola, and Mr. Socker on the Sheikh Hamad bin Khalifa's yacht to discuss the opportunity in California. There, Mr. McKillen presented the vision for the hotel to Sheikh Hamad bin Khalifa. Mr. McKillen confirmed to Sheikh Hamad bin Khalifa his views on the opportunity presented by the hotel and gave his commitment to manage and strategically redevelop the hotel in California. In reliance on said commitment, Sheikh Hamad bin Khalifa allowed the acquisition to proceed. **The purpose of this meeting was to allow Sheikh Hamad bin Khalifa to hear directly from Mr. McKillen the views and assurances he had formerly expressed to Sheikha Lulwah and Faissola during previous conversations: namely, that the hotel was worth its price, and that Mr. McKillen and his team would manage the hotel and its redevelopment.**

113. 90. Through these various dealings, the Qatari Royals engaged Mr. McKillen on the Maybourne Beverly Hills Project under the pretense of an ordinary course extension of a preexisting business relationship, complete with compensation for annual hotel and project management fees. **Mr. McKillen relied on their prior course of dealing. Mr. McKillen never anticipated that Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim would take advantage of their relationship to fraudulently obtain millions of dollars of work.**

114. 91. And at the time of the engagement, the Qatari Royals *knew* that Mr. McKillen believed his acceptance to be premised upon receiving fees in exchange for services provided, as had been the practice for prior hotel and project management services Mr. McKillen and HSMC had provided outside

41

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST SUITE 2900
LOS ANGELES, CALIFORNIA 90067
(310) 229-9900

of the above schemes.   The Qatari Royals gave no indication that the Maybourne Beverly Hills Project would be any different.  Further, the Qatari Royals understood that Mr. McKillen would not agree to expend the vast resources required for a project of such size without fair compensation.

115.   92. What is more, later that month, on October 16, 2019, Mr. McKillen, Mr. Cunningham, Mr. Socker, and Mr. Faissola met the outgoing management team of the Montage Beverly Hills at the Berkeley Hotel in London.[12][15]   There, on behalf of the Qatari Royals, Mr. Faissola and Mr. Socker explained that HSMC would replace the outgoing management team and manage and operate the hotel as the Maybourne Beverly Hills going forward.  After this meeting, and on behalf of Sheikh Hamad bin Khalifa, Mr. Faissola **affirmatively** confirmed to Mr. McKillen that HSMC would be compensated with fees paid for work performed on the Maybourne Beverly Hills.

116.   93. Given now-explicit assurances of compensation coupled with their years-long business relationship in which he had been compensated for work performed, Mr. McKillen had every reason to believe he would be paid.  However, at some time during the course of the agreement, the Qatari Royals decided that they had no intention of compensating Mr. McKillen for his services on the Maybourne Beverly Hills, but fraudulently induced him to continue**provide** his services.  Indeed, the Qatari Royals had, under the promise and pretense of compensation, solicited Plaintiffs, a foreign individual and company, to perform additional work in the United States under materially false pretenses.

---

[12][15] During the time of the redevelopment of the Maybourne Beverly Hills, Mr. Faissola was the subject of criminal proceedings in Italy for alleged wrongdoing during his tenure at Deutsche Bank and therefore could not travel himself to the United States.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND FEDERAL COMPUTER FRAUD ABUSE ACT

117.    94.  On December 20, 2019, the Qatari Royals purchased the Montage Beverly Hills via Beverly Hills Acquisition LLC, a holding company ultimately owned by Sheikh Hamad bin Khalifa, as direct owner and operator. **Sheikh Hamad bin Khalifa is thus the ultimate owner of the Maybourne Beverly Hills.**

118.    The former Montage Beverly Hills was then renamed the Maybourne Beverly Hills.  Shortly thereafter, on January 19, 2020, upon landing in Los Angeles, Mr. McKillen reached out to Sheikh Hamad bin Jassim via WhatsApp to discuss the Maybourne Beverly Hills project.  Mr. McKillen wrote, "I arrived in LA for a few days and thought I'd let you know in case you are here for a chat and update."  Sheikh Hamad bin Jassim responded, re-affirming the Qatari Royals' intention to have Mr. McKillen lead the redevelopment of the Maybourne Beverly Hills, saying, "Unfortunately I am in Doha ... when you are going to take over the hotel in L.A?"

119.    95.  Accordingly, over the next two years, Mr. McKillen and his team undertook a massive redevelopment effort for the benefit of the Qatari Royals.  First, from January to May 2020, Mr. McKillen and his team transitioned the hotel to the Maybourne brand.  Then, from May 2020 until January 2022, they led the hotel's overall strategic development and management.  Over this time, Mr. McKillen not only ensured that the Maybourne Beverly Hills was transformed into a first-rate hotel, but also kept the Maybourne Beverly Hills operational during the redevelopment.  The work HSMC performed during this period was wide-ranging and ensured that the Maybourne Beverly Hills was brought up to the highest standards of luxury.

120.    96.  Mr. McKillen and HSMC's work included, but was not limited to, effecting the rebranding of the hotel from the Montage Beverly Hills to the Maybourne Beverly Hills, budgeting capital expenditures for significant improvements, designing and overseeing redevelopment of guest

43

suites and rooms and common areas, designing and overseeing redevelopment of new food and beverage spaces, designing a plan to relocate the hotel's kitchen to facilitate these new spaces, preparing landscaping plans and a parking layout, developing plans for the hotel's entrance and shops and galleries, preparing a significant plan to add three new stories to the hotel, attracting top artists, meeting with staff, full-time residents, travel agents, and potential guests, and navigating local Beverly Hills planning and permitting requirements related to the redevelopment, all while managing the day-to-day operations of the Maybourne Beverly Hills.

121.    ~~97.~~ A project of this size required Mr. McKillen to be regularly engaged on-site in California.    Mr. McKillen secured a special travel exemption to travel to and work in California during the COVID-19 pandemic to oversee the redevelopment of the Maybourne Beverly Hills.[~~13~~16]    Further, HSMC's agents were themselves on-site in Beverly Hills to manage the redevelopment virtually every day.    ~~Thus, the~~ **Mr. McKillen and his agents would not have relocated to the United States for this work in the absence of the false promises made by Sheikh Hamad bin Khalifa, Sheikh Hamad bin Jassim, and the other members of the scheme.**

122.    **The** Qatari Royals furthered the California Fraud through frequent phone communications terminating in California between the Qatari Royals and/or their agents, on the one hand, and Plaintiffs and/or their agents, on the other hand.

---

[~~13~~16] Specifically, Mr. McKillen traveled to Los Angeles during the following dates:  September 13 to 16, 2019; November 4 to 11, 2019; December 15 to 17, 2019; January 19 to 21, 2020; August 10 to 16, 2020; October 26 to November 1, 2020; February 16 to 21, 2021; March 10 to 17, 2021; April 20 to 30, 2021; July 8 to 16, 2021; September 29 to October 1, 2021; November 11 to 21, 2021; and December 30, 2021, to January 9, 2022.

**FIRST AMENDED** COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ~~AND FEDERAL COMPUTER FRAUD ABUSE ACT~~

123. **Additionally, the Qatari Royals furthered the California Fraud through a number of meetings with Mr. McKillen, including with Sheikh Hamad bin Jassim.**

124. ~~98. And~~**The Qatari Royals (Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim), as well as Sheikha Lulwah, Maybourne Hotels Limited, and Dilmon and its employees had direct or indirect financial interests in the newly acquired hotel and its operation.  As such,** the Qatari Royals **and their agents** communicated frequently with Plaintiffs throughout the project.  For instance, on August 17, 2020, Mr. McKillen updated Sheikh Hamad bin Jassim via WhatsApp, "I was in LA to open our new Maybourne Beverly Hills. It went very well. Locals love us already. Very successful."  The Qatari Royals were not only aware of the ongoing work, but also regularly engaged with Mr. McKillen and his team throughout the process to ensure that they accrued the maximum benefit from this work.  Indeed, the Qatari Royals, through Sheikha Lulwah, Mr. Socker and Mr. Faissola, continually made requests of Mr. McKillen, regularly approved his work, and encouraged continued efforts throughout the redevelopment process, often emphasizing the value they placed on Mr. McKillen and his services.

125. ~~99.~~ As an example, on November 4, 2020, Mr. McKillen sent Sheikha Lulwah a text message informing her that the new guestrooms at the Maybourne Beverly Hills would be complete in February or March 2021. Sheikha Lulwah asked when the redevelopment on the Maybourne Beverly Hills had begun, and Mr. McKillen provided an update on Plaintiffs' ongoing work on the redevelopment of the hotel's guestrooms, lobby, and dining options.  Mr. McKillen assured Sheikha Lulwah that he and his team would build the Maybourne Beverly Hills's food and beverage offerings "to be a destination."  Sheikha Lulwah echoed this sentiment and agreed that Mr.

**FIRST AMENDED** COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ~~AND FEDERAL COMPUTER FRAUD ABUSE ACT~~

McKillen would "be able to add significant improvements" to the dining and beverage options at the Maybourne Beverly Hills.

126. 100. Further, on March 8, 2021, while Mr. McKillen was in California, he sent Mr. Faissola a text message stating that a new restaurant at the Maybourne Beverly Hills was the "hottest in [town]." Mr. Faissola emphasized the value Mr. McKillen provided to the Qatari Royals through the project, responding that "there is no competition given location and management. Before it was poorly managed. They simply did not understand the business." Mr. McKillen responded, "We'll make it No 1 hotel in North America." Mr. Faissola responded, "Agreed!!!"

127. 101. And on April 15, 2021, Mr. McKillen texted Mr. Socker, who directed and approved his work, concerning the level of detail required for the budget on the Maybourne Beverly Hills's new food and beverage offerings. Specifically, Mr. McKillen asked Mr. Socker if a "pretty accurate" square footage estimate would suffice at the time, as it was "too early to give a 100 percent accurate quote." Mr. Socker told Mr. McKillen that it was important to receive the budget the next day, but that an estimate would be fine. Mr. Socker concluded, "Thanks Paddy . . . Appreciate the efforts." Mr. McKillen responded, "No problem. We'll work on it till dawn if necessary."

128. 102. In addition to frequent engagement with the Qatari Royals and their agents via text message, Mr. McKillen also personally met with Sheikh Hamad bin Jassim in Los Angeles to discuss the various hotel projects, including the Maybourne Beverly Hills, as arranged via WhatsApp communications between the parties.

129. 103. On February 17, 2021, while located in Los Angeles, Mr. McKillen messaged Sheikh Hamad bin Jassim via WhatsApp to arrange a meeting to discuss various hotel projects. He said, "I'm in LA but will leave on Sunday. Can you roughly let me know when you plan your trip here and I'll

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CALIFORNIA 90067
(310) 229-9900

46

come back for a day." Sheikh Hamad bin Jassim responded, "I will be from the 2nd or 3rd of March for 17 days in L.A[.] so u [sic] can chose the time and I will be happy to see you any time that suits you." Mr. McKillen and Sheikh Hamad bin Jassim then agreed to meet on March 10 or 11.

130. 104. On March 2, 2021, Mr. McKillen messaged Sheikh Hamad bin Jassim to confirm their meeting concerning the various hotel projects, saying, in relevant part, "I'm back in London now but available to go to LA to see you if it still suits you. You mentioned 10th or 11th. Is there a day and time you prefer? It would be great if we got a few hours to agree [on] the future for the hotels and our business partnership going forward." Sheikh Hamad bin Jassim responded, "Yes I am in the plane now flying to LA. 10th and 11th both work for me, I will be happy to discuss our future relationship."

131. 105. A few days later, on March 9, Sheikh Hamad bin Jassim, then having arrived in Los Angeles, left Mr. McKillen a voice note seeking to meet to discuss the ongoing hotel projects, including the Maybourne Beverly Hills. Sheikh Hamad bin Jassim said, in relevant part, "Um, can we, eh, have lunch together in my house [in Beverly Hills] at 12 o'clock on the 11th?" Mr. McKillen responded, in relevant part, "Perfect Boss. See you then."

132. **Throughout Plaintiffs' redevelopment of the Maybourne Beverly Hills, Sheikh Hamad bin Jassim frequently visited the hotel and had a standing reservation at the hotel's primary restaurant and terraces. Mr. McKillen regularly met with Sheikh Hamad Bin Jassim during these visits to discuss the ongoing redevelopment of the Maybourne Beverly Hills.**

133. 106. Over the course of the redevelopment, it is clear that Mr. McKillen provided an immense benefit to the Qatari Royals from a commensurate amount of work. For instance, Mr. McKillen invited many well-known friends and celebrities who supported the hotel. Mr. McKillen

47

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND FEDERAL COMPUTER FRAUD ABUSE ACT

ultimately reinvigorated the property and transformed the hotel into not only a top luxury hotel in Beverly Hills, but also a world-class establishment.  Mr. McKillen's efforts to transform the Maybourne Beverly Hills did not go unnoticed and received extensive praise and acclaim in the media.  Media outlets praised the "sophisticated, old-school luxury"[~~14~~17] throughout the redeveloped hotel, from the "opulence commingl[ing] with a breezy coastal vibe in the newly refurbished lobby" to the hotel's "world-renowned dining and culinary collaborations[.]"[~~15~~18]   And during this period Mr. McKillen received no indication that anything had changed with respect to his business relationship with the Qatari Royals, compensation-related or otherwise.

134.  ~~107.~~ Indeed, on April 24, 2021, while Mr. McKillen was in Los Angeles, Mr. McKillen messaged Sheikh Hamad bin Jassim, "Congratulations today on our 6 year anniversary of signing our partnership."  Sheikh Hamad bin Jassim responded, "Thank u [sic] my friend ,and [sic] thank u [sic] for the good work and I hope we will continue our relation for a long time."

135.  ~~108.~~ By June 2021, Mr. McKillen was actively attempting to secure compensation by way of fees for services rendered.  But, according to plan, the Qatari Royals, themselves and through their representatives, engaged in a variety of tactics to ward off Mr. McKillen's requests for payment: **fraudulently** lulling Mr. McKillen into believing that he would be paid for his

---

[~~14~~17] Krista Simmons, Review of Maybourne Beverly Hills, CONDÉ NAST TRAVELER, https://www.cntraveler.com/hotels/united-states/beverly-hills/montage-beverly-hills (last visited ~~Nov~~**Mar**. ~~14~~10, ~~2024~~**2026**).

[~~15~~18] Felicity Carter, *Take A First Look At The Ultra-Luxurious Maybourne Beverly Hills Hotel*, FORBES (May 30, 2020), https://www.forbes.com/sites/felicitycarter/2020/05/30/take-a-first-look-at-the-ultra-luxurious-maybourne-beverly-hills-hotel/?sh=66e7a0813828.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ~~AND FEDERAL COMPUTER FRAUD ABUSE ACT~~

work before declining to effectuate payment at the last minute, stonewalling Mr. McKillen rather than engaging with his requests, and eventually outright denying payment.

136. 109. On June 29, 2021, Mr. McKillen met with Mr. Faissola at The Connaught in London, where he attempted to discuss specifics of a fee arrangement for the Maybourne Beverly Hills project. Mr. Faissola, acting as though he was proceeding in good faith, instructed Mr. McKillen to put his fee proposal in writing.

137. 110. Mr. McKillen did so and on July 1, 2021 transmitted his fee proposal to Mr. Faissola via letter. Therein Mr. McKillen stated that HSMC was owed $6 million in project management fees on an annual basis, to be paid quarterly, from January 2020 to January 2025. Mr. McKillen reasoned that "given what [HSMC] had already delivered this fee should begin from January 2020 . . . when the real work began with multiple meetings and interaction with City Authorities and building relationships with the city in order to get them aligned on the redevelopment of the project."

138. Mr. McKillen's proposal was met with stonewalling by the Qatari Royals. Mr. Faissola never responded to Mr. McKillen's July 1, 2021 fee proposal letter.

139. 111. In September 2021, Mr. McKillen again asked Mr. Faissola about payment of fees. Despite Mr. McKillen's regular communications with Mr. Faissola over the preceding twenty months, Mr. Faissola refused to pay Mr. McKillen for the work performed.

140. 112. Believing this to be a misunderstanding, Mr. McKillen elected to speak with the Qatari Royals directly. Mr. McKillen first reached out to Sheikha Lulwah to request payment of fees. Sheikha Lulwah informed Mr. McKillen that Mr. Faissola acted in a representative capacity on behalf of her family, and thus spoke on behalf of Sheikh Hamad bin Khalifa and herself

49

when he indicated to Mr. McKillen that he would not receive payment of fees for the Maybourne Beverly Hills Project.

141. 113. Despite discussions concerning payment becoming tense, Mr. McKillen continued to provide services for the Qatari Royals' benefit in good faith, and the Qatari Royals knew that Mr. McKillen and HSMC continued to work diligently on the project, as evident from WhatsApp communications.

142. 114. On September 14, 2021, Mr. McKillen messaged Sheikh Hamad bin Jassim via WhatsApp concerning his team's progress on the Maybourne Beverly Hills, and Sheikh Hamad bin Jassim continued to affirm Mr. McKillen's work for the Qatari Royals' benefit.  Mr. McKillen wrote, in relevant part, "FYI I'll be in LA from 28 till 7 th [sic] October to present our new Maybourne Beverly Hills project to the City Council. Just to let you know I won't be in London during these days."  Sheikh Hamad bin Jassim responded, "Well, good luck Paddy and I hope we see you soon either in Doha or in London. Thank you."

143. 115. And on November 15, 2021, Sheikh Hamad bin Jassim left Mr. McKillen a voice note via WhatsApp to schedule a meeting with Mr. McKillen in Los Angeles the following day to discuss ongoing hotel projects. He said, in relevant part, "Paddy how about we meet afternoon late in the, in the Maybourne hotel [in Beverly Hills]?"  Mr. McKillen, then located in California, responded, in relevant part, "Sadly I'll be in San Francisco on Wednesday till 8 pm I'm here tomorrow Tuesday and then Thursday till Sunday. Is there any other time that suits you please?"  The two then continued to exchange voice notes concerning scheduling.  Sheikh Hamad bin Jassim later asked, via voice note, "Are you available today around 4:30 between 4:30 and 5 to come to the house [in Beverly Hills] we'll have a cup of coffee together."  Mr. McKillen responded, "Yes I can make it at 4 this afternoon

50

absolutely. See you at your home."  Sheikh Hamad bin Jassim said, via voice note, "Okay 4:30 I am waiting for you Paddy, thank you."  Sheikh Hamad bin Jassim solicited Mr. McKillen for this meeting in California, in part, to discuss Mr. McKillen's management of projects, including the Maybourne Beverly Hills.

144.  ~~116.~~ Nonetheless, Mr. McKillen continued to be unsuccessful in obtaining fees from the Qatari Royals.  On November 22, 2021, Mr. McKillen's assistant asked Mr. Faissola and Mr. Socker to pass on a letter to Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim authored by Mr. McKillen detailing the work he and his team had performed in California.  Mr. McKillen emphasized that, as the Qatari Royals already knew, Mr. McKillen and HSMC had "managed the new hotel in Beverly Hills for 2 years" and "created hundreds of improvements both physically and operationally to bring [the Hotel] up to the highest standards of luxury in North America."  Mr. McKillen highlighted his team's extensive efforts to obtain necessary permitting and approvals for the expansion of the Maybourne Beverly Hills, which included meetings with the Mayor of Beverly Hills, the City Manager of Beverly Hills, and members of the Beverly Hills City Council.  Mr. McKillen explained to Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim that Sheikh Hamad bin Khalifa's representatives had refused to pay him the fees owed.  Mr. McKillen informed the Qatari Royals that he could not let his injury in California continue to accrue by extending the duration of his providing services for which he was not receiving payment.  Accordingly, Mr. McKillen stated that he was forced to "withdraw [his] energies and the efforts of [his] people from the Beverly Hills Project" and "hand over [the] project in a professional and safe fashion" to Sheikh Hamad bin Khalifa's representatives.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ~~AND FEDERAL COMPUTER FRAUD ABUSE ACT~~

145. 117. Sheikh Hamad bin Khalifa responded to Mr. McKillen's earnest demands by making clear that Mr. McKillen's role in the redevelopment and management of the Maybourne Beverly Hills had come to an end. On December 2, 2021, Sheikh Hamad bin Khalifa sent Mr. McKillen a brief response letter that did not dispute any of Mr. McKillen's claims but ignored his demand for payment.[16][19] Rather, Sheikh Hamad bin Khalifa thanked Mr. McKillen for "all [of his] efforts and hard work over the past 7 years in developing and managing the Maybourne Group's hotels" and asked that Mr. McKillen ensure "that over the coming weeks and months a professional transition of management is coordinated with Michele [Faissola] and his team to ensure that the hotels continue to function properly to the best of their potential in the short and medium term."

146. 118. Despite the seeming finality of the Qatari Royals' response in this letter, they continued to string Mr. McKillen along by lulling him into believing that he *might* be compensated—and that they were not running off with free services as part of a coordinated, global effort.

147. 119. In February 2022, Mr. McKillen met with Sheikh Hamad bin Jassim at The Berkeley in London in another attempt to secure compensation by way of fees for his work. Like Mr. Faissola, upon Mr. McKillen's first request for fees, Sheikh Hamad bin Jassim presented to Mr. McKillen as though he was acting in good faith and agreed with Mr. McKillen that HSMC was owed fees for work on the Maybourne Beverly Hills. Sheikh Hamad bin

---

[16][19] This letter was sent to Mr. McKillen's secretary, Annemarie Ryan, from Mahmoud Raafat of Dilmon via email. The email was sent to Ms. Ryanthe secretary from Mr. Raafat's "dilmon.com" email address. Upon information and belief, the dilmon.com domain is registered on an Amazon server routed through Princeton, New Jersey.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND FEDERAL COMPUTER FRAUD ABUSE ACT

Jassim went so far as to ask Mr. McKillen to send him invoices so that he could get them paid, despite having no intention to effectuate payment.

148. 120. For a short time, the Qatari Royals' attempt to lull Mr. McKillen into believing he would be paid was successful. Thinking that he had reached a breakthrough, Mr. McKillen provided invoices to Sheikh Hamad bin Jassim for $6 million in hotel management fees and $12 million in project management fees for work performed in California in 2020 and 2021. Mr. McKillen proceeded in good faith. The invoices reflected amounts consistent with industry standards and the fair market value of HSMC's services.

149. 121. Still unsuccessful in obtaining fees, on January 7, 2022, while Mr. McKillen was in Los Angeles, he messaged Sheikh Hamad bin Jassim concerning the nonpayment. Mr. McKillen wrote, in relevant part, "Just an FYI to let you know that Dilmon supported by His Highness [Sheikh Hamad bin Khalifa] have formally told me they won't pay either my project management fees for rebranding and the restructuring of the BH hotel over the 30 months nor for the hotel management. This is a bizarre and ill conceived [sic] decision as the hotel has jumped in value and [is] loved by the City officials and community. I am further astonished that HH [Sheikh Hamad bin Khalifa] flatly refused to meet with me. Any light you can throw on this sad and unpleasant situation I would appreciate as it clearly impacts the general relationship and smooth running of the group. I am vacating the maybourne BH hotel today." Sheikh Hamad bin Jassim responded, "Hi Paddy, thank you for informing me. I am not aware of the details of your arrangements with Dilmon. However I will speak with them and try to find out about their thinking. I plan to be in London by the end of the month and hope to see you there. With my best regards. HBJ."

150. 122. Unfortunately, it soon became clear that Sheikh Hamad bin Jassim thereby only furthered the California Fraud by lulling Mr. McKillen

53

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CALIFORNIA 90067
(310) 229-9900

into a sense of security, concealing the true intent of the Qatari Royals, and, ultimately, refusing to effect payment in keeping with the united front of the Qatari Royals, their agents and representatives, and their controlled entities.

151. **The Beverly Hills Maybourne is run by entities owned by Sheikh Hamad bin Khalifa, including Dilmon. Despite that, Sheikh Hamad bin Jassim affirmatively got involved in misrepresenting to Mr. McKillen that he would be paid, illustrating the California Fraud was not simply carried out by employees of one corporate entity or family, but rather a group of individuals and entities working together to fraudulently induce Mr. McKillen to continue to provide services for free.**

152. ~~123.~~ Despite exhaustion after months of back-and-forth with the Qatari Royals in which he had made no gains, Mr. McKillen made a final attempt to secure payment. In early 2022, Mr. McKillen wrote to the Board of Directors of Maybourne Hotels Limited concerning nonpayment of fees. Mr. McKillen again recounted the considerable work he and his team had performed to redevelop the Maybourne Beverly Hills and expressed shock that Sheikh Hamad bin Khalifa's representatives continually refused to pay fees owed for the work.

153. ~~124.~~ On February 3, 2022, Mr. McKillen received a response via letter on behalf of the Board of Directors of Maybourne Hotels Limited. The letter did not address or dispute any of Mr. McKillen's points. Rather, the letter informed Mr. McKillen, "[w]e are considering the points you raised in [your] letter and will respond as may be necessary." The Board of Directors of Maybourne Hotels Limited once again presented to Mr. McKillen in good faith, suggesting that resolution of Mr. McKillen's concerns may be imminent when, in fact, the Qatari Royals had no intention to address Mr. McKillen's concerns. Indeed, no response was ever provided nor payment ever received.

**FIRST AMENDED** COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ~~AND FEDERAL COMPUTER FRAUD ABUSE ACT~~

154.    125. To date, years after Mr. McKillen's first request, the Qatari Royals, their agents and representatives, and controlled entities have refused to pay Mr. McKillen or HSMC any fees whatsoever for two years of work on the Maybourne Beverly Hills. And it is now clear that the Qatari Royals have no intent to compensate him.

126. 154.    As described *supra*, the Qatari Royals furthered the California Fraud through frequent phone communications terminating in California between the Qatari Royals and/or their agents and Plaintiffs and/or their agents. Further, throughout the California Fraud, Sheikh Hamad bin Khalifa and Dilmon utilized an email server located in the United States through which they routed their emails to further the California Fraud via, for example, denying Mr. McKillen payment for his services.

## THE NEW YORK FRAUD

155.    127. The Qatari Royals' fraud against Plaintiffs was not limited to the sphere of their hotel investments. Rather, they also saw—and took—opportunities to take advantage of Plaintiffs' good faith and fraudulently enrich themselves with respect to their personal property as well. Accordingly, a five-story Manhattan mansion was the object of the Qatari Royals' fourth fraud.

156.    128. In June 2012, Tower Management, a company beneficially owned by Sheikh Hamad bin Jassim, purchased a five-story mansion in Manhattan spanning over 22,000 square feet (the "Jassim Residence") for $47 million. Following purchase, Sheikh Hamad bin Jassim ordered an extensive, multi-year refurbishment of the property (the "New York Project"), which required converting the building from commercial to residential use. Initially, Uberto Construction ("Uberto") served as the primary contractor on the refurbishment and was overseen and managed by Qaya **Limited**, an entity

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND FEDERAL COMPUTER FRAUD ABUSE ACT

created for the provision of services to Sheikh Hamad bin Jassim by his agents. Karin Cooper led the project at Qaya.

157. 129. In 2018—around the same time as the other schemes against Plaintiffs were getting underway—Sheikh Hamad bin Jassim realized that the refurbishment of the Jassim Residence was getting nowhere. Indeed, at that time, the New York Project was extremely behind schedule and had encountered numerous difficulties, construction-related and otherwise.

158. 130. Sheikh Hamad bin Jassim then turned to Mr. McKillen and HSMC, who he knew were experienced project managers in the ultra-luxury property refurbishment space, as described *supra*. Accordingly, Sheikh Hamad bin Jassim approached Plaintiffs to engage HSMC to take over management of the New York Project. Sheikh Hamad bin Jassim made clear to Plaintiffs that the goal of the refurbishment was to allow him and his family to live in the Jassim Residence in an environment reflecting the highest standards of luxury.

159. 131. As, at this point, Mr. McKillen still believed that he had a productive business relationship with the Qatari Royals, Plaintiffs accepted the engagement on the premise, of course, that HSMC would be compensated for work performed based on past dealings in which this had been the case and the magnitude of labor required to refurbish a 22,000 square foot residence. And the Qatari Royals knew that Plaintiffs accepted the engagement on the premise that they would be compensated for the fair value of their services.

160. 132. HSMC assigned its associate Jim Byrne to manage the New York Project. Mr. Byrne had previously successfully managed the refurbishment of Sheikh Hamad bin Jassim's personal residence in London, and Sheikh Hamad bin Jassim trusted him and HSMC to get the job done again.

56

161. 133. However, in line with the pattern under the other three schemes, the Qatari Royals decided that they had no intention of compensating HSMC for services performed for their own enrichment, including on the New York Project, but **through a series of misrepresentations and omissions,** fraudulently induced him to **provide or** continue ~~providing~~**to provide** services under the pretense of compensation, thereby soliciting HSMC, a foreign company, to perform additional work in the United States under materially false pretenses.

162. 134. From September to December 2018, Mr. Byrne, on behalf of HSMC, dedicated over 950 hours to management of the New York Project in New York. During this time, Mr. Byrne oversaw contractors, addressed construction damage, and ensured proper operation of luxury features installed in the Jassim Residence. He attended to acoustics, insurance matters, plumbing issues, roofing, in-home gym features, and the resolution of city code violations. He oversaw work relating to the façade, finishings, steam room, elevator, dumbwaiter, plunge pool, painting, tiling, safety systems, hanging of fine art, and (even) disputes between Qaya and Uberto. And in September 2018, HSMC had to personally arrange for one of its New York contacts to pay a $13,700 deposit to an energy provider to turn on the gas supply at the Jassim Residence.

163. 135. Once it was feasible, Mr. Byrne even moved into the Jassim Residence to rigorously evaluate its suitability for Sheikh Hamad bin Jassim and his family, identifying and fixing any outstanding issues and providing ongoing management services. HSMC, via Mr. Byrne, thus ensured that the work done in the Jassim Residence was in accordance with Sheikh Hamad bin Jassim's ultra-luxury standards.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ~~AND FEDERAL COMPUTER FRAUD ABUSE ACT~~

164. 136. On November 15, 2019, the Jassim Residence received its certificate of occupancy, and Sheikh Hamad bin Jassim realized the fruits of HSMC's labor.

165. But despite HSMC's around-the-clock work on the New York Project for the benefit of Sheikh Hamad bin Jassim, aside from reimbursement for some one-off expenses, the Qatari Royals haveSheikh Hamad bin Jassim has since squarely refused to pay HSMC any more than a single, nominal payment of €20,000 for work performed on the Jassim Residence. To this day, no other payments have been made to HSMC—or Mr. Byrne—for over 950 hours of labor, despite the millions of dollars of appreciation in the value of the Jassim Residence as a direct result thereof, in line with the pattern adopted as part of the Qatari Royals' broader scheme against Plaintiffs.

166. 137. On information and belief, the Qatari Royals furthered the New York Fraud through frequent email and phone communications terminating in New York between the Qatari Royals and/or their agents and Plaintiffs and/or their agents.

### THE LONDON FRAUD

167. **Sheikh Hamad bin Jassim and other members of the conspiracy likewise fraudulently induced Mr. McKillen and/or HSMC to provide or continue to provide work on Forbes House, a large, historic building that Sheikh Hamad bin Jassim purchased with the intent of turning it into a residential palace. The resulting dispute has forced Mr. McKillen and HSMC to bring High Court Proceedings in London against Sheikh Hamad bin Jassim and certain of his entities, and those proceedings are contested and ongoing.[20]**

[20] **The below is a summary of Mr. McKillen's position in those proceedings without prejudice to the parties' pleaded cases.**

58

168.    Mr. McKillen met with Sheikh Hamad Bin Jassim on June 26, 2015.  Either on this date or subsequently, Sheikh Hamad bin Jassim informed Mr. McKillen that he would be acquiring Forbes House and that he wanted Forbes House to be redeveloped to a very high quality and standard of luxury.  Sheikh Hamad bin Jassim asked Mr. McKillen to manage the renovation of the near-derelict palatial property through to completion.  Sheikh Hamad bin Jassim introduced Mr. McKillen to Ms. Cooper, of Qaya, who managed Sheikh Hamad bin Jassim's properties all around the world.

169.    Mr. McKillen agreed to manage the Forbes House renovation project, a role that would include selecting the team, overseeing the design program, and providing strategic advice related to procurement, delivery, budget, and program.  Forbes House has indeed since been fully renovated.

170.    Because Mr. McKillen and Sheikh Hamad bin Jassim had a high degree of respect and trust in each other, like with many projects, they did not produce a formal written agreement memorializing the agreement.  No firm price was agreed upon.  But Sheikh Hamad bin Jassim knew that Mr. McKillen expected to be paid for his valuable services in managing this extremely complex renovation.  Sheikh Hamad bin Jassim asked Mr. McKillen to take care of the project because he was impressed by Mr. McKillen's track record in delivering refurbishment projects for the hotels on time and on budget.  The services performed by Mr. McKillen related to a complex and high-value refurbishment of a prestigious property and are not normally provided free of charge.  This trust was based on the many projects on which Mr. McKillen and Sheikh Hamad bin Jassim had collaborated, which included payment for Mr. McKillen's services.

59

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND FEDERAL COMPUTER FRAUD ABUSE ACT

171.    On May 13, 2016, Sheikh Hamad bin Khalifa purchased Forbes House Limited ("FHL"), the corporate entity that owns Forbes House.  Around the same time, HBJ created or caused to be created another corporate entity, Lomakx Limited ("Lomakx"), which was incorporated for the purpose of the redevelopment of the Forbes House.  Ms. Cooper is the sole director of Lomakx.

172.    During the project, Mr. McKillen regularly communicated with Ms. Cooper and Ben Weston, in-house legal counsel for Qaya, who were acting for Lomakx and FHL.

173.    Mr. McKillen (whether through himself or HSMC) provided the agreed-to services.  He hand-picked the professional team of trusted consultants for the project and they reported to him.  He provided substantial planning and preparation before construction began, including corresponding with stakeholders, neighbors, and local government entities.  He was heavily involved in the appointment of contractors (namely McGee Limited and Corramore Construction Limited) to conduct basement excavation works and roof raising, respectively.  Mr. McKillen was also heavily involved in the development and management of the budget for the renovation project.

174.    During the construction phase (September 2017 to December 2019), Mr. McKillen helped to arrange for demolition of parts of the structure and began to work with the designers.

175.    In November 2017, Ms. Cooper directed Mr. McKillen to meet with Thierry Despont, a noted French architect and designer.  Mr. McKillen met with Mr. Despont and then provided information to Lomakx and up the chain regarding Mr. Despont's proposals—one of which involved the turning of a 30-ton staircase—and costs.

60

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND FEDERAL COMPUTER FRAUD ABUSE ACT

176. **In early 2019, the parties discussed whether Mr. McKillen and HSMC should continue to perform the services for the remaining phase of the project.  It was not clear that Mr. McKillen providing further work would be fruitful if Mr. Despont's normal method of working was to be followed, which would involve Mr. Despont being primarily responsible for selecting the fit-out contractors.  Mr. McKillen indicated that he would be "happy to" hand over the responsibility for managing the project to Ms. Cooper or Qaya.**

177. **But, on January 9, 2019, Sheikh Hamad bin Jassim and Ms. Cooper confirmed that they wanted Mr. McKillen to remain in charge of the Forbes House restoration.  In keeping with that, Ms. Cooper sent emails confirming that Mr. McKillen and his team would "tender and implement" Mr. Despont's design.  There were also emails sent to Mr. Despont indicating that Mr. McKillen had "total control" over the Project.**

178. **Afterwards, Mr. McKillen continued to provide services, including budgeting, selection and procurement of contractors, implementing Mr. Despont's design, and identifying possible methods of expansion.   In doing so, he again worked with Ms. Cooper and Mr. Weston of Qaya and Lomakx.**

179. **Mr. McKillen's services continued into 2022, all on the continued understanding that he would be paid for his services and input.  Mr. McKillen corresponded directly with Sheikh Hamad bin Jassim at certain points, including one exchange in which Sheikh Hamad Bin Jassim stated that he would defer to Mr. McKillen's choice of interior design trade contractors.  Throughout this process, he continued to visit the property, and he also worked directly with Fady Bakhos in relation to the transfer of artwork to Forbes House.**

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND FEDERAL COMPUTER FRAUD ABUSE ACT

180. **In April 2022, Mr. McKillen and HSMC received letters indicating that their work on other hotels with the Qatari Royals (namely, Claridge's, the Connaught, and the Berkeley) had come to an end and that Mr. McKillen and other HSMC employees must not attempt to access the properties. Mr. McKillen understood this letter to mean that he was no longer permitted by Sheikh Hamad bin Jassim or Lomakx or FHL to work on the Forbes House Project.**

181. **On May 9, 2022, Mr. McKillen wrote a letter stating that he understood that his role in the Forbes House Project had terminated. He then ceased to perform any further services on the project.**

182. **Despite the oral agreement entered into and the parties' course of conduct as alleged by Mr. McKillen and HSMC, Sheikh Hamad bin Jassim, Lomackx, and FHL never provided any payment for any of the work done on Forbes House.**

183. **Yet again, Mr. McKillen and HSMC had been fraudulently induced into providing millions of dollars of work for the Qatari Royals, who have refused to make payment on demand—notwithstanding the longstanding trusting relationship between Mr. McKillen and Sheikh Hamad bin Jassim. It was never disclosed to Mr. McKillen that Sheikh Hamad bin Jassim did not intend to pay him for his services. It was only because of an understanding that he would be paid that Mr. McKillen provided his services.**

184. **Sheikh Hamad bin Jassim did not work alone in relation to Forbes House—other members of the Enterprise, including Ms. Cooper, Lomackx, and FHL—also participated in defrauding Mr. McKillen.**

185. **The Qatari Royals furthered the London Fraud through phone communications terminating in California between the Qatari**

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND FEDERAL COMPUTER FRAUD ABUSE ACT

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CALIFORNIA 90067
(310) 229-9900

**Royals and/or their agents, on the one hand, and Plaintiffs and/or their agents, on the other hand.**

### THE QUINTET SCHEME

186. ~~138.~~ Mr. McKillen's efforts at collecting on the payments he is owed, described *supra*, have only been met with retaliation and additional bad-faith business practices by the Qatari Royals.  Recently, the Qatari Royals used Quintet—a bank beneficially owned by Sheikh Hamad bin Jassim[~~17~~21] and used as a regular financial intermediary to service the Qatari Royals' private interests[~~18~~22]—to attempt to wrongfully intimidate (and squeeze) Mr. McKillen into dropping his efforts to obtain fees rightfully owed to him and his companies by interfering with their efforts to refinance a large loan, resulting in a costly default.

187. ~~139.~~ As background, on July 30, 2021, Quintet, in its capacity as a credit institution, entered into a loan agreement for a principal sum of €18,830,000 (the "Loan") with Loendro Finacement S.à r.l. ("Loendro") as "Borrower" and Mr. McKillen as "Guarantor" (the "Loan Agreement"). Loendro is a Luxembourg limited liability company of which Plaintiff McKillen is the sole shareholder.

188. ~~140.~~ At the beginning of August 2023, Loendro informed Quintet that it intended to accept an offer from another institution, Indosuez Bank, to

---

[~~17~~21] Quintet is 99.99% owned by Qatari company Precision Capital LLC.  On information and belief, Precision Capital LLC is beneficially owned by Sheikh Hamad bin Jassim.

[~~18~~22] For instance, since at least 2018, reports indicate that Quintet has granted a number of significant commercial loans to its shareholder and beneficial owner, Pioneer Holding, a company whose beneficial owner is Sheikh Hamad bin Jassim.  These loans demonstrate Sheikh Hamad bin Jassim's use of Quintet to advance his private interests and call into doubt the independence of Quintet and its shareholders, including Sheikh Hamad bin Jassim.

63

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ~~AND FEDERAL COMPUTER FRAUD ABUSE ACT~~

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CALIFORNIA 90067
(310) 229-9900

refinance the Loan on more favorable terms. But in response, Quintet approached Loendro with a highly favorable counteroffer to refinance the terms of the Loan Agreement (the "Refinancing Offer"). On information and belief, Quintet made the Refinancing Offer at the direction of Sheikh Hamad bin Jassim as beneficial owner.

189. ~~141.~~ As a result of the favorable terms of the Refinancing Offer and the parties' preexisting relationship, Loendro agreed with Quintet to cease the negotiation process over refinancing with Indosuez Bank in exchange for accepting Quintet's Refinancing Offer. Shortly thereafter, Quintet informed Loendro that the Refinancing Offer had been validated internally.

190. ~~142.~~ But after weeks of an accelerated negotiation process between Quintet and Loendro, on September 8, 2023, Quintet abruptly informed Loendro that it was retracting and withdrawing the Refinancing Offer and would be enforcing the terms of the Loan Agreement immediately. On information and belief, Quintet took such action at the direction of Sheikh Hamad bin Jassim as beneficial owner and did so in retaliation against Mr. McKillen for his efforts to obtain funds owed to him by the Qatari Royals and, more importantly, to attempt to force Mr. McKillen into dropping such efforts. Indeed, Quintet even went so far as to inform Loendro that the withdrawal of the Refinancing Offer was related to ongoing disputes between the entities' respective shareholders—i.e., Sheikh Hamad bin Jassim and Mr. McKillen.

191. ~~143.~~ The abrupt reversal left Loendro seriously prejudiced in its ability to seek alternative financing options, and, suspecting foul play, Loendro halted payments under the prior Loan Agreement. In response, on November 9, 2023—and as part of the Qatari Royals' effort to squeeze Mr. McKillen financially and to intimidate him into abandoning his attempts at recourse related to the above-described frauds—Quintet informed Loendro and Plaintiff McKillen that it was declaring them in default and terminating the Loan

64

Agreement, while also demanding immediate repayment of the outstanding balance. On April 11, 2024, Quintet then issued a payment order equivalent to a property seizure on Plaintiff McKillen. And on May 14, 2024, Quintet sought to enforce Plaintiff McKillen's guarantee as security for the Loan Agreement in the amount of €13,857,220.64. Despite this pressure tactic, Mr. McKillen promptly repaid Quintet the full amount outstanding on the loan.

192. 144. Quintet's abrupt retraction of the Refinancing Offer intentionally prejudiced Plaintiff McKillen as Loendro's sole shareholder by depriving Loendro of access to favorable market conditions and jeopardizing its refinancing project more broadly.

193. 145. Communications between Quintet and Plaintiff McKillen and/or his agents through which the Qatari Royals furthered the Quintet Scheme were routed through an email server located in the United States.[19][23]

**THE HACKING SCHEME**

**146. In Spring of this year, Plaintiffs learned that they were the victims of an unlawful cybersecurity attack. The cybersecurity attack was directed to Mr. McKillen's assistant's Microsoft 365 account, through which John Does gained access to Plaintiffs' data. On information and belief, John Does engaged in this unlawful hacking to retaliate against Mr. McKillen for his efforts to enforce his rights and recuperate what he is owed. Plaintiffs used the cloud-based Microsoft 365 account that was unlawfully accessed through its internet connection to conduct business and other activities in California.**

---

[19][23] Correspondence between Plaintiff McKillen and/or his agents and Quintet was routed through an email address, the domain of which, chateau-la-coste.com, was registered to Network Solutions, LLC in Jacksonville, Florida at the time of correspondence.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND FEDERAL COMPUTER FRAUD ABUSE ACT

147. Shortly after realizing that there had been an unauthorized access of the Microsoft account, Plaintiffs initiated an investigation into the suspected hacking and data exfiltration by hiring a forensic investigator. That investigation remains ongoing. The timing of the hack, the nature of the Hacked Materials, and the ways in which they were later used indicate that the Qatari Royal family was involved. However, further inquiry and discovery related to the IP address is likely to reveal the names of the perpetrators of the hack.

148. Thus far, the forensic investigation showed three sessions of unauthorized access into the Microsoft 365 account: (1) one beginning and ending in March 2025, (2) another beginning in March 2025 and ending in April 2025, and (3) a third beginning and ending in April 2025. All three unauthorized connections were traced back to a user associated with the same IP address.

149. The investigation has also revealed that the scope and scale of the data retrieved indicated a concerted effort to extract significant volumes of potentially sensitive information. Specifically, metadata logs show that, during the three periods of unauthorized access, thousands of email items were accessed from the Microsoft 365 account by a user with the same IP address.

150. The timing of the hacking of Mr. McKillen's information—which coincided with a confidential arbitration hearing in London—and the ways in which the Hacked Materials were later used both indicate that the John Does perpetrated the Hacking Scheme in coordination with at least some of the named Defendants here.

151. Indeed, shortly after Mr. McKillen's assistant fell victim to the cybersecurity attack, information from the Hacked Materials—including information that was, *and could only be*, the product of an illegal hacking

66

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CALIFORNIA 90067
(310) 229-9900

of Mr. McKillen—was published and distorted in a series of online articles specifically attacking Mr. McKillen's efforts to obtain just compensation from the named Defendants and falsely alleging that Mr. McKillen engaged in nefarious acts against the named Defendants. Plaintiffs are currently aware of at least seven such articles all published in April 2025, including at least six website publications based in the United States and two based overseas.[20]

152. The content of the articles focused exclusively on Mr. McKillen's disputes with the Qatari Royals—naming Defendant Sheikh Hamad bin Jassim specifically—and incorrectly alleged sponsored protests against the Qatari Royals. These publications reflected and heavily distorted specific, private communications, including privileged materials, involving Mr. McKillen and his associates that were stolen and that have never otherwise been made public.

153. On information and belief, members of the Maybourne Hotel Group, a company that certain named Defendants own in part, distributed these articles to targeted faith-based community members in Los Angeles in order to harm Mr. McKillen.

---

[20] The United States-based websites that published the Hacked Materials were Local Town Pages, based in Medway, Massachusetts; The Hood Magazine, based in Sioux Falls, South Dakota; Space Coast Daily, based in Merritt Island, Florida; Benzinga, based in Detroit, Michigan; EIN Presswire, based in Washington, D.C.; and International Business Times, based in New York, New York. An article published in the London Insider remains publicly available to this day. Other articles were removed once Plaintiffs informed the publications that the articles contained information that was sourced from an illegal hacking. The overseas website that published the Hacked Materials were the London Insider, based in the United Kingdom, and EU Reporter, based in Ireland.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND FEDERAL COMPUTER FRAUD ABUSE ACT

154. Further, on information and belief, media sources were contacted with information and details about the confidential arbitration, all framed to falsely suggest that Mr. McKillen had breached confidentiality agreements governing the arbitration.

155. In addition, a fake press release was published around the same time, falsely purporting to have come from Mr. McKillen's communications strategist related to his legal actions against the named Defendants and including information obtained from the hacking.

156. Moreover, Mr. McKillen's Wikipedia page was negatively, and falsely edited around this time in a manner suggesting coordination with media activity noted herein and aimed at reputational damage.

157. These efforts were deliberately undertaken in a sustained way to, on information and belief, damage Mr. McKillen's reputation, harass him, and retaliate against him.

158. The steps undertaken to execute the hack and to publish the Hacked Materials required knowing and intentional acts.

159. Because of the hacking, Mr. McKillen was forced to engage a forensic investigator and a public relations firm to ascertain the source of the information for the articles and to remediate harm.

160. Allegations of unauthorized digital monitoring and/or hacking of rivals are not new to the Qatari Royal family. Court filings in this very District allege and investigative articles report that the Qatari Royals have spied on U.S. Congress members, a former Central Intelligence Agency official, dissidents against Arab regimes, soccer officials in countries competing with Qatar to host the 2022 Soccer World Cup, and several Bollywood actresses.[21]

---

[21] Rep. Jack Bergman et al., *Letter to Speaker Kevin McCarthy et al.* (Feb. 2, 2023),

68

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND FEDERAL COMPUTER FRAUD ABUSE ACT

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CALIFORNIA 90067
(310) 229-9900

161. The theft and publication of the materials and information has caused significant harm to Plaintiffs. The materials at issue included communications and information protected under various legal doctrines, including the attorney-client privilege, attorney work product, as well as related privileges and protections. Plaintiffs have experienced damage to their reputation as a result and have been required to expend considerable resources to monitor and remove publications of private materials.

162. Plaintiffs have experienced a serious breach of privacy, and they needed to expend significant effort and resources to upgrade the security of their devices and internet provider. Plaintiffs invested in a

2, 2023), https://www.politico.com/f/?id=00000186-149d-d453-a38e-76dff17c0000 (detailing "Qatar's alarming penchant for spying on journalists, its supposed 'enemies' in the soccer world, and U.S. Political leaders including some [members of] Congress."); Alan Suderman, *FBI Probing Ex-CIA Officer's Spying for World Cup Host Qatar*, AP NEWS (Oct. 27, 2022), https://apnews.com/article/world-cup-technology-sports-soccer-religion-5af544d34eded38ff4093587d2efa0de (describing an agent of Qatar spying on soccer officials in countries that Qatar competed with to host the 2022 World Cup); David D. Kirkpatrick, *Hackers Went After A Now-Disgraced G.O.P. Fund-Raiser. Now He Is After Them*, N.Y. TIMES (Sept. 2018), https://www.nytimes.com/2018/09/20/world/middleeast/broidy-trump-hackers-qatar.html (explaining how members of the Qatari Royal family undertook cyberattacks of "well-known enemies of Qatar" and "several Syrian Americans, activists on multiple sides of the Syrian conflict, a former official of the Central Intelligence Agency and, incongruously, a handful of Bollywood actresses"); *see also Broidy Capital Management LLC v. State of Qatar*, No. 18-cv-2421 (C.D. Cal. Mar. 26, 2018) (credibly alleging that individuals associated with the Qatari Government carried out a hack-and-leak scheme against a prominent businessman in 2018. While the suit was ultimately unsuccessful against the State of Qatar, it was not because the detailed allegations of hacking were determined to be false; rather, the court held that Qatar was protected by sovereign immunity).

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND FEDERAL COMPUTER FRAUD ABUSE ACT

new, more secure internet provider and associated devices and replaced the impacted devices of Mr. McKillen and his assistant, which were damaged through lost integrity of data or information.[22]

**ADDITIONAL RACKETEERING**

194. ~~163.~~ Although Mr. McKillen once believed the Qatari Royals sought to engage his and his company's services in good faith, he now understands that they instead made a calculated decision to defraud him, and that this was only part of a global pattern of illegal racketeering perpetrated by the Qatari Royals or any affiliated entities or individuals. Indeed, for more than a decade, the Qatari Royals have grown their wealth and enhanced their geopolitical goals with little respect for the law or fair business dealings. Some schemes bear striking similarities to the fraud perpetrated against Mr. McKillen.

195. ~~164.~~ For example, the defrauding of Mr. McKillen for his services sounds in other schemes based in unpaid wages perpetrated by Qatar on workers during the FIFA World Cup in 2022 (the "World Cup").[~~23~~24] The Qatari Royals were, of course, involved in the World Cup. Having been referred to by one news outlet as the "Sheikh who secured [the] World Cup for

---

[22] As examples of the immediate monetary damages Plaintiffs suffered to restore the integrity of their data, program, system, or information, Plaintiffs invested about $2,104 for Smarthotspots and managed WiFi networks for business. Plaintiffs also invested approximately $5,571 for new phones.

[~~23~~24] Pete Pattisson, *World Cup stadium workers 'had their money stolen and lives ruined', says rights group: Report on conditions in Qatar alleges labour abuses are widespread and calls on Fifa to set up compensation fund*, THE GUARDIAN (Nov. 10, 2022), https://www.theguardian.com/global-development/2022/nov/10/world-cup-stadium-workers-had-their-money-stolen-and-lives-ruined-says-rights-group.

70

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ~~AND FEDERAL COMPUTER FRAUD ABUSE ACT~~

Qatar,"[24][25] Sheikh Hamad bin Jassim personally orchestrated Qatar's successful World Cup bid.[25][26] And as Emir of Qatar at the time, Sheikh Hamad bin Khalifa was also instrumental to these efforts.[26][27] His son, Sheikh Mohammed bin Hamad bin Khalifa Al Thani, served as the chairman of Qatar's bid committee.[27][28]

196. ~~165.~~ Qatar's World Cup bid has now obtained widespread notoriety for allegations of corruption. For instance, the Department of Justice has since found that representatives working for Qatar bribed FIFA officials to win the World Cup bid and indicted top FIFA officials.[28][29] And,

[24][25] Rob Davies, *Sheikh who secured World Cup for Qatar has UK links going back decades*, THE GUARDIAN (Nov. 15, 2022), https://www.theguardian.com/news/2022/nov/15/sheikh-world-cup-qatar-uk-links-decades-hamad-bin-jassim-bin-jaber-al-thani.

[25][26] *See* Josh Mone, *What Happened in Qatar?: Examining the Corruption Scandal Surrounding the 2022 World Cup*, MINN. J. OF INT'L L. BLOG (Mar. 17, 2023), https://minnjil.org/2023/03/17/what-happened-in-qatar-examining-the-corruption-scandal-surrounding-the-2022-world-cup/ ("In 2010, Sheikh Hamad bin Jassim al-Thani . . . traveled to France to pitch the almost fantastical idea of hosting the world's largest sporting event . . . . In the nearly thirteen years since then, [FIFA] and Qatari officials have faced countless scandals and accusations relating to the 2022 World Cup.").

[26][27] Jon Gambrell, *Qatar's World Cup opener shows its reemergence after boycott*, AP NEWS (Nov. 20, 2022), https://apnews.com/article/2022-world-cup-qatar-politics-8c7b494269449c56b4a4e2daec53fbc0 ("But the biggest applause came for Sheikh Tamim and his father, Sheikh Hamad bin Khalifa Al Thani, who secured the tournament back in 2010.").

[27][28] *The FIFA World Cup Qatar 2022: ~~Turning a Vision into~~A Dream Turned Reality*, STATE OF QATAR GOVERNMENT COMMUNICATIONS OFFICE, https://www.gco.gov.qa/en/fifa/our-journey/ (last visited ~~Nov~~Mar. ~~14~~16, ~~2024~~2026).

[28][29] Tariq Panja & Kevin Draper, *U.S. Says FIFA Officials Were Bribed to Award World Cups to Russia and Qatar*, N.Y. TIMES (Apr. 6, 2020),

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ~~AND FEDERAL COMPUTER FRAUD ABUSE ACT~~

unsurprisingly, as the organizer of such an effort, Sheikh Hamad bin Jassim was later personally named in a complaint filed by anti-corruption organization Anticor in France on April 7, 2023, alleging corruption in connection with the awarding of the World Cup to Qatar, also involving former French president Nicolas Sarkozy.  The complaint alleged, among other offenses, active and passive trading in influence, active and passive corruption of a foreign public official, and criminal association.²⁹³⁰

197.  166.  After Qatar secured the World Cup bid—under Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim's leadership—it has also been widely alleged that a company owned by the Al Thani family engaged to build several of the World Cup stadiums perpetuated and covered up labor abuses—such as wage theft—on workers it employed.  The Hamad bin Khalid Contracting Company (the "HBK Contracting Company"), owned by the Al Thani royal family, was implicated in a thorough, wide-ranging report published by Equidem, a labor rights organization, for a series of wage abuses—including wage theft and fraud—perpetrated on workers on FIFA World Cup stadiums in Qatar³⁰³¹ during a similar time period as the wage theft

_Award World Cups to Russia and Qatar_, N.Y. TIMES (Apr. 6, 2020), https://www.nytimes.com/2020/04/06/sports/soccer/qatar-and-russia-bribery-world-cup-fifa.html#:~:text=After%20years%20of%20investigations%20and,World%20Cup%20in%20men's%20soccer.

²⁹³⁰ Rémi Dupré & Samuel Laurent, _Corruption complaint filed against Sarkozy over Qatar World Cup awarding process_, LE MONDE (Apr. 25, 2023), https://www.lemonde.fr/en/politics/article/2023/04/25/corruption-complaint-filed-against-sarkozy-over-qatar-world-cup-attribution_6024289_5.html. Reporting also indicates that, in 2009, Sheikh Hamad bin Khalifa paid six million euros to former President Sarkozy's wife.  _See The Raven Project Leaks: Qatar Reportedly Ordered Payment Of Six Million Euros To Wife Of French President Sarkozy In 2009_, MEMRI (Dec. 26, 2023), https://www.memri.org/reports/raven-project-leaks-qatar-reportedly-ordered-payment-six-million-euros-wife-french-president.

³⁰³¹ _See "If we complain, we are fired:" Discrimination and Exploitation of Migrant Construction Workers on FIFA World Cup Qatar 2022 Stadium Sites_,

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND FEDERAL COMPUTER FRAUD ABUSE ACT

perpetrated against Plaintiffs through the frauds described herein.  At least one publication has directly connected Sheikh Hamad bin Khalifa to these allegations.[3132]

198.  167. World Cup workers stated, for example, that they did not receive promised wages from the HBK Contracting Company during the pandemic and that, even before the pandemic, their salaries were not paid on time or, at other times, at all.[3233]  Still other workers alleged that the HBK Contracting Company failed to comply with salary promises and systematically underpaid them what was promised.[3334]  On top of these examples of fraud and wage theft, workers employed by the HBK Contracting Company also described working long days without overtime pay, nonpayment of severance pay, and reimbursement for only a fraction of the amount of sizeable recruitment fees paid by workers.[3435]  Hearkening back to the frauds described herein, as the Report puts it, "Wage theft is most visible in cases where workers *agree to particular terms of remuneration, complete the work, yet*

---

*Migrant Construction Workers on FIFA World Cup Qatar 2022 Stadium Sites*, EQUIDEM (2022), https://www.equidem.org/assets/downloads/Equidem_Qatar_World_Cup_Stadiums_Report_Final.pdf (the "Report")reports/if-we-complain-we-are-fired-discrimination-and-exploitation-of-migrant-construction-workers-on-fifa-world-cup-qatar-2022-stadium-sites/.

[3132] Avani Dias & Som Patidar, *Qatar royal family company accused of covering up migrants' exploitative working conditions ahead of FIFA World Cup*, AUSTRALIAN BROADCASTING CORPORATION (Nov. 9, 2022), https://www.abc.net.au/news/2022-11-10/fifa-world-cup-qatar-and-human-rights/101624010 (the "Report").

[3233] Report at 51.

[3334] *Id*. at 53–54, 57.

[3435] *See id.* at 9, 53–56.

73

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND FEDERAL COMPUTER FRAUD ABUSE ACT

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CALIFORNIA 90067
(310) 229-9900

*receive no payment.* However, non-payment and underpayment of wages and severance in the range of forms described above all constitute wage theft" (emphasis added).[35][36]

199. ~~168.~~ Aside from the World Cup, reporting to U.S. government agencies and media articles strongly suggest that the Qatari Royals' unlawful activities were to grow their wealth and enhance their geopolitical goals.

200. ~~169.~~ For instance, the Qatari Royals have used Quintet as a financial intermediary to facilitate transactions that are, at a minimum, suspicious, if not outright fraudulent. Between 2013 and 2017, at least a dozen transactions involving accounts opened in Quintet's books were flagged as suspicious by United States authorities under anti-money laundering rules and on the basis of suspicious activity reports filed by United States banks through which the transactions were processed.[36][37]

201. ~~170.~~ The Qatari Royals also appear to have utilized Quintet to engage in a complex scheme to advance the family's luxury hotel investment

---

[35][36] *Id.* at 58.

[36][37] *See Explore the FinCEN Files data*, INTERNATIONAL CONSORTIUM OF INVESTIGATIVE JOURNALISTS, https://www.icij.org/investigations/fincen-files/explore-the-fincen-files-data/ (last visited ~~Nov~~Mar. ~~14~~10, ~~2024~~2026); *see also Adam Lusher, Panama Papers: 12 world leaders linked to offshore dealings - and the full allegations against them*, THE INDEPENDENT (April 5, 2015), https://www.the-independent.com/news/world/politics/panama-papers-assad-putin-poroshenko-mubarak-al-saud-pm-iceland-sigmundur-davio-gunnlaugsson-a6967411.html; Yann Philippin, *The Secret History of Hamad al-Thani's Offshore Fortune*, MEDIAPART (June 22, 2016), https://www.mediapart.fr/journal/international/220616/l-histoire-secrete-de-la-fortune-offshore-de-hamad-al-thani; *Panama Papers – Mossack Fonseca, Yalis S.A.*, INTERNATIONAL CONSORTIUM OF INVESTIGATIVE JOURNALISTS, https://offshoreleaks.icij.org/nodes/10157956 (last visited ~~Nov~~Mar. ~~14~~10, ~~2024~~2026).

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ~~AND FEDERAL COMPUTER FRAUD ABUSE ACT~~

interests while also hiding illicit activities.  In 2018, Sheikh Hamad bin Jassim engaged with U.S. real estate billionaire Ben Ashkenazy and Indian businessman Sabatra Roy related to Mr. Roy's sale of the Plaza Hotel (the "Plaza") to ensure the sale of the Plaza to a subsidiary of the Qatar Investment Authority ("QIA"), Qatar's sovereign wealth fund.  That transaction appears to have been set up to improperly benefit the Qatari Royals from misappropriated government funds while also hiding payments to Mr. Roy from Indian authorities.[38]

202.  171. Financial records of the deal show that Sheikh Hamad bin Jassim: (i) engaged Mr. Ashkenazy to act as Sheikh Hamad bin Jassim's proxy in the purchase of the Plaza to obscure his involvement in the deal; (ii) purchased the mortgages on the Plaza and one other hotel owned indirectly by Mr. Roy and subsequently sold them to Katara Hospitality, a subsidiary of the QIA, at an inflated price, utilizing KBL European Private Bankers, now known as Quintet; and (iii) effectuated the sale through, first, partnership with Mr. Ashkenazy to block legitimate bids for the hotel and, second, to make a disguised $20 million payment to Mr. Roy to ensure the Plaza was sold to a subsidiary of the QIA, all at a time when Mr. Roy was under close observation for criminal failure to pay off penalties to the Indian Government.

203.  172. More specifically, in June 2017, Mr. Ashkenazy acquired a minority equity position in the Plaza, which included a right of first refusal to any sale.  The next month, Sheikh Hamad bin Jassim, through one of his companies, purchased the mortgages Mr. Roy's companies took out to finance the purchase of the Plaza and another New York hotel.  That day, Sheikh Hamad bin Jassim's company also provided almost $130 million in additional

---

[38] Sheikh Hamad bin Jassim previously served as the QIA's Chairman and Chief Executive Officer.

debt financing to Mr. Roy's companies, secured by the Plaza and another New York hotel (the "Roy Loan"). On information and belief, a significant portion of the funds used in this transaction were processed through an account at the bank now known as Quintet. In total, Sheikh Hamad bin Jassim paid almost $531 million for Mr. Roy's mortgages on the properties.

204. ~~173.~~ As a mortgagee on the Plaza and through Mr. Ashkenazy's right of first refusal and ownership of these mortgages, Sheikh Hamad bin Jassim was able to control the sale of the Plaza and blocked legitimate bids. These advantages, combined with his control over the QIA, allowed Sheikh Hamad bin Jassim to inflate the price at which the Plaza was sold to a subsidiary of the QIA—$600 million—such that he profited from the deal through his sale of his mortgage to Katara Hospitality, using an account at Quintet. On the day of sale, July 2, 2018, public filings indicate that the mortgages he owned were released.

205. ~~174.~~ What is more, according to public filings, the outstanding principal on the Roy Loan, now secured solely by another New York hotel, was $100 million at the time of the sale of the Plaza. Following sale, this balance was then divided into two tranches: $80 million assigned from Sheikh Hamad bin Jassim's company to an affiliate of the QIA, and $20 million assigned to Salisbury Group Holdings LLC ("Salisbury"), affiliated with Mr. Roy. On information and belief, Sheikh Hamad bin Jassim funneled this $20 million payment to Mr. Roy through Salisbury to ensure the sale of the Plaza to a subsidiary of the QIA after blocking other legitimate bids, structured in such a manner to conceal the funds from the Indian authorities closely monitoring the sale of Mr. Roy's overseas assets.

206. ~~175.~~ As another example, the Qatari Royals' support of terrorist groups is now no secret. Public reporting indicates that the Qatari Royals have

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CALIFORNIA 90067
(310) 229-9900

provided material support to various terrorist organizations.  And the Qatari Royals have not kept silent about their support for such groups.

207. ~~176.~~ Further, Michele Faissola, a member of the Qatari Royals' inner circle and key player in defrauding Mr. McKillen, has faced criminal inquiries of his own.  Faissola is a former Deutsche Bank executive who has worked as an advisor to the Al Thani family since January 2018 as Chief Executive Officer of Dilmon.

208. ~~177.~~ Mr. Faissola was implicated in multiple criminal investigations during his time at Deutsche Bank.  While serving as Global Head of Rates, Mr. Faissola oversaw traders subsequently convicted of wire fraud due to their role in a long-running LIBOR-fixing scheme.  A preliminary report on the scandal published in 2015 by BaFin, Germany's financial regulator, stated that "there [was an] indication that Mr. Faissola could have known about the manipulations by DB trades in 2008" and that "he might have even supported the manipulations by making the request to trader[.]"[~~38~~39]  A former trader later alleged that she even provided Mr. Faissola with a report illustrating evidence of market manipulation during her tenure at the Bank.[~~39~~40]  Though the traders' convictions were later overturned, Deutsche Bank agreed

[~~38~~39] Letter from Frauke Menke, Department President, Federal Financial Supervisory Authority, to Deutsche Bank AG, Management Board (May 13, 2015) (draft convenience translation) at 2–3. https://graphics.wsj.com/documents/doc-cloud-embedder/?sidebar=0&_gl=1*6 vn2eu*_gcl_au*MTQ2NTYyMjIwMC4xNzM4MDA5MDQw*_ga*MTc4NTc 4MTY4MTY4Ni4xNzE2OTIwOTcy*_ga_K2H7B9JRSS*MTc0NDY3NTg0Ny4yOC 4xLjE3NDQ2NzU5MTAuNjAuMC4w#2167237-deutsche.

[~~39~~40] Caroline Binham, *Trader caught up in Libor scandal sues Deutsche Bank*, FINANCIAL TIMES (Oct. 26, 2015), https://www.ft.com/content/2204ac3c-740e-11e5-bdb1-e6e4767162cc.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ~~AND FEDERAL COMPUTER FRAUD ABUSE ACT~~

to pay over €3.8 billion in fines and settlements to regulators in the United States and Europe.

209. ~~178.~~ In May 2018, a Milan court convicted Mr. Faissola and others of market manipulation in one of the most high-profile European banking cases of the decade.  In January 2013, managers of Italian bank Monte dei Paschi di Siena SpA ("MPS") were accused of colluding with Deutsche Bank and Nomura bankers, including Mr. Faissola, following the financial crisis, to hide losses at MPS by using complex derivatives trades that misrepresented MPS's finances.  Though this sentence was overturned on appeal, a second Italian court sentenced Mr. Faissola on the same charges in November 2019.  In May 2022, this second sentence was overturned on the basis of a challenge to the prosecutors' definition of the derivative trades used.

210. ~~179.~~ Such a global and long-running spree of unlawful activity by the Qatari Royals and their associates, representing only *reported* instances, informs the broader context in which Mr. McKillen was victimized by bad actors.

## FIRST CLAIM FOR RELIEF
**Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)**
(Against All Defendants)

211. ~~180.~~ Plaintiffs reallege and incorporate herein each and every allegation set forth in Paragraphs 1 through ~~179~~210 as if fully set forth herein.

212. ~~181.~~ Patrick McKillen and Hume Street Management Consultants Limited are each a "person" under 18 U.S.C. §§ 1961(3) and 1964(c), as they are each capable of holding a legal or beneficial interest in property.

213. ~~182.~~ Sheikh Hamad bin Khalifa, Sheikh Hamad bin Jassim, Sheikha Lulwah, Michele Faissola, Marc Socker, Dilmon, Beverly Hills Acquisition LLC, and Maybourne Hotels Limited are each a "person" under 18

78

United States Code Sections1961 U.S.C. §§ 1961(3) and 1962(c), as they are each capable of holding a legal or beneficial interest in property.

214. 183. Defendants Sheikh Hamad bin Khalifa, Sheikh Hamad bin Jassim, Sheikha Lulwah, Michele Faissola, Marc Socker, Dilmon, Beverly Hills Acquisition LLC, and Maybourne Hotels Limited, and each of their agents and representatives, along with non-defendant enterprise members SEDHV, Gilles de Boissieu, Constellation Paris, and Fady Bakhos, Qaya Limited, Karin Cooper, Lomakx, and FHL, constitute an "enterprise" engaged in, and the activities of which affect, interstate and foreign commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (the "Al Thani Enterprise"). The Al Thani Enterprise is an informal association operating for a common purpose on an ongoing basis. To further this purpose, the Al Thani Enterprise has engaged in coordinated activity to perpetrate a series of fraudulent schemes against Mr. McKillen by fraudulently inducing and soliciting Plaintiffs, a foreign individual and foreign company, to continue to provide services in the United States on ultra-luxury property projects under the false pretense of compensation for services rendered, while having no intention to compensate them, and later refusing to compensate them once a benefit to the Qatari Royals had been realized.

a. The Al Thani Enterprise is distinct from the corporate associations at issue in this case. This is not simply a case of individuals acting in their corporate capacities while performing regular business activities. For example, Sheikh Hamad bin Jassim participated in the Beverly Hills Fraud by fraudulently misrepresenting to Mr. McKillen that he would be paid even though he was not formally associated with Dilmon, which is owned instead by Sheikh Hamad bin Khalifa. Beyond that, members of the Al Thani Enterprise worked under the direction of and for the benefit of Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim.

79

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND FEDERAL COMPUTER FRAUD ABUSE ACT

215. 184. As members of the Al Thani Enterprise, each Defendant was and remains associated with the Al Thani Enterprise and has conducted and/or participated in the management and operation of the affairs of the Al Thani Enterprise in relation to Plaintiffs through a pattern of unlawful activity implicated under 18 U.S.C. § 1961(1)(B), including multiple, related, repeated, and continuous acts of wire fraud and fraud in foreign labor contracting chargeable under §§ 1343 and 1351, respectively.

216. 185. At all times relevant herein, Defendants have each carried out and participated in schemes to defraud Plaintiffs through the Al Thani Enterprise. Defendants' conduct includes, though is not limited to:

a.    Inducing and soliciting Plaintiffs, a foreign individual and foreign company, to continue to provide management and/or redevelopment services in the United States in support of the Qatari Royals' investments on the materially false pretense and/or via materially false representations that Plaintiff would be compensated for services performed, when in truth Defendants did not intend to fully compensate Plaintiffs for services performed;

b.    Making materially false representations that Plaintiffs would be compensated for services performed;

c.    **Making material omissions by failing to inform Plaintiffs that they would not be compensated for services performed despite the existence of a longstanding relationship between the parties;**

d.    e. Directing and/or approving Plaintiffs' work on each of these management and/or redevelopment projects for the Qatari Royals' benefit with knowledge that the Qatari Royals did not intend to compensate Plaintiffs and in furtherance of the fraudulent schemes;

**FIRST AMENDED** COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND FEDERAL COMPUTER FRAUD ABUSE ACT

**e.** ~~d.~~ Engaging in dilatory tactics to conceal the Qatari Royals' true intent from Plaintiffs and luring Plaintiffs into believing that the Qatari Royals would compensate them; and

**f.** ~~e.~~ Wrongfully refusing to compensate Plaintiffs once a benefit to the Qatari Royals had been realized.

217. ~~186.~~ Defendants' racketeering acts consisted of, though are not limited to, multiple acts of wire fraud, including transmitting communications through interstate and foreign commerce in furtherance of the scheme to induce Plaintiffs to continue to provide services on materially false pretenses and via materially false representations, to direct and approve Plaintiffs' work for the benefit of the Qatari Royals, to engage in dilatory tactics to conceal the Qatari Royals' true intent to deny Plaintiffs compensation, and/or refuse to compensate Plaintiffs for services rendered after a benefit to the Qatari Royals had been realized, and multiple acts of fraud in foreign labor contracting, including soliciting Plaintiffs, a foreign individual and foreign company residing and based outside of the United States, for employment inside the United States **(specifically, in California and New York)** on materially false pretenses and via materially false representations, employing Plaintiffs in the United States, directing and approving Plaintiffs' work in the United States for the benefit of the Qatari Royals, engaging in dilatory tactics to conceal the Qatari Royals' true intent to deny Plaintiffs compensation, and/or refusing to compensate Plaintiffs for services rendered in the United States after a benefit to the Qatari Royals had been realized.  Defendants' acts were committed for the unlawful purpose of defrauding Plaintiffs in furtherance of the objectives of the Al Thani Enterprise.  In committing these acts, Defendants systematically coordinated their activities, shared essential information between and among the members of the Al Thani Enterprise, and acted as a continuing unit in furtherance of its objectives.

81

218. 187. Defendants' conduct constitutes a "pattern" of racketeering activity under 18 U.S.C. § 1961(5) because these activities include at least two acts of racketeering activity within the past ten years. The California Fraud, the New York Fraud, the Saint-Germain Fraud, and the Riviera **Fraud, and the London** Fraud undertaken by the Al Thani Enterprise were each initiated and effectuated within ten years of one another. Each of these frauds is related, as they involve common participants, share the same purpose of stealing Plaintiffs' services, and employ the same methods to do so. These related acts of racketeering activity have taken place for over five years. **Additionally, these schemes share numerous victims, including Mr. McKillen, HSMC, SOF, and subcontractors working on each of the projects at issue here, including contractors, cleaners, designers, and artists.**

219. Further, each of these frauds is ongoing and results in continuing harm to Plaintiffs. The Al Thani Enterprise's conduct threatens to continue indefinitely, as there is no indication that the Al Thani Enterprise intends to terminate any of these schemes by compensating Plaintiffs at any point, and Plaintiffs' injuries only continue to increase the longer payment is wrongfully withheld.

220. 188. Defendants' conduct was designed to injure Plaintiffs, and Defendants have been and continue to be successful in injuring Plaintiffs. As a direct and proximate result of the activities and conduct of Sheikh Hamad bin Khalifa, Sheikh Hamad bin Jassim, Sheikha Lulwah, Michele Faissola, Marc Socker, Dilmon, Maybourne Hotels Limited, and Beverly Hills Acquisition LLC in violation of 18 U.S.C. § 1962(c), Plaintiffs have suffered and continue to suffer injury to their business or property within the meaning of 18 U.S.C. § 1964(c) that arose in California and New York. Plaintiffs have suffered and continue to suffer damages and injury to their business, including a financial

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CALIFORNIA 90067
(310) 229-9900

**FIRST AMENDED** COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND FEDERAL COMPUTER FRAUD ABUSE ACT

loss of millions of dollars for uncompensated work performed in California and New York by Plaintiffs. As a direct result of Defendants inducing Plaintiffs to continue work on substantial redevelopment projects under false pretenses and via explicit false representations, Plaintiffs have expended countless hours and immense resources in California and New York, only for Defendants to wrongfully withhold from Plaintiffs fees owed in accordance with their fraudulent schemes. Plaintiffs' injuries arose in California and New York, as Plaintiffs' considerable financial losses were incurred in California and New York, Defendants' activity was conducted with the aim and effect of injuring Plaintiffs in California and New York, and Defendants' fraudulent schemes were undertaken to enrich the Qatari Royals in California and New York. Plaintiffs are, therefore, entitled to recover threefold the damages sustained, in addition to the cost of the suit and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF
**Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d), by Conspiring to Violate 18 U.S.C. § 1962(c)**
(Against All Defendants)

221. ~~189.~~ Plaintiffs reallege and incorporate herein each and every allegation set forth in Paragraphs 1 through ~~188~~220 as if fully set forth herein.

222. ~~190.~~ As alleged in Count One, one or more of the following individuals and/or entities violated 18 U.S.C. § 1962(c): Sheikh Hamad bin Khalifa, Sheikh Hamad bin Jassim, Sheikha Lulwah, Michele Faissola, Marc Socker, Dilmon, Maybourne Hotels Limited, and Beverly Hills Acquisition LLC. Any person or persons found to have violated 18 U.S.C. § 1962(c) is hereafter referred to as the "Conductor/Participant" for the remainder of this Count.

223. ~~191.~~ Each of the Defendants was and is associated with the Al Thani Enterprise, defined *supra*, and they have all conspired with the

83

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CALIFORNIA 90067
(310) 229-9900

Conductors/Participants within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c). Each of the Defendants conspired with the Conductors/Participants to conduct or participate, directly or indirectly, in the management and/or operation of the affairs of the Al Thani Enterprise in relation to Plaintiffs through a pattern of activity unlawful under 18 U.S.C. § 1961(1)(B), including multiple, related, repeated, and continuous acts of wire fraud chargeable under § 1343 and fraud in foreign labor contracting chargeable under § 1351 in violation of 18 U.S.C. § 1962(c), for the purpose of stealing Plaintiffs' services.

224. 192. At all times relevant herein, Defendants intended to and agreed to further an unlawful endeavor of the Conductors/Participants, which, if completed, would violate 18 U.S.C. § 1962(c), and adopted the goal of furthering or facilitating the unlawful endeavor. Defendants' conduct includes, though is not limited to:

a. Agreeing to induce and solicit Plaintiffs, a foreign individual and foreign company, to continue to provide management and/or redevelopment services in the United States in support of the Qatari Royals' investments on the materially false pretense and/or via materially false representations that Plaintiffs would be compensated for services performed, when in truth Defendants did not intend to fully compensate Plaintiffs for services performed;

b. Agreeing to make materially false representations that Plaintiffs would be compensated for services performed;

c. **Agreeing not to inform Plaintiffs that there would be no compensation for services performed despite the existence of a longstanding relationship between the parties;**

d. c. Agreeing to direct and/or approve any portion of Plaintiffs' work on each of these management and/or redevelopment projects for the

84

Qatari Royals' benefit with the knowledge that the Qatari Royals did not intend to compensate Plaintiffs and in furtherance of the fraudulent schemes;

e. ~~d.~~ Agreeing to engage in dilatory tactics to conceal the Qatari Royals' true intent from Plaintiffs and luring Plaintiffs into believing that the Qatari Royals would compensate them; and

f. ~~e.~~ Agreeing to wrongfully refuse to compensate Plaintiffs once a benefit to the Qatari Royals had been realized.

225. ~~193.~~ Plaintiffs were injured by Defendants' racketeering acts or acts otherwise unlawful under 18 U.S.C. § 1962, which included multiple acts of wire fraud and fraud in foreign labor contracting through the Al Thani Enterprise as alleged in Count One.

226. ~~194.~~ As a direct and proximate result of the activities and conduct of Sheikh Hamad bin Khalifa, Sheikh Hamad bin Jassim, Sheikha Lulwah, Michele Faissola, Marc Socker, Dilmon, Maybourne Hotels Limited, and Beverly Hills Acquisition LLC in violation of 18 U.S.C. § 1962(d), Plaintiffs have suffered and continue to suffer injury to their business or property within the meaning of 18 U.S.C. § 1964(c) that arose in California and New York. Plaintiffs have suffered and continue to suffer damages and injury to their business, including a financial loss of millions of dollars for uncompensated work performed in California and New York by Plaintiffs. As a direct result of these Defendants inducing Plaintiffs to continue to complete massive redevelopment projects under the false pretense and via explicit false assurances of compensation, Plaintiffs have expended countless hours and immense resources on the projects in California and New York, only for Defendants to wrongfully withhold from Plaintiffs fees owed in accordance with their fraudulent schemes. Plaintiffs' injuries arose in California and New York, as Plaintiffs' considerable financial losses were incurred in California and New York, Defendants' activity was conducted with the aim and effect of

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CALIFORNIA 90067
(310) 229-9900

85

injuring Plaintiffs in California and New York, and Defendants' fraudulent schemes were undertaken to enrich the Qatari Royals in California and New York. Plaintiffs are, therefore, entitled to recover threefold the damages sustained, in addition to the cost of the suit and reasonable attorneys' fees.

**THIRD CLAIM FOR RELIEF**
**Violation of the Computer Fraud and Abuse Act,**
**18 U.S.C. § 1030**

**(Against John Does)**

195. Plaintiffs reallege and incorporate herein each and every allegation set forth in Paragraphs 1 through 194 as if fully set forth herein.

196. The Microsoft 365 Account was used by Plaintiffs to engage in interstate foreign commerce. 18 U.S.C. § 1030(e)(2)(B).

197. As a result of the Hacking Scheme perpetuated by John Does, within the last year, Plaintiffs have suffered damages in excess of the $5,000 statutory minimum. Specifically, Plaintiffs have been damaged by Defendants' actions, including through the impairment to the integrity of Plaintiffs' online accounts, devices, networks, and email accounts, and the thousands of email items that were accessed without authorization, some of which were later used nefariously. Plaintiffs also suffered loss from the costs associated with upgrading and replacing the impacted online accounts, devices, and networks, expending resources to prevent future hacking activity, undertaking a forensic investigation, and paying legal fees to remove publications of the Hacked Material. 18 U.S.C. §§ 1030(a)(4), (a)(5), (c)(4), (e)(8), (e)(11).

198. Plaintiffs have also suffered irreparable and incalculable reputational harm and injuries from the scheme and the publication of the stolen information. John Does intentionally accessed Plaintiffs' protected devices without authorization or exceeding authorized access, and thereby

86

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CALIFORNIA 90067
(310) 229-9900

obtained information from protected computers in violation of 18 U.S.C. § 1030(a)(2)(C).

199. John Does intentionally accessed Plaintiffs' protected online account without authorization. On information and belief, John Does knowingly caused the transmission of a program, information, code, or command. As a result of this conduct, Defendants intentionally and recklessly caused damage without authorization, and Plaintiffs have experienced damage and loss in violation of 18 U.S.C. §§ 1030(a)(5)(A)–(C).

200. On information and belief, the John Does knowingly, and with intent to defraud, accessed a protected computer without authorization or exceeding authorized access, by means of such conduct furthering the intended fraud and obtaining one or more things of value in violation of 18 U.S.C. § 1030(a)(4).

201. On information and belief, the John Does agreed to commit violations of 18 U.S.C. §§ 1030(a)(2)(C), 1030(a)(4), and 1030(a)(5)(A)–(C) in violation of 18 U.S.C. § 1030(b).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Patrick McKillen and Hume Street Management Consultants Limited respectfully request that the Court issue the following relief:

a. All actual damages suffered as a result of these fraudulent schemes, in an amount no less than $20 million, which amount continues to grow due to interest;

b. Treble damages pursuant to 18 U.S.C. § 1964(c);

c. Attorney fees and costs pursuant to 18 U.S.C. § 1964(c);

d. Damages pursuant to 18 U.S.C. § 1030 *et seq.*;

d. e. Pre- and post-judgment interest; and

87

e.  f. Any such other and further relief as this Court may deem just and proper.

Dated:  ~~September 25~~**March 16**, ~~2025~~**2026**

**WILLKIE FARR & GALLAGHER LLP**

*/s/ Michael J. Gottlieb*

Michael J. Gottlieb
Samuel G. Hall (**Admitted** *Pro* ~~*hac vice forthcoming*~~**Hac Vice**)
Marina A. Torres
Logan M. Elliott

*Attorneys for Plaintiffs*

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CALIFORNIA 90067
(310) 229-9900

---

88

**FIRST AMENDED** COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ~~AND FEDERAL COMPUTER FRAUD ABUSE ACT~~

## DEMAND FOR JURY TRIAL

Under Rule 38(b) of the Federal Rules of Civil Procedure and Local Civil Rule 38-1, Plaintiffs demand a trial by jury of all issues so triable that are raised here or that may be raised hereinafter in this action.

Dated: ~~September 25~~March 16, ~~2025~~2026

**WILLKIE FARR & GALLAGHER LLP**

*/s/ Michael J. Gottlieb*

Michael J. Gottlieb
Samuel G. Hall (**Admitted** *Pro* ~~*hac vice forthcoming*~~*Hac Vice*)
Marina A. Torres
Logan M. Elliott

*Attorneys for Plaintiffs*

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CALIFORNIA 90067
(310) 229-9900

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ~~AND FEDERAL COMPUTER FRAUD ABUSE ACT~~