**LATHAM & WATKINS LLP**
  Marvin S. Putnam (SBN 212839)
   *marvin.putnam@lw.com*
  Jessica Stebbins Bina (SBN 248485)
   *jessica.stebbinsbina@lw.com*
  Alexander C.K. Wyman (SBN 295339)
   *alex.wyman@lw.com*
10250 Constellation Boulevard, Suite 1100
Los Angeles, CA 90067
Tel.: 424.653.5500 | Fax: 424.653.5501

*Attorneys for Defendants Sheikh Hamad bin Khalifa bin Hamad bin Abdullah bin Jassim bin Mohammed Al Thani, Sheikh Hamad bin Jassim bin Jaber bin Mohammed bin Thani Al Thani, Sheikha Lulwah bint Hamad bin Khalifa Al Thani, Michele Faissola, Marc Socker, Dilmon LLC, Maybourne Hotels Limited, and Beverly Hills Acquisition LLC*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK MCKILLEN and HUME STREET MANAGEMENT CONSULTANTS LIMITED,<br><br>Plaintiffs,<br><br>v.<br><br>SHEIKH HAMAD BIN KHALIFA BIN HAMAD BIN ABDULLAH BIN JASSIM BIN MOHAMMED AL THANI, SHEIKH HAMAD BIN JASSIM BIN JABER BIN MOHAMMED BIN THANI AL THANI, SHEIKHA LULWAH BINT HAMAD BIN KHALIFA AL THANI, MICHELE FAISSOLA, MARC SOCKER, DILMON LLC, MAYBOURNE HOTELS LIMITED, and BEVERLY HILLS ACQUISITION LLC,<br><br>Defendants. | Case No. 2:25-cv-09178-MCS-AGR<br><br>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND STRIKE PLAINTIFFS' FIRST AMENDED COMPLAINT; OR IN THE ALTERNATIVE TO STAY**<br><br>Date:     August 3, 2026<br>Time:    9:00 a.m.<br>Place:   Courtroom 7C<br><br>Hon. Mark C. Scarsi |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................ 2

    A.    The History of Litigation Between the Parties ................................... 2

    B.    Plaintiffs' Present RICO Allegations ................................................. 9

        1.    Claims Regarding the Properties ............................................. 9

        2.    The "Quintet Scheme" ........................................................... 13

III.  LEGAL STANDARD ...................................................................................... 13

IV.   ARGUMENT .................................................................................................... 14

    A.    HBK Should Be Dismissed Due to Improper Service ..................... 14

    B.    The Court Lacks Personal Jurisdiction Over Foreign Defendants ............................................................................................ 16

        1.    Plaintiffs Fail to Allege General Jurisdiction ........................ 17

            a.    HBK, Sheikha Lulwah, Faissola, and Socker Are Foreign Citizens with Minimal Ties to California ................................................................... 17

            b.    HBJ Is Not "At Home" in California ........................... 18

            c.    Dilmon Is Not "At Home" in California ...................... 19

        2.    There Is No Basis for Specific Jurisdiction ........................... 19

            a.    No Action Was Purposely Directed Toward California .................................................................... 20

            b.    Exercising Jurisdiction Would Be Unreasonable ................................................................ 24

        3.    Plaintiffs Do Not Establish Rule 4(k) Jurisdiction ................ 25

i

C.   Plaintiffs' FAC Fails to Transform a Series of Contract Disputes Into a RICO Action, And All Claims Should Be Dismissed .................................................................................26

  1.   Plaintiffs Fail to Plead That Any Defendants Committed Predicate Acts Under the RICO Statute ..............27

     a.   Plaintiffs Fail to Sufficiently Plead a Scheme to Defraud or Use of Wires in Furtherance Thereof ........................................28

     b.   Plaintiffs Fail to Sufficiently Plead any False Statements ...............................................30

     c.   Plaintiffs Fail to Allege Any Special Relationship Giving Rise to a Duty to Disclose .......................................................31

     d.   Plaintiffs Fail to Sufficiently Allege Intent to Defraud ...........................................................33

     e.   Plaintiffs' Invocation of "Fraud In Foreign Labor Contracting" Is Frivolous .................35

  2.   The FAC Allegations Do Not Establish a RICO "Enterprise" ....................................................36

  3.   Plaintiffs Do Not Allege a "Pattern" of Racketeering ..................................................38

  4.   The FAC Does Not State an Actionable Claim for RICO Conspiracy Against Defendants....................................40

D.   Alternatively, the Court Should Dismiss the FAC for *Forum Non Conveniens* or Stay the Case .........................................41

E.   The Court Should Strike Prejudicial and Speculative Allegations Unrelated to Plaintiffs' Claims....................................44

V.   CONCLUSION ..................................................................................45

ii

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alcon Ent., LLC v. Autos. Peugeot SA*,
  No. CV19-00245 CJC (AFMx), 2021 WL 2792435
  (C.D. Cal. Feb. 26, 2021) ................................................................ 14, 43

*A-List Mktg. Sols. Inc. v. Headstart Warranty Grp. LLC*,
  No. 8:25-CV-00131-FWS-KES, 2025 WL 1674377
  (C.D. Cal. May 7, 2025) .........................................................................22

*Amoco Egypt Oil Co. v. Leonis Nav. Co.*,
  1 F.3d 848 (9th Cir. 1993) .....................................................................25

*Asahi Metal Indus. Co. v. Super. Ct. of Cal., Solano Cnty.*,
  480 U.S. 102 (1987) ........................................................................ 16, 24

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................ 14, 40

*Attilio Giusti Leombruni S.p.A. v. Lsil & Co.*,
  No. CV15-002128-BRO(EX), 2015 WL 12743878
  (C.D. Cal. May 29, 2015) ......................................................................20

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*,
  874 F.3d 1064 (9th Cir. 2017) ...............................................................20

*Barantsevich v. VTB Bank*,
  954 F. Supp. 2d 972 (C.D. Cal. 2013) ...................................................25

*Baumer v. Pachl*,
  8 F.3d 1341 (9th Cir. 1993) ...................................................................38

*Beasley v. Lucky Stores, Inc.*,
  400 F. Supp. 3d 942 (N.D. Cal. 2019) ...................................................45

*Bjorklund v. N. Am. Cos. for Life and Health Ins.*,
  72 F. App'x 550 (9th Cir. 2003) ..............................................................9

iii

*Bobulinski v. Dickson*,
No. CV 24-02600-MWF, 2025 WL 863462
(C.D. Cal. Feb. 20, 2025) ...................................................................... 39, 40

*Brand v. Menlove Dodge*,
796 F.2d 1070 (9th Cir. 1986) ................................................................. 17

*Brockmeyer v. May*,
383 F.3d 798 (9th Cir. 2004) ................................................................... 13

*Brown v. 140 NM LLC*,
No. 17-CV-05782-JSW, 2019 WL 118425
(N.D. Cal. Jan. 7, 2019) ........................................................................... 17

*Canyon Cnty. v. Syngenta Seeds, Inc.*,
519 F.3d 969 (9th Cir. 2008) ................................................................... 27

*Capitol W. Appraisals, LLC v. Countrywide Fin. Corp.*,
759 F. Supp. 2d 1267 (W.D. Wash. 2010), *aff'd*, 467 F. App'x 738
(9th Cir. 2012) ......................................................................................... 30

*Cavalry SPV I, LLC v. Watkins*,
36 Cal. App. 5th 1070 (2019) .................................................................... 9

*City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*,
43 Cal. 4th 375 (2008) ............................................................................. 32

*City Sols., Inc. v. Clear Channel Commc'ns, Inc.*,
201 F. Supp. 2d 1048 (N.D. Cal. 2002) ............................................... 32, 33

*CollegeSource, Inc. v. AcademyOne, Inc.*,
653 F.3d 1066 (9th Cir. 2011) ................................................................. 20

*Colo. River Water Conservation Dist. v. United States*,
424 U.S. 800 (1976) ............................................................................ 14, 43

*Comm. to Protect our Agric. Water v. Occidental Oil & Gas Corp.*,
235 F. Supp. 3d 1132 (E.D. Cal. 2017) ............................................ 27, 29, 30

*Concorde Equity II, LLC v. Miller*,
732 F. Supp. 2d 990 (N.D. Cal. 2010) ..................................................... 40

*Cooper v. Tokyo Elec. Power Co., Inc.*,
860 F.3d 1193 (9th Cir. 2017) ........................................................ 14, 41, 42, 43

iv

*Corbrus, LLC v. 8th Bridge Capital, Inc.*
   No. 2:19-CV-10182-CAS (AFMX), 2021 WL 1390366 (C.D. Cal.
   Apr. 12, 2021) ................................................................................. 34, 35

*Core-Vent Corp. v. Nobel Indus. AB*,
   11 F.3d 1482 (9th Cir. 1993) ........................................................... 24, 25

*Coronavirus Rep. v. Apple, Inc.*,
   85 F.4th 948 (9th Cir. 2023) ................................................................... 36

*Coto Settlement v. Eisenberg*,
   593 F.3d 1031 (9th Cir. 2010) ................................................................ 33

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014) .......................................................................... 17, 19

*Doan v. Singh*,
   617 F. App'x 684 (9th Cir. 2015) ..................................................... 36, 38

*Does 1-60 v. Republic Health Corp.*,
   669 F. Supp. 1511 (D. Nev. 1987) ................................................... 44, 45

*Eclectic Props. E., LLC v. Marcus & Millichap Co*,
   751 F.3d 990 (9th Cir. 2014) ......................................................... *passim*

*Eclipse Grp. LLP v. Fortune Mfg. Co.*,
   No. 14CV0441-GPC-WVG, 2014 WL 6907897
   (S.D. Cal. Dec. 8, 2014) ........................................................................ 15

*Eller v. EquiTrust Life Ins. Co.*,
   778 F.3d 1089 (9th Cir. 2015) ......................................................... 31, 33

*Fantasy, Inc. v. Fogerty*,
   984 F.2d 1524 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S.
   517 (1994) .............................................................................................. 14

*Faryniarz v. Ramirez*
   62 F. Supp. 3d 240 (D. Conn. 2014) ...................................................... 29

*Gabor v. Deshler*,
   No. 17-CV-01524-LHK, 2018 WL 2762411
   (N.D. Cal. June 7, 2018) ........................................................................ 22

v

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

*Giles v. Gen. Motors Acceptance Corp.*,
   494 F.3d 865 (9th Cir. 2007)........................................................................32, 33

*Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*,
   284 F.3d 1114 (9th Cir. 2002).............................................................................25

*Gomez v. Guthy-Renker, LLC*,
   No. EDCV14-01425-JGB (KKx), 2015 WL 4270042
   (C.D. Cal. July 13, 2015)......................................................................................26

*H.J. Inc. v. Nw. Bell Tel. Co.*,
   492 U.S. 229 (1989) .......................................................................................39, 40

*Howard v. Am. Online Inc.*,
   208 F.3d 741 (9th Cir. 2000).................................................................................41

*In re All Terrain Vehicle Litig.*,
   978 F.2d 1265, 1992 WL 332105 (9th Cir. 1992).................................................31

*In re Jamster Mktg. Litig.*, No. 05CV0819 JM (CAB), 2009 WL
   1456632
   (S.D. Cal. May 22, 2009) ......................................................................................36

*In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*,
   601 F. Supp. 3d 625 (C.D. Cal. 2022)..................................................................19

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945) ..................................................................................13, 16, 24

*Intelsat Corp. v. Multivision TV LLC*,
   736 F. Supp. 2d 1334 (S.D. Fla. 2010)..................................................................16

*Kan-Di-Ki, LLC v. Sorenson*,
   723 F. App'x 432 (9th Cir. 2018)..........................................................................40

*Kanter v. Warner-Lambert Co.*,
   265 F.3d 853 (9th Cir. 2001).................................................................................19

*Kexuan Yao v. Crisnic Fund*,
   No. SACV 10-1299 AG JCGX, 2011 WL 3818406
   (C.D. Cal. Aug. 29, 2011) .....................................................................................15

*Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*,
   940 F.2d 397 (9th Cir. 1991).............................................................................26, 29

vi

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW

*Leroy-Garcia v. Brave Arts Licensing*,
   No. C 13-01181 LB, 2013 WL 4013869 (N.D. Cal. Aug. 5, 2013)...................23

*Lesnik v. Eisenmann SE*,
   374 F. Supp. 3d 923 (N.D. Cal. 2019)...............................................................36

*Loomer v. Zuckerberg*,
   No. 23-3158, 2025 WL 927186 (9th Cir. Mar. 27, 2025), *cert.
   denied*, 146 S. Ct. 272 (2025).........................................................................26

*Lueck v. Sundstrand Corp.*,
   236 F.3d 1137 (9th Cir. 2001)...........................................................................43

*M.O. Dion & Sons, Inc. v. VP Racing Fuels, Inc.*,
   No. CV 19-5154-MWF (SSX), 2019 WL 4750116
   (C.D. Cal. Sept. 27, 2019) ...........................................................................20, 23

*Macri v. Yamauchi*,
   No. 01 C 50168, 2002 WL 390223
   (N.D. Ill. Mar. 11, 2002) ..................................................................................16

*Makarem v. Get Buzzed LLC*,
   No. 2:25-cv-02357-MWC-ASX, 2025 WL 3030580 (C.D. Cal.
   Sept. 23, 2025)..................................................................................................38

*Malekar v. Birley*,
   No. 22-CV-06187-HSG, 2023 WL 3202664
   (N.D. Cal. May 1, 2023)..............................................................................18, 19

*Marshall v. Galvanoni*,
   No. 2:17-CV-00820-KJM-CKD, 2017 WL 5177764
   (E.D. Cal. Nov. 8, 2017).....................................................................................22

*Martinez v. Aero Caribbean*,
   764 F.3d 1062 (9th Cir. 2014)...........................................................................19

*McGowan v. Weinstein*,
   562 F. Supp. 3d 744 (C.D. Cal. 2021)................................................................39

*Metaxas v. Lee*,
   503 F. Supp. 3d 923 (N.D. Cal. 2020)...........................................................39, 40

*Miss. Band of Choctaw Indians v. Holyfield*,
   490 U.S. 30 (1989) .............................................................................................18

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

Case No. 2:25-cv-09178-MCS-AGR
MEMO OF LAW ISO DEFENDANTS' MOTION TO
DISMISS AND STRIKE PLAINTIFFS' FAC

*Mocha Mill, Inc. v. Port of Mokha, Inc.*,
No. 18-CV-02539-HSG, 2019 WL 1048252
(N.D. Cal. Mar. 5, 2019) ................................................................................ 25

*Nakash v. Marciano*,
882 F.2d 1411 (9th Cir. 1989) ................................................................. 14, 43

*Nguyen v. Hartford Life Ins. Co.*,
No. SACV09-0244-AG (SSx), 2009 WL 10673367
(C.D. Cal. July 13, 2009) ............................................................................... 28

*NuCal Foods, Inc. v. Quality Egg LLC*,
887 F. Supp. 2d 977 (E.D. Cal. 2012) ..................................................... 23, 24

*Ogdon v. Grand Canyon Univ., Inc.*,
No. 1:20-CV-00709-DAD-SKO, 2022 WL 846973
(E.D. Cal. Mar. 22, 2022) .............................................................................. 21

*Orr v. Bank of Am., NT & SA*,
285 F.3d 764 (9th Cir. 2002) *superseded by Rule on other grounds
as stated in David v. Betts*, No. 1:20-cv-00002-JMS-WRP, 2024
WL 2214613 (D. Haw. May 15, 2024) .......................................................... 29

*Pandolfi v. Aviagames, Inc.*,
No. 23-CV-05971-EMC, 2024 WL 4951258
(N.D. Cal. Dec. 3, 2024)................................................................................. 19

*Picot v. Weston*,
780 F.3d 1206 (9th Cir. 2015)................................................................... 19, 20

*PMC, Inc. v. Ferro Corp.*,
131 F.R.D. 184 (C.D. Cal. 1990) ..................................................................... 1

*Przewozman v. Charity*,
No. 20-CV-6088-NGGTAM, 2023 WL 2562537
(E.D.N.Y. Mar. 17, 2023)............................................................................... 15

*Quantum Tech. Partners II, L.P. v. Altman Browning & Co.*,
No. 3:08-cv-00376-BR, 2009 WL 1795574 (D. Or. June 23, 2009),
*as amended* (June 24, 2009), *aff'd*, 436 F. App'x 792 (9th Cir.
2011)............................................................................................................... 34

viii

*R. Prasad Indus. v. Flat Irons Env't Sols. Corp.*,
   No. CV 12-8261-PCT-JAT, 2013 WL 2217831
   (D. Ariz. May 20, 2013) ..................................................................................... 39

*Ranza v. Nike, Inc.*,
   793 F.3d 1059 (9th Cir. 2015) .................................................................... 17, 19

*Reiffin v. Microsoft Corp.*,
   No. C11-03505-CRB, 2012 WL 1309179
   (N.D. Cal. Apr. 16, 2012) ................................................................................. 18

*Republic of Kazakhstan v. Ketebaev*,
   No. 17-CV-00246-LHK, 2018 WL 2763308
   (N.D. Cal. June 8, 2018) ................................................................................... 26

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993) .......................................................................................... 36

*Riot Games, Inc. v. Suga PTE, Ltd.*,
   638 F. Supp. 3d 1102 (C.D. Cal. 2022) ........................................................... 23

*Royce Int'l Broad. Corp. v. Field*,
   No. C-99-4169-SI, 2000 WL 236434
   (N.D. Cal. Feb. 23, 2000) ................................................................................. 28

*Safe Air for Everyone v. Meyer*,
   373 F.3d 1035 (9th Cir. 2004) ......................................................................... 16

*Sanford v. MemberWorks, Inc.*,
   625 F.3d 550 (9th Cir. 2010) ...................................................................... 28, 41

*Schwarzenegger v. Fred Martin Motor Co.*,
   374 F.3d 797 (9th Cir. 2004) ............................................................... 13, 16, 17

*Sever v. Alaska Pulp Corp.*,
   978 F.2d 1529 (9th Cir. 1992) ......................................................................... 39

*Shenzhen Riitek Tech. Co. Ltd. v. AERB, Inc.*,
   No. 8:18-CV-00645-JLS-JDE, 2018 WL 5264077
   (C.D. Cal. July 18, 2018) ................................................................................. 23

*Sher v. Johnson*,
   911 F.2d 1357 (9th Cir. 1990) ......................................................................... 16

ix

*Sompo Japan Ins. Co. of Am., Inc. v. I-Sheng Elec. Wire & Cable, Co.*,
   No. CV-07-5984-JFW (PJWx), 2008 WL 11343361
   (C.D. Cal. Jan. 3, 2008) .................................................................................. 15

*Spotlight Ticket Mgmt., Inc. v. StubHub, Inc.*,
   No. CV-19-10791-PA (JCX), 2020 WL 4342260
   (C.D. Cal. May 22, 2020) ................................................... 1, 27, 28, 37

*State Narrow Fabrics, Inc. v. Fisher*,
   No. 16-4252-MWF, 2016 WL 11002147
   (C.D. Cal. Nov. 29, 2016) ............................................................................. 23

*Three-D Spirits, Inc. v. Voodoo Tiki Tequila Corp.*,
   No. 2:11-CV-09255-JHN (AJWx), 2012 WL 13012646
   (C.D. Cal. Mar. 19, 2012) ............................................................................. 23

*Turner v. Cook*,
   362 F.3d 1219 (9th Cir. 2004) ..................................................................... 38

*United InvestexUSA 7 Inc. v. Miller*,
   No. 8:20-CV-02308-JVS (ADs), 2021 WL 6804224
   (C.D. Cal. Nov. 10, 2021) ............................................................................. 44

*United States v. Jesenik*,
   152 F.4th 924 (9th Cir. 2025) ................................................................ 29, 31

*Vivendi SA v. T-Mobile USA Inc.*,
   586 F.3d 689 (9th Cir. 2009) ....................................................................... 42

*Walter v. Drayson*,
   538 F.3d 1244 (9th Cir. 2008) ..................................................................... 36

*Wargaming.net Ltd. v. Blitzteam LLC*,
   No. CV20-02763-CJC (MRWx), 2021 WL 3619956
   (C.D. Cal. Jan. 20, 2021) ........................................................................ 24, 25

*Wash. Shoe Co. v. A-Z Sporting Goods, Inc.*,
   704 F.3d 668 (9th Cir. 2012) ....................................................................... 20

*Wasson v. Riverside Cnty.*,
   237 F.R.D. 423 (C.D. Cal. 2006) ................................................................. 13

x

*Wolf v. Superior Ct.*,
107 Cal. App. 4th 25 (2003), *as modified on denial of reh'g* (Mar. 20, 2003) ..................................................................................32, 33

*Xavier v. AutoNation, Inc.*,
No. 5:25-CV-00731-AB (DTB), 2026 WL 166909 (C.D. Cal. Jan. 14, 2026) ..................................................................21

*Yagman v. Gabbert*,
684 F. App'x 625 (9th Cir. 2017)..................................................41

**STATUTES**

18 U.S.C.
§ 1341 ..........................................................................................29
§ 1351 ..........................................................................................35
§ 1351(a) ......................................................................................35
§ 1961(1)......................................................................................27
§ 1961(5)................................................................................27, 31

28 U.S.C. § 1782 ....................................................................................7

Cal. Civ. Proc. Code § 339 ..........................................................11, 12

**RULES**

Fed. R. Civ. P.
4(f) ...............................................................................................14
4(f)(1)...........................................................................................14
4(f)(2)...........................................................................................15
4(f)(2)(C)(ii) ................................................................................15
4(k)........................................................................................25, 26
4(k)(2)....................................................................................25, 26
4(l)(2)...........................................................................................15
4(l)(2)(B) .....................................................................................15
8 ............................................................................................27, 34
9 ...................................................................................................34
9(b)........................................................................................*passim*
12(b)(2)......................................................................................1, 13
12(b)(5)......................................................................................1, 13
12(b)(6)..................................................................................1, 13, 14
12(f) .......................................................................................1, 13, 14

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

N.Y. C.P.L.R. § 213 ................................................................................................ 12

**OTHER AUTHORITIES**

Qatar's Civil and Commercial Procedural Law (Excerpt) ........................................ 15

xii

## I.    INTRODUCTION

Defendants bring this motion pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(5), 12(b)(6) and 12(f).

This case is textbook abuse of the civil RICO statute.  As courts in this Circuit have warned, there is an "increasingly familiar phenomenon of expanding [] straightforward breach of contract" allegations into civil RICO violations.  *PMC, Inc. v. Ferro Corp.*, 131 F.R.D. 184, 187 (C.D. Cal. 1990).[1]  This case exemplifies exactly that phenomenon.  Plaintiffs allege nothing more than a series of business disputes between foreign parties (an Irish company and its principal, and Qatari companies and their principals and employees) regarding their business relationships.  The parties have already litigated, and are continuing to litigate, these disputes elsewhere.  Plaintiffs and their affiliates have won some of those disputes; Defendants and their affiliates have won others.  Crucially, in none of those litigations—in New York, California, London, and multiple courts in France—has any court found that the parties' disputes constitute anything more than run-of-the-mill business disagreements.  Plaintiffs' wholly conclusory allegations of "conspiracy," "fraud," and "racketeering" are not sufficient to transform this series of contract disputes into a RICO claim.  "Courts should strive to flush out frivolous RICO allegations at an early stage of the litigation," *Spotlight Ticket Mgmt., Inc. v. StubHub, Inc.*, No. CV 19-10791 PA (JCX), 2020 WL 4342260, at *2 (C.D. Cal. May 22, 2020), and the Court should do so here.

Not only does this case fail to state a claim on the merits, but it also suffers from numerous other flaws warranting dismissal.  On its face, this lawsuit is a foreign dispute that does not belong in this forum.  The alleged harms occurred entirely overseas.  Plaintiffs fail to plead any cognizable basis for personal jurisdiction over all but two Defendants, and even failed to serve one Defendant.

---

[1] Emphases added and citations omitted throughout unless otherwise stated.

1

There is no basis to pursue this wasteful, duplicative litigation in this Court. The Court should grant this motion and dismiss Plaintiffs' claims.

## II.    BACKGROUND

Plaintiff Patrick McKillen is a prior business associate of Defendants. Through his company Plaintiff Hume Street Management Consultants Limited ("HSMC"), McKillen provided "the Qatari Royals" with redevelopment and management services of several hotels that were part of the Maybourne Hotel Group. Dkt. 53 ("FAC") ¶¶ 1-3, 5. Plaintiffs claim that Defendants "fraudulently induced" Plaintiffs' services on these projects by denying Plaintiffs remuneration despite "assurances" that Plaintiffs would be paid. *Id.* ¶¶ 55, 226. Plaintiffs characterize this payment dispute as "schemes" that are part of a "broader pattern . . . carried out by, and at the direction of, the Qatari Royals" through their "large network." *Id.* ¶¶ 55, 59. Plaintiffs have pending lawsuits in other forums addressing the same allegations Plaintiffs make here. None of Plaintiffs' allegations, here or in any other forum, support claims for fraud, fraudulent inducement, or any other torts or misconduct. These are simple contract disputes.

### A.    The History of Litigation Between the Parties

Plaintiffs and certain of the Defendants and other parties worked together over many years to develop various properties around the world. Plaintiffs' claims boil down to allegations that Plaintiffs were not paid what they contend they were owed for work they purportedly performed in connection with five properties: the Maybourne Riviera hotel on the French Riviera, the Îlot Saint Germain building in Paris, a personal residence of one Defendant in New York, a personal residence of that same Defendant in London, and the Maybourne Beverly Hills hotel. Those payment disputes are already being litigated elsewhere. In this case, Plaintiffs do nothing more than repeat the allegations from those other suits and then dress them up with conclusory allegations of fraud and conspiracy, in a seeming attempt to harass Defendants with the burden of duplicative litigation in what to most of them

2

is a foreign forum, and the threat of treble damages under the civil RICO statute.

Plaintiffs here are McKillen, a citizen of Ireland and the United Kingdom, and McKillen's company HSMC, which is registered and based in Ireland. *See id.* ¶¶ 11-12. Defendants are various foreign entities and individuals that are alleged to have had varying degrees of involvement with the properties at issue. Dilmon LLC ("Dilmon"), a Qatari company, is the Al Thani family investment office and transacts business around the globe. *See id.* ¶ 18. Maybourne Hotels Limited is an English company that provides centralized office support to the global Maybourne Hotel Chain. *See id.* ¶ 19. Beverly Hills Acquisition LLC is a Delaware limited liability company that directly owns the Maybourne Beverly Hills hotel. *See id.* ¶ 20. Michele Faissola is an Italian national residing in England, and is Dilmon's Chief Executive Officer. *See id.* ¶ 16. Marc Socker is a British national and resident of England, and is Dilmon's Head of Real Estate as well as Co-Chief Executive Officer of the Maybourne Hotel Group. *See id.* ¶ 17. Sheikh Hamad bin Khalifa bin Hamad bin Abdullah bin Jassim bin Mohammed Al Thani ("HBK") and Sheikh Hamad bin Jassim bin Jaber bin Mohammed bin Thani Al Thani ("HBJ") are Qatari citizens and members of the Qatari royal family, collectively referred to by Plaintiffs as the "Qatari Royals." *See id.* at 1 & ¶¶ 13-14. The Qatari Royals are alleged to have worked with Plaintiffs to redevelop several of their personal and business properties. *See id.* ¶¶ 1, 7. Sheikha Lulwah bint Hamad bin Khalifa Al Thani ("Sheikha Lulwah") is HBK's daughter who is alleged to have assisted in business regarding the Maybourne Hotel properties. *See id.* ¶ 15.

All of Plaintiffs' allegations here have already been, or are being, litigated in five other sophisticated forums around the world.

***Maybourne Riviera Litigation***. Plaintiffs' global campaign of duplicative litigation against Defendants started in October 2022, with the first of many lawsuits

regarding the properties. At that time, SOF Construction ("SOF"),[2] a company beneficially owned by McKillen, initiated suit against SEDHV,[3] a company beneficially owned by HBK, in Paris Commercial Court, claiming that SOF was owed expenses advanced towards the redevelopment of the Maybourne Riviera. *See* Declaration of Jessica Stebbins Bina ("Bina Decl.") Ex. A, at 8, 12 (Paris Commercial Court Judgment); *see also* Def. Request for Judicial Notice ("RJN"), at 2-3; Declaration of Marie-Stephanie Cipriano ("Cipriano Decl.") ¶ 3; Bina Decl. ¶ 4. Just two weeks later, HSMC—another McKillen entity and a Plaintiff here—brought a very similar lawsuit against SEDHV in the same court, also based on alleged non-payment of fees related to its work performed on the Maybourne Riviera redevelopment. *See* Bina Decl. Ex. A, at 7, 9. The allegations in these two cases are substantively identical to the "Riviera Fraud" alleged in the FAC—and despite Plaintiffs labeling it a "fraud" here, the allegations amount to nothing more than a claim for breach of an agreement to pay.

Because, in part, SOF's and HSMC's lawsuits against SEDHV involved overlapping parties and issues, the Paris Commercial Court later consolidated them. *See* Bina Decl. Ex. A, at 15-16. The Paris Commercial Court then dismissed HSMC's claim for over €17,500,000 in purported contract fees and dismissed HSMC's "abusive resistance" claim, and separately ordered SOF to return artwork in connection with its payment dispute with SEDHV. *See* Dkt. 48-4 (Paris Court of Appeal Order), at 8-9; Dkt. 48-2 (RJN), at 3; Dkt. 48-16 (Cipriano Decl.) ¶ 3; Dkt. 48-3 (Bina Decl.) ¶ 5. The court also ordered SEDHV to pay certain sums to SOF and HSMC and dismissed SEDHV's counterclaims against SOF to resolve their payment dispute over the Maybourne Riviera redevelopment—a dispute that

---

[2] SOF Construction is a French company beneficially owned by McKillen and created for the purposes of working on the Maybourne Riviera redevelopment project. FAC ¶ 65.

[3] SEDHV is the company that directly owns the Maybourne Riviera and is beneficially owned by HBK. *See id.* ¶ 21.

4

Plaintiffs now cast as part of a "RICO conspiracy." Dkt. 48-4, at 8-9; *see* FAC ¶¶ 7, 60-85. HSMC and SEDHV appealed. *See* Dkt. 48-4, at 8-9.

Shortly thereafter, while the appeal was pending, SOF brought yet another suit against SEDHV in the Paris Commercial Court, based on the same facts and seeking similar damages for non-payment of fees. *See* Dkt. 48-10 (Paris Commercial Court Summons), at 102; *see also* Dkt. 48-2, at 4; Dkt. 48-16 ¶ 5; Dkt. 48-3 ¶ 4. As in the FAC, SOF claimed that Defendants "wrongful[ly] [] terminate[d]" SOF and "refus[ed]" to pay SOF. *See* Dkt. 48-10, at 102, 108-11; *compare* Dkt. 48-10, at 119 (claiming that SEDHV excluded SOF's site manager from the project site and falsely claimed abandonment by SOF) *with* FAC ¶¶ 74-75 (same). SEDHV has filed a pending motion asking that the Paris Commercial Court reject jurisdiction over this case, given the identical and ongoing Court of Appeal proceedings. *See* Dkt. 48-16 ¶ 7.

While this ***third*** Paris Commercial Court case was pending, SOF rushed to yet another court to secure asset seizures against SEDHV. *See* Dkt. 48-5 (Paris Court of Justice Judgment), at 23; *see also* Dkt. 48-2, at 3; Dkt. 48-16 ¶ 5; Dkt. 48-3 ¶ 4. SEDHV challenged these asset seizures because the underlying claims were invalid. *See* Bina Decl. Ex. B (Paris Judicial Court Summons), at 45-46; *see also* RJN at 3; Cipriano Decl. ¶ 4; Bina Decl. ¶ 4. Before the court could hear that challenge, SOF rapidly brought three ***new*** provisional attachments for the same claims. *See* Bina Decl. Ex. B, at 45-46. SEDHV challenged the new attachments as well. *Id.* at 46-47. The asset seizures were overturned in May 2025, in part because the court found that "SEDHV's alleged claim may prevail over SOF's." *See* Dkt. 48-5, at 26. Appeal of this order is ongoing. *See* Dkt. 48-16 ¶ 6.

***Îlot Saint Germain Litigation***. Plaintiffs also brought multiple suits in France substantially identical to the "Saint-Germain Fraud" they allege here. These suits, again, boil down to a dispute over a claimed obligation to pay. In June 2023, HSMC sought pre-litigation discovery related to the Îlot Saint Germain from Constellation

5

Paris (a company beneficially owned by HBJ), HBJ, Socker, and other parties. *See* Bina Decl. Ex. C (Petition Paris Commercial Court), at 136-39; RJN at 3-4; Bakhos Decl. ¶ 3; Bina Decl. ¶ 5. Plaintiffs sought evidence to "confirm [HBJ]'s direct involvement . . . in the refusal to pay the sums due to HSMC [and] establish [] the bad faith" of HBJ and others. *See* Bina Decl. Ex. C ¶ 5. As in the FAC, HSMC alleged a pattern wherein the "companies affiliated with the Qatari Royal Family refused to pay HSMC the amounts owed [for redevelopment of] [the Maybourne] Beverly Hills, [the Maybourne] Riviera, and [the Îlot] Saint-Germain" and prematurely terminated the underlying contracts. *Id.* ¶¶ 60-70, 98. Despite HSMC's dressed-up allegations of a pattern of "bad faith" and intentional "refusals to pay," the court denied the request for pre-litigation discovery, and ultimately HSMC's claim was dismissed and the dismissal was upheld on appeal. *See* Dkt. 48-11 (Paris Court of Appeal Judgment), at 154-56, 162-63; Dkt. 48-2, at 4; Dkt. 48-3 ¶ 10; Dkt. 48-15 (Bakhos Decl.) ¶ 3.

While that litigation was pending, HSMC initiated further proceedings against Constellation Paris for purported non-payment of fees for the redevelopment of the Îlot Saint Germain, again before the Paris Commercial Court. This suit was based on identical allegations that companies belonging to the Qatari royal family successively terminated their relationships and refused to pay HSMC with regards to the Maybourne Riviera, the Maybourne Beverly Hills, and the Îlot Saint Germain. *See* Bina Decl. Ex. D (Summons Paris Commercial Court) ¶¶ 5, 49-57; RJN at 4; Bakhos Decl. ¶ 4; Bina Decl. ¶ 5. Much like the RICO allegations in the present case, HSMC alleged that "[i]t is . . . highly likely that the refusals to pay [] stem from instructions given by [] the Qatari royal family for reasons unrelated to the various projects." Bina Decl. Ex. D ¶ 59. This litigation remains ongoing. *See* Bakhos Decl. ¶ 4; *see also* Bina Decl. Ex. E (Judgment Paris Commercial Court dismissing

6

HSMC's request for a stay);[4] RJN at 4; Bakhos Decl. ¶ 5; Bina Decl. ¶ 5.  In parallel with this lawsuit, HSMC sought and obtained an asset seizure to secure payment.  *See* FAC ¶ 99.  This litigation is also pending.

 ***Maybourne Beverly Hills Litigation***.  In December 2022, HSMC filed a lawsuit in California state court based on the same underlying facts as the "Maybourne Beverly Hills" scheme that Plaintiffs allege here—which, again, amounts to nothing more than a dispute over monies allegedly owed.  Dkt. 48-8 (Los Angeles Superior Court complaint); *see also* Dkt. 48-2, at 4; Dkt. 48-3 ¶ 8.  That action, like the present FAC, names as defendants HBK, HBJ, Sheikha Lulwah, Maybourne Hotels Limited, and Beverly Hills Acquisition LLC.[5]  Dkt. 48-8, at 65.  As here, Plaintiffs allege the claim "arises out of an effort by the Qatari Royals [] to [allegedly] cheat [HSMC] out of [] fees for work on [] the Maybourne Beverly Hills."  *Id.* ¶ 1.  But there, as here, Plaintiffs point to no specific fraudulent misrepresentations or other misconduct through which the Qatari Royals or others tried to "cheat" them; all Plaintiffs allege is that there was a supposed agreement to pay that the defendants breached.  *Compare*, *e.g.*, Dkt. 48-8 ¶ 40 *with* FAC ¶¶ 125-127 (quoting the same text messages between Sheikha Lulwah, Faissola, Socker, and McKillen); *compare, e.g.*, Dkt. 48-8 ¶¶ 36-38 *with* FAC ¶¶ 110-12, 115 (detailing same events underlying engagement of Plaintiffs' services).  This case is

---

[4] Apparently unsatisfied by the French courts, Plaintiffs simultaneously asked an ***American*** court to get involved in the Îlot Saint Germain dispute.  In May 2024, Plaintiffs filed an *ex parte* application in this District for an order pursuant to 28 U.S.C. § 1782 to serve subpoenas upon HBJ in connection with their proceedings before the Paris Commercial Court regarding the Îlot Saint Germain.  *See* Dkt. 48-6 (*ex parte* application), at 36-37; *see also* Dkt. 48-2, at 3-4; Dkt. 48-3 ¶ 7.  Plaintiffs claimed, again, that HBJ engaged in "bad faith" refusal to compensate them for services on the Îlot Saint Germain.  Dkt. 48-6, at 44, 47-48.  After the Paris Court of Economic Activities dismissed HSMC's request for a stay, *see* Bina Decl. Ex. E, at 266, Plaintiffs then withdrew their application before the Central District of California, *see* Dkt. 48-7 (Notice of Withdrawal); *see also* Dkt. 48-2, at 3-4; Dkt. 48-3 ¶ 7.

[5] Other defendants have been dismissed due to lack of personal jurisdiction, and HBK and Sheikha Lulwah have not yet had the opportunity to challenge jurisdiction in the California state case but intend to do so.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

Case No. 2:25-cv-09178-MCS-AGR
MEMO OF LAW ISO DEFENDANTS' MOTION TO
DISMISS AND STRIKE PLAINTIFFS' FAC

ongoing.

***HBJ New York Residence Litigation***.   HSMC also sued over HBJ's New York City residence (as it does again here through its "New York Fraud" claim) in New York state court in May 2024.   That case, which is also ongoing, likewise alleges "unjust enrichment arising from [HBJ] [] and his agents' failure to pay for [HSMC's] work performed [on HBJ's] New York City [residence]."   Dkt. 48-13 (New York State Supreme Court complaint) ¶ 1; Dkt. 48-2, at 5; Dkt. 48-3 ¶ 12. Again, HSMC's allegations in the New York state case are the clear template for the present "New York Fraud," with the FAC and the New York state complaint mirroring one another—and with both lacking any actual allegations of fraud. *Compare* Dkt. 48-13 ¶¶ 20-27 (alleging services performed by HSMC on the New York residence and compensation paid) *with* FAC ¶¶ 162-63, 165 (same).

***Forbes House***.   In 2024, HSMC brought suit against, among others, HBJ, based on purported unpaid fees for the redevelopment of the "Forbes House" in London—mirroring the "London Fraud" alleged in the FAC.   *See* Dkt. 48-9 (High Court of Justice Judgment), at 91; *see also* Dkt. 48-2, at 4; Dkt. 48-3 ¶ 9.   HSMC claimed that an oral contract existed for the "redevelopment of Forbes House," and that after HSMC was "terminated," HBJ and defendants "unjust[ly] [] enriched" themselves by denying HSMC what it considered "reasonable" payment for its services.   *See* Dkt. 48-9 (High Court of Justice Judgment), at 91-92.   The judge dismissed HSMC's request to serve out of jurisdiction, noting that the underlying claim was not "serious," HSMC alleged only "very vague contractual arrangements," and, "despite many attempts and sophisticated legal representation, HSMC [] c[a]me nowhere near" pleading a sufficient claim.   Dkt. 48-9, at 94.   After the request was dismissed, McKillen filed a near-identical suit against HBJ and others, again alleging unpaid contractual fees and "unjust enrichment" for redevelopment of the Forbes House.   *See* Dkt. 48-14 (High Court of Justice Particulars of Claim), at 230; Dkt. 48-2, at 5; Dkt. 48-3 ¶ 13; Dkt. 48-15 ¶ 5.

8

***Other Litigations.*** McKillen sought through confidential arbitration in London sums for his allegedly unpaid sale of shares in the holding company of Maybourne Hotel Group. FAC ¶ 4. Plaintiffs allege that McKillen was awarded over £700 million in that arbitration. *Id.* ¶ 50.

### B.    Plaintiffs' Present RICO Allegations

Plaintiffs' allegations here, conclusory allegations of "fraud" and "conspiracy" aside, largely mirror those in the ongoing litigations described above.

### 1.    Claims Regarding the Properties

***The Maybourne Riviera.*** Plaintiffs allege that the Maybourne Riviera is directly owned by SEDHV. FAC ¶ 61. Plaintiffs do not identify any other ownership interest between any of the Defendants and the Maybourne Riviera. *See generally id.* Plaintiffs allege that in 2019, HSMC and SEDHV entered into a project management agreement to redevelop the Maybourne Riviera. *Id.* ¶ 65. They also allege that SOF "entered into a general contractor agreement with SEDHV on February 5, 2021." *Id.* Plaintiffs allege that under the project management agreement, Plaintiffs were to receive scheduled payments and a results fee. *Id.* ¶ 66. According to Plaintiffs, "[a]s early as January 22, 2021,[6] [] McKillen emailed [HBJ] and [] Faissola to express [] the difficulty he was having in obtaining payment of outstanding hotel management fees." *Id.* ¶ 71. During the project, McKillen claims Defendants became "hostile" and removed him and his associate from the Maybourne Hotels Limited board of directors and denied one member of his team access to the project site. *Id.* ¶¶ 73-74. In April 2022, SEDHV terminated the project management agreement based on McKillen's "abandonment" and later denied

---

[6] "In California, the statute of limitations is four years for a breach of contract claim based on a written contract . . . .," *Cavalry SPV I, LLC v. Watkins*, 36 Cal. App. 5th 1070, 1081 (2019), and "accrues at the time of breach." *Bjorklund v. N. Am. Cos. for Life and Health Ins.*, 72 F. App'x 550, 551 (9th Cir. 2003). Had Plaintiffs filed the present action as a breach of contract claim, it would be barred by the relevant statute of limitations. *See* Dkt. 1 (complaint filed September 25, 2025). And, of course, it is also already the subject of pending French proceedings. *See supra*, Section II.A.

payment of the final installment of the fixed fee for "issues with the quality of HSMC's work." *Id.* ¶¶ 75, 78. Plaintiffs claim that "this refusal [to pay] was made at the direction of [HBK]." *Id.* ¶ 78.

***The Îlot Saint Germain.*** Plaintiffs allege that HBJ purchased the Îlot Saint Germain in 2019 through his company, Constellation Paris. *Id.* ¶ 88. Plaintiffs do not identify any other ownership interest between any of the Defendants and the Îlot Saint Germain. *See generally id.* Plaintiffs allege that HBJ engaged Plaintiffs to manage the redevelopment of the Îlot Saint Germain and represented that Plaintiffs would be paid fees "in accordance with prior hotel projects." *Id.* ¶ 89. Plaintiffs further allege they provided planning services for the hotel, but that the Qatari Royals "refused to pay [Plaintiffs] for work performed." *Id.* ¶¶ 93, 105.

***The Maybourne Beverly Hills.*** Plaintiffs allege that Beverly Hills Acquisition LLC is the direct owner of the Maybourne Beverly Hills, and that HBK is the "ultimate beneficial owner" of Beverly Hills Acquisition LLC. *Id.* ¶ 20. Plaintiffs do not identify any other ownership interest between any of the Defendants and the Maybourne Beverly Hills. *See generally id.*

Plaintiffs claim that in 2019, Faissola, on "behalf" of HBK and Sheikha Lulwah, requested that McKillen oversee redevelopment of the Maybourne Beverly Hills. *Id.* ¶ 110. Over a telephone call, McKillen "affirmed" to Sheikha Lulwah that he would work on the project. *Id.* According to the FAC, McKillen believed the fee arrangement for the project would be an "ordinary course extension of [their] preexisting business relationship." *Id.* ¶ 113. But Plaintiffs do not allege that the parties entered into an agreement regarding compensation; rather, they claim that Defendants should have known "McKillen would not agree [to the] project . . . without fair compensation" (without defining what either party considered "fair compensation"). *Id.* ¶ 114. In October 2019, Plaintiffs allege that McKillen, Faissola, and Socker met in London, and "Faissola confirmed [that] [Plaintiffs] would be compensated [] for work performed on the Maybourne Beverly Hills."

10

*Id.* ¶ 115.  McKillen traveled to California several times during the project and periodically communicated updates to the Defendants over the phone.  *See, e.g.*, *id.* ¶¶ 121, 125-27.  By Plaintiffs' own admission, McKillen did not propose his fees for the project until 2021, two years after he claims to have begun work on the project.  *Id.* ¶ 136.  By June 2021, Plaintiffs claim that "McKillen was actively attempting to secure compensation [] for services rendered."  *Id.* ¶ 135.[7]  Plaintiffs allege that McKillen met with Faissola in London and provided Faissola with a fee proposal, *id.* ¶¶ 136-37, and that Plaintiffs also requested payment from Sheikha Lulwah, but that she said she was not the person handling the payment, *id.* ¶ 140.

According to the FAC, Plaintiffs continued to provide services for the Maybourne Beverly Hills until November 2021, when McKillen raised his payment concerns in a letter to HBK and asked to "withdraw" and "hand over the project." *Id.* ¶ 144 (cleaned up).  HBK responded via letter "thank[ing]" McKillen and asking for a "professional transition" of management.  *Id.* ¶ 145.  McKillen later requested fees from HBJ, based on what McKillen believed to be the "fair market value" for his work, *id.* ¶ 148, and HBJ responded that he was "not aware" of McKillen's payment arrangements, *id.* ¶ 149.  McKillen also allegedly reached out to the Board of Directors of Maybourne Hotels Limited, who "consider[ed]" the letter but did not ultimately respond.  *Id.* ¶¶ 152-53.

***The Manhattan Residence.***  Plaintiffs allege that Tower Management, a company "beneficially owned" by HBJ, purchased the Manhattan Residence in 2012.  *Id.* ¶ 156.  Plaintiffs do not identify any other ownership interest between any of the Defendants and the Manhattan Residence.  *See generally id.*  Plaintiffs allege that in 2018, HBJ approached Plaintiffs to oversee the redevelopment of the personal

---

[7] The statute of limitations for breach of an oral contract in California is two years, and begins to run at the time of the breach.  *See* Cal. Civ. Proc. Code § 339.  Had Plaintiffs filed the present action as a breach of contract claim based on non-payment in June of 2021, it would be barred by the relevant statute of limitations.  *See* Dkt. 1 (complaint filed September 25, 2025).

11

property (with no connection to the Maybourne hotels). *Id.* ¶ 158. Plaintiff "accepted the engagement on the premise [] that HSMC would be compensated for work performed based on past dealings." *Id.* ¶ 159. Plaintiffs do not allege that the parties entered into a written contract, but instead that the "Qatari Royals knew that Plaintiffs accepted" the work for the "fair value of their services." *Id.* The project was completed in November of 2019. *Id.* ¶ 164. Plaintiffs admit that HSMC was paid "€20,000" for the work performed on the Manhattan Residence, but claim further money is owed. *Id.* ¶ 165.[8]

***The Forbes House.*** Plaintiffs allege that Forbes House Limited directly owns Forbes House, and that HBK purchased Forbes House Limited, while HBJ[9] created another corporate entity, Lomakx Limited, for the purpose of redeveloping Forbes House. *Id.* ¶ 171. No other ownership interest by any other Defendant over the Forbes House is alleged. *See generally id.* Plaintiffs allege that on or around June 26, 2015, HBJ asked McKillen to oversee the renovation of Forbes House in coordination with Qaya, a company that manages HBJ's properties globally. *Id.* ¶ 168. Plaintiffs admit there was no "formal agreement" and "no firm price [] agreed upon," but nonetheless allege that HBJ should have known that "McKillen expected to be paid" for the "high-value" renovation. *Id.* ¶ 170. In April 2022, McKillen was asked to cease work on three separate hotels: Claridge's, the Connaught, and the Berkeley. *Id.* ¶ 180. McKillen thereafter wrote a letter to HBJ, withdrawing himself from the Forbes House redevelopment. *Id.* ¶ 181. Plaintiffs claim McKillen is owed payments for work performed on Forbes House. *Id.* ¶ 183.

---

[8] The statute of limitations for a breach of contract action in New York is six years. *See* NY CLS CPLR § 213. The statute of limitations for breach of an oral contract in California is two years, and begins to run at the time of the breach. *See* Cal. Civ. Proc. Code § 339. Had Plaintiffs filed the present action as a breach of contract action based on non-payment in or around 2019 for services rendered on the Manhattan Residence, it would be barred by California's two-year statute of limitations.

[9] Plaintiffs allege that HBK purchased Forbes House Limited, which directly owns Forbes House. FAC ¶ 171. In other international proceedings, Plaintiffs have alleged that HBJ indirectly owns Forbes House. *See* Bina Decl. Ex. K, at ¶ 2.

12

### 2.    The "Quintet Scheme"

Plaintiffs allege that in Fall 2023, Quintet, a bank beneficially owned by HBJ, made, and then abruptly withdrew, an offer to refinance a loan that Quintet had made to Loendro Financement S.à.r.l. ("Loendro"), a company owned by McKillen. *Id.* ¶¶ 186-90.   Plaintiffs allege "on information and belief" that withdrawing the refinancing offer was retaliatory.  *Id*. ¶ 190.  Plaintiffs allege that Loendro had difficulty obtaining alternative financing and stopped paying under the existing loan. *Id.* ¶ 191. After Loendro stopped paying, Quintet held Loendro in default and threatened to seize collateral.  *Id.*  McKillen thereafter paid off the loan.  *Id.* Plaintiffs do not allege that Quintet violated any laws or otherwise did not have the right to collect its loan, that Quintet was obligated to refinance or provide a new loan to Loendro, or that Quintet breached any contract in withdrawing the purported refinance offer.

## III.    LEGAL STANDARD

Defendants move to dismiss under Rules 12(b)(5), 12(b)(2), and 12(b)(6) of the Federal Rules of Civil Procedure and the doctrine of *forum non conveniens*. Alternatively, Defendants move to stay the proceeding pending concurrent litigation in other forums.  Defendants also move to strike under Rule 12(f).

Under Rule 12(b)(5), a party may move to dismiss for insufficient service of process.   *Wasson v. Riverside Cnty*., 237 F.R.D. 423, 424 (C.D. Cal. 2006). "[P]laintiffs bear the burden of establishing that service was valid under Rule 4." *Brockmeyer v. May*, 383 F.3d 798, 801 (9th Cir. 2004).

Under Rule 12(b)(2), a party may seek dismissal for lack of personal jurisdiction.  Plaintiffs bear the burden of demonstrating that personal jurisdiction is proper by showing that Defendants have "at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Schwarzenegger v. Fred Martin Motor Co*., 374 F.3d 797, 801 (9th Cir. 2004) (quoting *Int'l Shoe Co. v. Washington*, 326

13

U.S. 310, 326 (1945)).

To survive a challenge under Rule 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," nor do "'legal conclusion[s] couched as . . . factual allegation[s].'" *Id.*

"The doctrine of *forum non conveniens* allows a court to dismiss a case properly before it when litigation would be more convenient in a foreign forum." *Cooper v. Tokyo Elec. Power Co., Inc.*, 860 F.3d 1193, 1210 (9th Cir. 2017). Alternatively, a court may stay proceedings in favor of parallel state and foreign litigation. *See Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817-18 (1976); *see also Alcon Ent., LLC v. Autos. Peugeot SA*, No. CV1900245CJCAFMX, 2021 WL 2792435, at *4 (C.D. Cal. Feb. 26, 2021) (applying the *Colorado River* doctrine to international proceedings). The stay doctrine is appropriate where "proceedings are 'substantially similar.'" *See Nakash v. Marciano*, 882 F.2d 1411, 1416 (9th Cir. 1989).

Under Rule 12(f) the Court can "strike from a pleading [] any redundant, immaterial, impertinent, or scandalous matter." The Court has discretion to strike allegations that have "no essential or important relationship to the claim for relief," or are otherwise "not necessary[] to the issues in question." *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993) (cleaned up), *rev'd on other grounds*, 510 U.S. 517 (1994).

## IV.   ARGUMENT

### A.   HBK Should Be Dismissed Due to Improper Service

Federal Rule of Civil Procedure 4(f) governs service upon an individual in a foreign country. There are no "internationally agreed means of service" between the United States and Qatar. *See* Dkt. 20, at 2; *see also* Fed. R. Civ. P. 4(f)(1). Instead, service must be "reasonably calculated to give notice" and must not be prohibited

14

by Qatari law. Dkt. 20, at 3 (citing Fed. R. Civ. P. 4(f)(2)(C)(ii)). To serve a foreign defendant by mail under Rule 4(f)(2), the serving party must provide "a receipt signed by the addressee, or [] other evidence satisfying the court that the summons and complaint were delivered to the addressee." *See* Fed. R. Civ. P. 4(l)(2)(B). Plaintiffs bear the burden of proving that service was proper. *Sompo Japan Ins. Co. of Am., Inc. v. I-Sheng Elec. Wire & Cable, Co.*, No. CV075984JFWPJWX, 2008 WL 11343361, at *2 (C.D. Cal. Jan. 3, 2008).

This Court previously granted Plaintiffs' application to serve HBK "by international mail that requires signed receipts" at the Al Wajba Palace. *See* Dkt. 20, at 3-4. Plaintiffs filed a Proof of Service for HBK, relying on a FedEx receipt indicating that the service packet was delivered to Al Wajba Palace and was signed for by "M. Mohammed Abdulla." *See* Dkt. 36-1. But this proof of service does not satisfy Rule 4(l)(2)'s requirement of a receipt "signed by the addressee"—HBK— or "other evidence" that the documents were, in fact, delivered to him.

Nor does it comport with Qatari law. Although "summons may be delivered to a person in his workplace by registered mail," Qatari law does not state that it may be received by *any* person, without further proof of authority. *See* Dkt. 20, at 3; *see also* Dkt. 19-2 (Excerpt of Qatar's Civil and Commercial Procedural Law), at 7. Here, Plaintiffs provide no evidence regarding who "M. Mohammed Abdulla" is, or any other reason to believe HBK received the service packet from this person. Courts regularly find service to be improper based on this very deficiency. *See Kexuan Yao v. Crisnic Fund, S.A.*, No. SACV 10-1299 AG JCGX, 2011 WL 3818406, at *6 (C.D. Cal. Aug. 29, 2011) (FedEx receipt showing delivery to defendant's place of business signed for by third party insufficient); *Przewozman v. Charity*, No. 20CV6088NGGTAM, 2023 WL 2562537, at *6 (E.D.N.Y. Mar. 17, 2023) (same); *Eclipse Grp. LLP v. Fortune Mfg. Co.*, No. 14CV0441-GPC-WVG, 2014 WL 6907897, at *3 (S.D. Cal. Dec. 8, 2014) (service improper where "the return receipt [was] only stamped that it was received at Defendant's building");

15

*Intelsat Corp. v. Multivision TV LLC*, 736 F. Supp. 2d 1334, 1342 (S.D. Fla. 2010) (service improper where "the receipts were signed by receptionists at [defendant's] place of work, not by [defendant] himself"); *Macri v. Yamauchi*, No. 01 C 50168, 2002 WL 390223, at *3 (N.D. Ill. Mar. 11, 2002) (service improper where "the return receipt filed by [p]laintiff d[id] not appear to have been signed by [d]efendant"). Thus, Plaintiffs' service was insufficient and improper, and HBK should be dismissed.

### B. The Court Lacks Personal Jurisdiction Over Foreign Defendants[10]

For a court to exercise personal jurisdiction over a non-resident defendant, "that defendant must have at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Schwarzenegger*, 374 F.3d at 801 (quoting *Int'l Shoe Co.*, 326 U.S. at 326). A defendant's minimum contacts can establish either general or specific jurisdiction. *Schwarzenegger*, 374 F.3d at 801-02. The court must consider the contacts of "each defendant [] individually." *Sher v. Johnson*, 911 F.2d 1357, 1365 (9th Cir. 1990).

This dispute plainly does not belong in this forum, and "the allegations [] in a complaint are insufficient on their face to invoke federal jurisdiction." *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Plaintiffs, themselves foreign parties, allege a purported "global scheme" against foreign defendants based on events that occurred almost entirely overseas. *See* FAC ¶¶ 1, 7; *see also Asahi Metal Indus. Co. v. Super. Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 115 (1987) ("Great care and reserve should be exercised when extending [] personal jurisdiction into the international field."). The only flimsy tie between Defendants and California is an alleged oral agreement reached abroad. That is not enough.

---

[10] References to "Defendants" in this Section exclude Beverly Hills Acquisition, LLC and Maybourne Hotels Limited, as those defendants do not dispute jurisdiction.

16

### 1.      Plaintiffs Fail to Allege General Jurisdiction

To justify the "exceptional" exercise of general jurisdiction, *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1069 (9th Cir. 2015), Defendants must have such "continuous and systematic" contacts with California that they are "essentially at home" in the forum, *Daimler AG v. Bauman*, 571 U.S. 117, 127, 139 (2014).  Plaintiffs fail to meet their burden.

### a.      HBK, Sheikha Lulwah, Faissola, and Socker Are Foreign Citizens with Minimal Ties to California

Plaintiffs concede that HBK, Sheikha Lulwah, Faissola, and Socker are foreign citizens who reside outside of the United States.  FAC ¶¶ 13, 15, 16-17.  There are no specific allegations that these parties even entered the forum.  Nonetheless, Plaintiffs attempt to place these Defendants "at home" in California through the Maybourne Beverly Hills—one of many hotels in which these parties are involved globally.  *See* FAC ¶¶ 31, 36-37.  Their attempt fails.

HBK is alleged only to hold an indirect ownership interest in the Maybourne Beverly Hills, which falls far short of establishing a constant and pervasive relationship to California.  *See* FAC ¶ 20; *Brown v. 140 NM LLC*, No. 17-CV-05782-JSW, 2019 WL 118425, at *6 (N.D. Cal. Jan. 7, 2019) ("An individual's frequent visits to a forum, or even his owning property in a forum, do not, alone, justify the exercise of general jurisdiction over him.").  Similarly, Sheikha Lulwah is alleged merely to "assist[] her father with his hotel investments."  *See* FAC ¶ 15.  Likewise, Socker's and Faissola's alleged "occasional" business contacts from abroad—such as texting with McKillen about the Maybourne Beverly Hills—are insufficient.  *See id.* ¶¶ 126-27; *see also Schwarzenegger*, 374 F.3d at 801 (rejecting general jurisdiction where the defendant retained the services of California companies); *Brand v. Menlove Dodge*, 796 F.2d 1070, 1073 (9th Cir. 1986) (holding that "occasional" sales to California residents did not establish general jurisdiction).

17

### b.   HBJ Is Not "At Home" in California

Although Plaintiffs admit that HBJ is a citizen of Qatar, Plaintiffs claim jurisdiction is appropriate because HBJ "maintains a dwelling in Los Angeles." *See* FAC ¶¶ 14, 33.  But maintaining a secondary property is far from being "at home" in a forum, and is insufficient to confer general jurisdiction.  *Malekar v. Birley*, No. 22-CV-06187-HSG, 2023 WL 3202664, at *3 (N.D. Cal. May 1, 2023) ("[F]requent visits to a forum, or even owning property in a forum, do not justify the exercise of general jurisdiction."); *Reiffin v. Microsoft Corp.*, No. C1103505CRB, 2012 WL 1309179, at *3 (N.D. Cal. Apr. 16, 2012) (finding mere "property ownership" of a secondary home that defendant is not alleged to "frequent" is insufficient to confer jurisdiction).  Plaintiffs acknowledge that HBJ maintains residences around the world, including in London and New York.  *See* FAC ¶¶ 156, 167.  Nonetheless, Plaintiffs assert that HBJ is uniquely at home in California because he invested in expanding, designing, and hiring staff for his personal California property (not at issue in this case), and "public[] report[s]" claim HBJ once considered relocating to California.  *See id.* ¶ 33(a)-(e).  But, as Plaintiffs admit, HBJ has likewise invested in and hired employees for his London and New York properties, and also spends time in these locations.  *See id.* ¶¶ 142, 147, 158, 169-178.

Plaintiffs point to an order in the ongoing, parallel California state case finding that HBJ is a "resident" of Los Angeles for purposes of service.  *See id.* ¶ 33(g).  But that court acknowledged that an individual may have multiple residences where they can be served, Bina Decl. Ex. F (Minute Order), at 291-92,[11] but they have only one domicile for personal jurisdiction, which is their "home" where they intend to indefinitely remain.  *See Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989) ("'Domicile' is not necessarily synonymous with 'residence,' [] and one

---

[11] The Court previously permitted Plaintiffs to serve HBJ at his address in Doha, Qatar, which undermines Plaintiffs' argument that the California residence is HBJ's "domicile" for the purposes of personal jurisdiction merely because his agent was allowed to be served there.  *See* Dkts. 19, 20.

can reside in one place but be domiciled in another."); *Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001) ("A person residing in a given state is not necessarily domiciled there."). The state court found that HBJ has "part-time homes" and visits California only on a "limited basis." *See* Bina Decl. Ex. F, at 292. This does not establish that HBJ, a Qatari citizen and its former Emir, is permanently "at home" in California. *See Malekar*, 2023 WL 3202664, at *3.

### c. Dilmon Is Not "At Home" in California

Plaintiffs acknowledge that Dilmon is a Qatari company with its principal place of business in Qatar. *See* FAC ¶ 18. Plaintiffs also allege that Dilmon serves as the "Al Thani family office," and, like the other Defendants, conducts business all over the world. *Id.* ¶¶ 18, 62. Indeed, its CEO and Head of Real Estate are foreign citizens residing in England. *See id.* ¶¶ 16, 17. The general jurisdiction inquiry "calls for an appraisal of a corporation's activities in their entirety, [including] worldwide." *See Daimler*, 571 U.S. at 139 n.20; *see also Ranza*, 793 F.3d at 1070 (same). Plaintiffs' allegations do not demonstrate this is an "exceptional case" in which Dilmon's California contacts are major "compared to its other worldwide contacts," and so they fail to establish general jurisdiction over Dilmon. *Martinez v. Aero Caribbean*, 764 F.3d 1062, 1070 (9th Cir. 2014).

### 2. There Is No Basis for Specific Jurisdiction

Because Plaintiffs cannot show general jurisdiction, they must establish specific jurisdiction based on each Defendant's "specific, forum-related activities." *In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*, 601 F. Supp. 3d 625, 691 (C.D. Cal. 2022). Plaintiffs must show: (1) purposeful direction;[12] (2) that the claim "arises out of [] the defendant's forum-related activities"; and (3) that the exercise of jurisdiction is "reasonable." *See Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir.

---

[12] Although in some instances courts may apply a "purposeful availment" standard, here, "the only claim that Plaintiffs assert against [Defendants] is the RICO claim," which is subject to "a purposeful direction analysis." *Pandolfi v. Aviagames, Inc.*, No. 23-CV-05971-EMC, 2024 WL 4951258, at *8 (N.D. Cal. Dec. 3, 2024).

19

2015). The only connection Plaintiffs allege between the global "RICO scheme" and California is an alleged overseas oral agreement related to the Maybourne Beverly Hills redevelopment. This alleged agreement involved minimal Defendant participation and relates to just one of many purported "schemes." This tenuous link cannot justify subjecting Defendants to jurisdiction in California.

### a.    No Action Was Purposely Directed Toward California

Purposeful direction requires Plaintiffs to show that each Defendant (1) committed an intentional act, (2) expressly aimed at the forum, (3) causing harm that the Defendant knew was likely to be suffered in California. *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1077 (9th Cir. 2011). Plaintiffs' allegations fail to make such a showing. Plaintiffs allege a global RICO conspiracy involving international parties engaged in separate "frauds" across five forums. The only alleged harm remotely touching California is Defendants' supposed failure to compensate Plaintiffs for their role in redeveloping the Maybourne Beverly Hills. *See, e.g.*, FAC ¶¶ 32, 34, 36-37. Plaintiffs are foreign citizens who primarily conduct business abroad, *see id.* ¶¶ 11-12, and any harm Plaintiffs experienced due to the California "fraud" would likely be felt overseas, *see Attilio Giusti Leombruni S.p.A. v. Lsil & Co.*, No. CV 15–002128 BRO (Ex), 2015 WL 12743878, at *10 (C.D. Cal. May 29, 2015). To the extent Plaintiffs have a claim regarding the Maybourne Beverly Hills, it cannot properly be brought against these foreign Defendants based merely on their indirect ownership of or corporate association with the hotel. *See M.O. Dion & Sons, Inc. v. VP Racing Fuels, Inc.*, No. CV 19-5154-MWF (SSX), 2019 WL 4750116, at *5 (C.D. Cal. Sept. 27, 2019).

Purposeful direction requires "something more" than "a foreign act with foreseeable effects in the forum state." *Wash. Shoe Co. v. A-Z Sporting Goods, Inc.*, 704 F.3d 668, 675 (9th Cir. 2012). Plaintiffs must show that Defendants "inten[ded] to perform an actual[] physical act," *Picot*, 780 F.3d at 1214, "expressly aimed" at California based on Defendants' "'own contacts' with the forum," *Axiom Foods, Inc.*

20

*v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1069-70 (9th Cir. 2017).  Here, Defendants' alleged actions with regards to the Maybourne Beverly Hills were merely incidental to their corporate duties, occurred almost entirely abroad, and had no meaningful connection to the forum.

For example, Plaintiffs allege that HBK and Sheikha Lulwah (1) requested, through corporate representatives, McKillen's opinion on the purchase of the Maybourne Beverly Hills; (2) inquired, through corporate representatives, about McKillen's services before acquiring the property; (3) met with McKillen *in Qatar* to hear McKillen's redevelopment pitch; and (4) exchanged limited communications about the hotel and McKillen's payment dispute.  *See* FAC ¶¶ 107-08, 110, 112, 125, 140, 144-45.  These were overseas business interactions between foreign parties that did not directly "impact" California.  *See Xavier v. AutoNation, Inc.*, No. 5:25−cv−00731−AB−DTB, 2026 WL 166909, at *5 (C.D. Cal. Jan. 14, 2026) ("[E]ven substantial financial interactions with the people in the forum do not satisfy the express aiming requirement where none of the challenged conduct was directed at the forum itself."); *Cf. Ogdon v. Grand Canyon Univ., Inc.*, No. 1:20-cv-00709-DAD-SKO, 2022 WL 846973, at *11, 14 (E.D. Cal. Mar. 22, 2022) (finding no "purposeful direction" or "express aiming" in a nationwide RICO fraud case where a CFO compensated and oversaw employees in California).

Similarly, rather than intentionally acting or expressly aiming conduct at California, Faissola, Socker, and Dilmon are alleged to have been corporate middlemen with respect to the Maybourne Beverly Hills.  *See, e.g.*, FAC ¶ 110 (alleging Faissola reached out to McKillen on behalf of Sheikha Lulwah and HBK regarding his services); *id.* ¶ 136-37 (alleging Faissola accepted a letter from McKillen with his fee proposal); *id.* ¶ 144 (alleging Faissola and Socker were asked to pass a letter on to HBK and HBJ from McKillen); *id.* ¶ 149 (alleging "Dilmon supported by [HBK] [] told [McKillen] they won't pay [Plaintiffs'] [] fees").  At most, the FAC alleges that Socker and Faissola participated in a *London* meeting

21

where Faissola merely "confirmed" that Plaintiffs would be "compensated." *Id.* ¶ 115. There is insufficient alleged "independent decision-mak[ing]" by Faissola, Socker, or Dilmon with respect to Plaintiffs' employment in California to find purposeful direction. *Marshall v. Galvanoni*, No. 2:17–cv–00820–KJM–CKD, 2017 WL 5177764, at *4 (E.D. Cal. Nov. 8, 2017).

Plaintiffs' allegations as to HBJ fare no better. Although Plaintiffs claim that "meetings" occurred in California between HBJ and McKillen, *see* FAC ¶¶ 34, 123, the FAC primarily alleges that they communicated about scheduling a meeting—not that these meetings occurred, *see, e.g., id.* ¶¶ 118, 129-131, 143. At best, Plaintiffs vaguely allege that HBJ had a standing reservation at a restaurant in the Maybourne Beverly Hills and may have met with McKillen. *See id.* ¶ 132. These allegations are devoid of any detail connecting these meetings to the purported international "fraud." Regardless, "meetings to discuss the parties' business relationship in California, without more, are insufficient to establish specific jurisdiction," let alone for a sprawling RICO conspiracy with multiple "schemes" outside California. *A-List Mktg. Sols. Inc. v. Headstart Warranty Grp. LLC*, No. 8:25-CV-00131-FWS-KES, 2025 WL 1674377, at *5 (C.D. Cal. May 7, 2025); *see also Gabor v. Deshler*, No. 17-CV-01524-LHK, 2018 WL 2762411, at *9 (N.D. Cal. June 7, 2018) ("[A]lthough Plaintiffs allege that Harris met with Plaintiffs [] in California . . . Plaintiffs do not contend . . . anything [] said at the meeting form[s] the basis for any of the causes of action . . . .").

Furthermore, the Individual Defendants[13] cannot be subject to jurisdiction based on their ownership or management of the Maybourne Beverly Hills. Plaintiffs claim jurisdiction is proper because of alleged indirect acts the Individual Defendants took incidental to their ownership or management of the Maybourne Beverly Hills. *See, e.g.*, FAC ¶¶ 31-32, 34, 36-37. But under the fiduciary shield

---

[13] "Individual Defendants" refers to HBK, HBJ, Sheikha Lulwah, Faissola, and Socker.

22

doctrine, personal jurisdiction does not exist over a corporate officer or employee where their "contacts with the forum state were functions of [their] employment." *M.O. Dion & Sons, Inc.*, 2019 WL 4750116, at *5. To overcome the fiduciary shield, Plaintiffs must show each Defendant was the "primary participant" in the corporate activities forming the basis of jurisdiction, or that the corporate entities are their "alter egos."[14] *See Shenzhen Riitek Tech. Co. Ltd. v. AERB, Inc.*, No. 8:18-cv-00645-JLS-JDE, 2018 WL 5264077, at *7 (C.D. Cal. July 18, 2018). Plaintiffs show neither.

As described above, Plaintiffs fail to adequately allege that any of the Individual Defendants "caused th[eir] harm." *See NuCal Foods, Inc. v. Quality Egg LLC*, 887 F. Supp. 2d 977, 997 (E.D. Cal. 2012). Plaintiffs claim they ultimately requested fees from the Board of Directors of Maybourne Hotels Limited, *see* FAC ¶ 152, which suggests that "other entities," rather than the Individual Defendants, directly made decisions about Plaintiffs' engagement and compensation. *See Leroy-Garcia v. Brave Arts Licensing*, No. C 13-01181 LB, 2013 WL 4013869, at *8 (N.D. Cal. Aug. 5, 2013). Moreover, the actions Individual Defendants allegedly took, such as requesting Plaintiffs' services or exchanging high-level updates about the Maybourne Beverly Hills, *see, e.g.*, FAC ¶¶ 108, 110, 125-27, are consistent with the duties of attenuated corporate officers rather than "primary participants." *See State Narrow Fabrics, Inc. v. Fisher*, No. 16-4252 MWF (RAOX), 2016 WL 11002147, at *4 (C.D. Cal. Nov. 29, 2016) ("hir[ing]" and "pay[ment]" decisions "merely show[ed] [] participat[ion] [] as an officer"); *see also Three-D Spirits, Inc. v. Voodoo Tiki Tequila Corp.*, No. 2:11-CV-09255-JHN (AJWx), 2012 WL 13012646, at *4 n.4 (C.D. Cal. Mar. 19, 2012) (phone calls made "on behalf of the corporation" could not establish specific jurisdiction over corporate officer). In fact,

---

[14] Plaintiffs do not allege any corporation involved in the purported fraud is the "alter ego" of any of the Individual Defendants. *See Riot Games, Inc. v. Suga PTE, Ltd.*, 638 F. Supp. 3d 1102, 1112 (C.D. Cal. 2022) ("[A] plaintiff must allege specifically both of the elements of alter ego liability, as well as facts supporting each.").

23

when contacted, Sheikha Lulwah and HBJ allegedly affirmed that they did not handle these issues directly.  FAC ¶¶ 140, 149.  Accordingly, Plaintiffs cannot meet the "stringent" requirements to support such an "extreme" remedy of disregarding the corporate form to exercise jurisdiction over the Individual Defendants based on their corporate contacts.  *NuCal Foods, Inc.*, 887 F. Supp. 2d at 993.

### b.    Exercising Jurisdiction Would Be Unreasonable

Exercise of specific personal jurisdiction must be reasonable and comport with "traditional conception[s] of fair play and substantial justice."  *Int'l Shoe Co.*, 326 U.S. at 320; *see also Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1487-88 (9th Cir. 1993) (listing relevant factors).  It would be unreasonable here.

Plaintiffs' tenuous connection to California is a purported oral agreement made overseas between international parties about the California branch of a global hotel brand.  Yet Plaintiffs ask the Court to exercise jurisdiction over the foreign-based Defendants for a RICO "conspiracy" composed primarily of "schemes" outside California.  That is neither just nor reasonable.  *See Core-Vent Corp.*, 11 F.3d at 1490 (declining jurisdiction where "the plaintiff [was] an international corporation and [] defendants [were] individual citizens of a foreign country [] whose purposeful interjection into the forum state [was] very limited").  Indeed, courts recognize that requiring foreign defendants to litigate around the world presents a "substantial burden" on them.  *See Wargaming.net Ltd. v. Blitzteam LLC*, No. CV20-02763-CJC (MRWx), 2021 WL 3619956, at *13 (C.D. Cal. Jan. 20, 2021).

The Supreme Court has cautioned that "great care" must be exercised before courts interfere in disputes involving foreign citizens, because "other nations" have superior sovereign "interests [that are] affected by the assertion of jurisdiction."  *See Asahi*, 480 U.S. at 115.  California has little interest in this conflict that does not involve "United States citizen[s], and [where] United States citizens are not being harmed."  *Wargaming.net*, 2021 WL 3619956, at *5.  And that minimal interest

24

cannot overcome the "high" sovereignty barrier presented by Plaintiffs' numerous, ongoing international lawsuits. *See Amoco Egypt Oil Co. v. Leonis Nav. Co.*, 1 F.3d 848, 852 (9th Cir. 1993); *Wargaming.net*, 2021 WL 3619956, at *5. Here, the most efficient resolution of this controversy would be in a foreign jurisdiction, where the majority of the purported activity took place and where the parties are located ***and are already litigating***. *See Core-Vent Corp.*, 11 F.3d at 1489 ("[E]fficiency of the forum . . . look[s] primarily at where the witnesses and the evidence are likely to be located."). Thus, the Court should decline to participate in yet another stop in Plaintiffs' global revenge tour.

### 3.    Plaintiffs Do Not Establish Rule 4(k) Jurisdiction

In a last-ditch effort to establish personal jurisdiction, Plaintiffs allege that jurisdiction under Rule 4(k)(2) is appropriate as to HBK, HBJ, Sheikha Lulwah, and Dilmon. FAC ¶ 35. Rule 4(k)(2) allows jurisdiction over unrelated defendants only "in a narrow band of cases." *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1126 (9th Cir. 2002). A federal court may exercise jurisdiction under Rule 4(k)(2) where defendants have substantial "contacts with the nation as a whole." *Barantsevich v. VTB Bank*, 954 F. Supp. 2d 972, 995 (C.D. Cal. 2013). Plaintiffs claim jurisdiction under Rule 4(k)(2) is appropriate here because HBK, HBJ, Sheikha Lulwah, and Dilmon "have sufficient ties to the United States . . . through [] their ownership of the Maybourne Beverly Hills and the [New York] Residence and associated ventures and activities." FAC ¶ 35. Of course, neither HBK, HBJ, Sheikha Lulwah, nor Dilmon are the direct owners of the Maybourne Beverly Hills and, as discussed, they have attenuated ties to the hotel and to California. *See supra*, Section IV.B.1-2. Likewise, none of the Defendants— including HBJ—are alleged to be the owner of the New York residence, and there are no allegations that any Defendant entered or otherwise directed any action towards New York. *See* FAC ¶ 156; *see also Mocha Mill, Inc. v. Port of Mokha, Inc.*, No. 18CV02539HSG, 2019 WL 1048252, at *6 (N.D. Cal. Mar. 5, 2019)

25

("Plaintiffs pleaded no U.S. contacts outside of California . . . [t]hus, Rule 4(k)(2). . . . affords Plaintiffs no [] tenable basis for personal jurisdiction . . . ."); *Republic of Kazakhstan v. Ketebaev*, No. 17CV00246LHK, 2018 WL 2763308, at *17-18 (N.D. Cal. June 8, 2018) (finding no jurisdiction under Rule 4(k)(2) where defendant earned profits from sales in the United States, but the profits were enjoyed overseas). These allegations are woefully deficient to subject foreign Defendants who conduct business primarily overseas to jurisdiction under Rule 4(k)(2) based on their "nationwide" contacts.

Plaintiffs fail to demonstrate that this Court has any basis for jurisdiction— either general, specific, or under Rule 4(k)—over foreign Defendants involved in international business.  The Court should dismiss all claims against HBK, HBJ, Sheikha Lulwah, Faissola, Socker, and Dilmon for lack of personal jurisdiction.

**C.  Plaintiffs' FAC Fails to Transform a Series of Contract Disputes Into a RICO Action, And All Claims Should Be Dismissed**

The FAC should be dismissed on the merits as to all Defendants.  To overcome a motion to dismiss, a plaintiff asserting a civil RICO claim must plead facts establishing "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to the plaintiff's 'business or property.'"  *Loomer v. Zuckerberg*, No. 23-3158, 2025 WL 927186, at *1 (9th Cir. Mar. 27, 2025), *cert. denied*, 146 S. Ct. 272 (2025).  Each of these elements must be independently pleaded with sufficient factual matter to satisfy the plausibility standard, and where the predicate acts sound in fraud (as they do here), the heightened requirements of Rule 9(b) apply as well.  *See Eclectic Props. E., LLC v. Marcus & Millichap Co*, 751 F.3d 990, 995-97 (9th Cir. 2014); *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991).  "Courts have overwhelmingly rejected attempts to characterize routine commercial relationships as RICO enterprises."  *Gomez v. Guthy-Renker, LLC*, No. 5:14-cv-01425-JGB-kk, 2015 WL 4270042, at *8-11 (C.D. Cal. July 13, 2015); *see also, e.g.*,

26

*Spotlight Ticket Mgmt.*, 2020 WL 4342260, at *5 (dismissing complaint because the allegations of underpaid commissions were "insufficient to establish a plausible scheme to defraud"). That is precisely what Plaintiffs seek to do here. Plaintiffs sensationalize a series of commercial disputes in an attempt to cast them as a RICO conspiracy, but the facts as pleaded do not meet the threshold of Rule 9(b) or plausibly allege a RICO scheme. Accordingly, the Court should dismiss these claims.

### 1. Plaintiffs Fail to Plead That Any Defendants Committed Predicate Acts Under the RICO Statute

Plaintiffs fail to plead a RICO claim for multiple independent reasons, but the most basic is that Plaintiffs plead no specific facts to establish that any Defendant—much less all of them—committed any racketeering activity. "'A pattern of racketeering activity' requires [a showing of] at least two acts of racketeering activity" by each defendant "within ten years." *See* 18 U.S.C. § 1961(5); *Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008); *Comm. to Protect our Agric. Water v. Occidental Oil & Gas Corp.*, 235 F. Supp. 3d 1132, 1177 (E.D. Cal. 2017). "Racketeering activity" includes various enumerated crimes and frauds. 18 U.S.C. § 1961(1). Plaintiffs do not allege any violations of law that purportedly injured them. Rather, the only racketeering activities Plaintiffs allege are various purported fraudulent statements and omissions in their dealings with Defendants. Plaintiffs' fraud allegations fail because they do not meet the requirements of Rules 8 and 9(b): they do not plead any specific fraudulent statements, and as to their fraudulent omissions claims, they do not plead facts giving rise to an obligation to disclose, nor do they specifically plead what omissions rendered any Defendant's statements false.

Plaintiffs claim their foreign business disputes with Defendants rise to the level of racketeering based on "continuous acts of wire fraud and fraud in foreign labor contracting." *See* FAC ¶ 215. Because these purported predicate acts sound

27

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

in fraud, they must be pleaded with the particularity required by Rule 9(b), which means Plaintiffs must "state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010).  These purported predicate acts require more than mere non-payment or broken business expectations. *Eclectic Props.*, 751 F.3d at 997 ("Plaintiffs' fraud theory requires them to show more than a business deal gone bad for economic and non-fraudulent reasons.").

The FAC lacks the necessary particularized allegations to show predicate acts by any Defendant, much less all of them.  At most, the FAC describes "a 'pattern of breach of contract activity,'" which is not sufficient to establish a violation of RICO. *Royce Int'l Broad. Corp. v. Field*, No. C 99-4169 SI, 2000 WL 236434, at *4, *6 (N.D. Cal. Feb. 23, 2000) ("To the extent that plaintiff's allegations of mail or wire fraud are little more than allegations of a state breach of contract claim, a RICO claim is not cognizable.").  Taken together, Plaintiffs' allegations, even if accepted, do not describe fraud committed with specific intent to deceive.  *See id.* at *4 ("simple breach of contract and fraud" in a failed business transaction does not show a pattern of racketeering activity for purposes of a RICO claim); *Nguyen v. Hartford Life Ins. Co.*, No. 8:09-cv-00244-AG-SS, 2009 WL 10673367, at *3 (C.D. Cal. July 13, 2009) (similar); *Spotlight Ticket Mgmt.*, 2020 WL 4342260, at *5.  "When companies engage in [] transactions that are facially legitimate [] and operate legitimate businesses for years thereafter . . . a significant level of factual specificity is required to allow a court to infer reasonably that such conduct is plausibly part of a fraudulent scheme." *Eclectic Props.*, 751 F.3d at 997-98.  Plaintiffs provide no such factual specificity here.

### a.      Plaintiffs Fail to Sufficiently Plead a Scheme to Defraud or Use of Wires in Furtherance Thereof

Plaintiffs' wire fraud allegations fail to satisfy any of the required elements. To establish wire fraud as a predicate act, Plaintiffs must allege: (1) a scheme to

28

defraud, (2) use of interstate wires in furtherance of the scheme, and (3) specific intent to defraud. *See Comm. to Protect our Agric. Water*, 235 F. Supp. 3d at 1176 (citing *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 782 (9th Cir. 2002) *superseded by Rule on other grounds as stated in David v. Betts*, No. 1:20-cv-00002-JMS-WRP, 2024 WL 2214613, at *17 n.20 (D. Haw. May 15, 2024)). The FAC fails on each.

A scheme to defraud requires the use of *material* falsehoods—either affirmative misrepresentations or, in limited circumstances, material omissions. *United States v. Jesenik*, 152 F.4th 924, 938 (9th Cir. 2025). "A false statement is material if it has a natural tendency to influence, or is capable of influencing, the decisionmaker to whom the statement was addressed." *Id.* (cleaned up). Additionally, the use of wires must be made "for the purpose of executing" the fraudulent scheme. 18 U.S.C. § 1341. Routine or incidental communications do not suffice. *Id.* Under Rule 9(b), Plaintiffs must identify with particularity each wire communication alleged to have furthered the scheme, including the specific content and the identity of the sender and recipient. *See Lancaster*, 940 F.2d at 405. The FAC fails to identify any material misrepresentation by any Defendant and fails to "allege facts explaining how any of defendants' claimed communications involved a misrepresentation, or how any innocuous communications were an essential part of a scheme to defraud." *Comm. to Protect our Agric. Water*, 235 F. Supp. 3d at 1179-80.

The decision in *Faryniarz v. Ramirez* is illustrative. 62 F. Supp. 3d 240 (D. Conn. 2014). In *Faryniarz*, an inventor alleged that his business partner had fraudulently induced him to develop patentable chemical technologies by promising to share profits equally under an oral agreement, only to later stop paying him his share of royalty payments. *Id.* at 244-45. The court dismissed, holding that the plaintiff's allegations amounted to "breach of contract and common business tort" that could not "be transmogrified into a RICO claim by the facile device of charging that the breach was fraudulent, indeed criminal." *Id.* at 254.

29

Here too, across all five projects, the wire communications identified in the FAC are not misrepresentations, but routine project updates, scheduling communications, and cordial exchanges. *See, e.g.*, FAC ¶ 85 (WhatsApp voice notes to arrange meetings); *id.* ¶ 94 (WhatsApp message wishing McKillen good luck); *id.* ¶ 105 (WhatsApp message to arrange a meeting in Paris and Zoom meeting concerning a project); *id.* ¶¶122-26, 166, 185 (references to phone and email communications concerning project updates but no identified fraudulent statements). None of these communications is alleged with any specificity to have been false or to have furthered a fraudulent purpose. Plaintiffs do not allege (nor could they) how routine project updates, a cordial well-wishing message, or attendance at a project presentation furthered any fraudulent scheme. *See Capitol W. Appraisals, LLC v. Countrywide Fin. Corp.*, 759 F. Supp. 2d 1267, 1276 (W.D. Wash. 2010) (holding that complaint failed to meet Rule 9(b)'s particularity requirements where plaintiff did not "establish *how* the emails were fraudulent or furthered the alleged fraudulent scheme"), *aff'd*, 467 F. App'x 738 (9th Cir. 2012); *Comm. to Protect our Agric. Water*, 235 F. Supp. 3d at 1179-80 (dismissing RICO claim where FAC "d[id] not allege facts explaining how any of defendants' claimed communications involved a misrepresentation, or how any innocuous communications were an essential part of a scheme to defraud").

### b.    Plaintiffs Fail to Sufficiently Plead any False Statements

Plaintiffs also plead no facts establishing that any statements were false when made. Critically, for every project, Plaintiffs' FAC merely states that Plaintiffs had an expectation of compensation based on prior business arrangements, but there is no specificity as to when, where, or in what form Defendants allegedly made material representations. For example, Plaintiffs' allegation that, with respect to the Maybourne Beverly Hills, HBJ "lull[ed] Mr. McKillen into a sense of security" by stating that he was not aware of McKillen's arrangement with Dilmon and that HBJ

30

would speak with them, *id.* ¶¶ 149-50, describes communications incident to an ongoing commercial relationship, not fraud. Plaintiffs' allegations throughout simply reflect contract disputes about what was owed. *See, e.g.*, *id.* ¶ 80 (alleging that SEDHV offered an "alternative" calculation for the fees owed to McKillen on the Riviera project). The existence of competing views on compensation demonstrates a business disagreement, not a fraudulent scheme.

Plaintiffs also allege a "Quintet Scheme" whereby a bank beneficially owned by HBJ ("on information and belief") induced McKillen's Luxembourg company, Loendro, into a refinancing and later pulled the offer, *id.* ¶¶ 186-90, and a series of unrelated "additional racketeering" by the Qatari Royals, including "corruption" and "illicit" usage of Quintet wholly unrelated to Plaintiffs, *id.* ¶¶ 194-210. But Plaintiffs do not allege these two "schemes" are part of the "pattern" of racketeering in their civil RICO claim. *Id.* ¶ 218 (alleging only that the "California Fraud, the New York Fraud, the Saint-Germain Fraud, the Riviera Fraud, and the London Fraud" constitute a "pattern" of racketeering activity under 18 U.S.C. § 1961(5)). Nor do they allege these claimed schemes involved predicate acts of wire fraud or fraud in foreign labor contracting. In fact, Plaintiffs do not allege the "Quintet Scheme" involves any unlawful conduct at all. As for the alleged "additional racketeering," these allegations have nothing to do with Plaintiffs, are included solely for salacious purposes, and should be stricken. *See infra*, Section IV.E.

### c. Plaintiffs Fail to Allege Any Special Relationship Giving Rise to a Duty to Disclose

To the extent Plaintiffs rely on an omissions theory of fraud, they must show that "the defendant had a special 'trusting relationship' with the victim" giving rise to a duty to disclose. *Jesenik*, 152 F.4th at 938. Absent such a duty, silence—even silence that allows another party to proceed under a mistaken assumption—is not actionable fraud. *See Eller v. EquiTrust Life Ins. Co.*, 778 F.3d 1089, 1092 (9th Cir. 2015); *In re All Terrain Vehicle Litig.*, 978 F.2d 1265 (9th Cir. 1992) (affirming

31

dismissal where plaintiffs alleged no independent duty on the part of defendants giving rise to mail and wire fraud liability for failure to disclose).

Despite Plaintiffs' insistence to the contrary, arms-length business relationships, even relationships that persist over many years, do not establish a special relationship giving rise to a duty to disclose. *See*, e.g., FAC ¶¶ 53, 55, 99, 183. "Every contract requires one party to repose an element of trust and confidence in the other to perform." *City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 389 (2008). "The mere fact that in the course of their business relationships the parties reposed trust and confidence in each other does not impose any corresponding fiduciary duty in the absence of an act creating or establishing a fiduciary relationship known to law." *City Sols., Inc. v. Clear Channel Commc'ns, Inc.*, 201 F. Supp. 2d 1048, 1050 (N.D. Cal. 2002); *see also Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865, 883 (9th Cir. 2007) (finding no special relationship even though plaintiffs alleged that they placed a "special trust" or "special confidence" in the counterparty, because the relationship was "a standard friendly but arms-length business relationship"). The FAC alleges no facts to suggest there was any "act creating or establishing a fiduciary relationship." *See City Sols., Inc.*, 201 F. Supp. 2d at 1050.

Even when parties develop trust through repeated dealings or one party gains access to confidential information, this alone cannot transform an arms-length relationship into a fiduciary one without additional extraordinary circumstances. *See Wolf v. Superior Ct.*, 107 Cal. App. 4th 25, 31-32 (2003), *as modified on denial of reh'g* (Mar. 20, 2003); *Genentech*, 43 Cal. 4th at 391-92. Plaintiffs have pleaded no extraordinary circumstances that would transform the parties' arms-length business dealings into a fiduciary relationship. "[T]he [FAC] is devoid of allegations showing an agency, trust, joint venture, partnership or other 'traditionally recognized' fiduciary relationship and . . . cannot be amended to state facts alleging such a relationship." *Wolf*, 107 Cal. App. 4th at 30.

32

Likewise, a fiduciary duty does not arise simply from Plaintiffs' alleged right to receive compensation. *See id.* at 28-36. This is particularly true here, where the parties "negotiated as co-equals and interacted with their eyes wide open." *City Sols.*, 201 F. Supp. 2d at 1051. "A fiduciary relationship does not exist on the basis of an arm's length business transaction, unless provided for by contract." *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1041 (9th Cir. 2010). Plaintiffs do not allege any fiduciary or special relationship between McKillen and Defendants. Nor does the FAC identify any contractual provision or other legal obligation imposing disclosure duties upon Defendants. Absent such a duty, Defendants' alleged failure to volunteer that the Maybourne Beverly Hills arrangement "would be any different" from prior projects cannot constitute fraud. *See Eller*, 778 F.3d at 1092 (silence does not constitute fraud absent a duty to speak); *Giles*, 494 F.3d at 883-84 ("the law of contract would dissolve if an ordinary personal friendship between business associates . . . were sufficient to transform an otherwise arms-length business transaction into a transaction based on a confidential or special relationship"). With respect to the Maybourne Beverly Hills, McKillen did not propose his fees for the project until 2021—two years after he was engaged. *See* FAC ¶ 136. If anyone failed to clarify the compensation terms, it was McKillen. His misunderstanding of the fee arrangement is, at best, a "business deal gone bad for [] non-fraudulent reasons." *Eclectic Props.*, 751 F.3d at 997. And Plaintiffs have already pleaded a claim for breach of contract based on these very same facts in the pending California state court case. *See Hume St. Mgmt. Consultants, Ltd.*, No. 22SMCV02646. Finally, even if there were a duty to disclose, Plaintiffs fail to allege what specific statements were rendered false or misleading by Defendants' purported omissions. This failure independently defeats any omissions-based theory of wire fraud.

>                    **d.** **Plaintiffs Fail to Sufficiently Allege Intent to Defraud**

Plaintiffs also fail to allege specific intent to defraud. Courts have long distinguished between a party who enters an agreement with the preexisting intent

33

to breach and one who later decides not to perform—only the former can possibly constitute fraud. *See Quantum Tech. Partners II, L.P. v. Altman Browning & Co.*, No. 3:08-cv-00376-BR, 2009 WL 1795574, at *17 (D. Or. June 23, 2009) ("[P]laintiffs must prove that defendants either intended not to perform when they made the promises, or that they made the promise with reckless disregard for whether they could perform."), *as amended* (June 24, 2009), *aff'd*, 436 F. App'x 792 (9th Cir. 2011). Although Rule 9(b) permits intent to "be alleged generally," the Ninth Circuit has made clear that the plausibility analysis of *Iqbal* "applies equally to Rule 9 as it does to Rule 8," and thus allegations of fraudulent intent must still be tested against the plausibility standard. *Eclectic Props.*, 751 F.3d at 995 n.5. Accordingly, where two explanations for a defendant's conduct are available (one fraudulent and one innocent), plaintiffs must plead "facts tending to exclude the possibility that the alternative explanation is true, in order to render plaintiffs' allegations plausible." *Id.* at 996-97.

The FAC contains no such allegations, relying instead on conclusory assertions and hindsight recharacterization of ordinary business dealings. Intent to defraud cannot be inferred from the mere fact that a business relationship did not yield the compensation one party expected. *See id.* at 997.

*Corbrus, LLC v. 8th Bridge Capital, Inc.* is instructive on this point. No. 2:19-cv-10182-CAS-AFM, 2021 WL 1390366, at *8 (C.D. Cal. Apr. 12, 2021). In *Corbrus*, the plaintiff entered into a joint venture partnership to provide financing for real estate projects and alleged that its partners fraudulently induced it to resign its partnership interest by making "false promises" that it would be compensated through a consulting agreement. *Id.* at *1, *6. The plaintiff alleged that for months the defendants engaged in "sham negotiations" via email and telephone, assuring the plaintiff it would be "made whole," while secretly intending to cut it out of the deal. *Id.* at *1, *7. The court dismissed the RICO claim, finding that although the plaintiff's complaint was replete with assertions that the defendants engaged in a

34

"'charade and fraud designed to induce [the plaintiff] into giving up [its] partnership interest,'" those "allegations of intent [were] mere conclusions" that were unsupported by non-conclusory facts. *Id.* at \*7. The alleged facts showed only "that negotiations regarding [the plaintiff's] consulting role were ongoing for several months, but . . . ultimately did not result in an executed consulting agreement." *Id.* These circumstances did not "'tend to exclude' the explanation that [the] RICO claim arise[d] from a straightforward 'business deal[] gone bad' rather than a scheme conducted with 'specific intent to defraud.'" *Id.* at \*8. Plaintiffs' allegations here fail for the same reason. The FAC describes years of ongoing discussions about compensation across multiple projects, competing views about what was owed, fee proposals submitted years into engagements, and business relationships that ultimately broke down. As in *Corbrus*, Plaintiffs' failure to plead facts excluding the alternative explanation that Defendants were engaged in legitimate business dealings is fatal to their RICO claims.

> ### e.    Plaintiffs' Invocation of "Fraud In Foreign Labor Contracting" Is Frivolous

Plaintiffs also allege "fraud in foreign labor contracting" under 18 U.S.C. § 1351 as a predicate act. *See* FAC ¶ 215.[15] But this statute is wholly inapplicable. Section 1351 was enacted to combat human trafficking, and targets schemes involving deceptive recruitment of foreign workers through "false or fraudulent pretenses, representations or promises regarding" employment. 18 U.S.C. § 1351(a). As explained above, Plaintiffs plead no facts establishing any such thing. In any event, Section 1351 is designed to protect vulnerable foreign workers from exploitative labor practices, not to provide a remedy for sophisticated business partners engaged in fee disputes over luxury hotel development projects.

---

[15] While Plaintiffs generally allege fraud in foreign labor contracting in their first and second claims for relief, *see* FAC ¶¶ 214–17, 223–25, they do not specifically allege how each of the five frauds in the FAC constitutes such fraud.

35

Because Plaintiffs fail to adequately allege any predicate act of racketeering activity, their claims must be dismissed.

## 2. The FAC Allegations Do Not Establish a RICO "Enterprise"

Even if Plaintiffs had sufficiently alleged predicate acts, their RICO claims would still fail for additional independent reasons. For one, Plaintiffs fail to plead a RICO enterprise. The facts pleaded in the FAC establish, at most, a number of instances in which various of the Defendants cooperated to achieve multiple unrelated commercial ends at various points in time. But a RICO enterprise requires more: it requires "(a) a common purpose, [with] (b) a structure or organization, and (c) longevity necessary to accomplish the purpose." *Eclectic Props.*, 751 F.3d at 997. Defendants must "conduct[] or participat[e] in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). Additionally, civil RICO liability reaches only those who "participate[] in the operation or management of the enterprise itself." *Id.* at 183. "Simply performing services" or being "involved" is not enough; the test is "control," not association. *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008).

Plaintiffs' enterprise allegations fail to identify any enterprise hierarchy, decision-making mechanism, roles, or continuity separate from Defendants' routine corporate roles within the family business structure. *See Lesnik v. Eisenmann SE,* 374 F. Supp. 3d 923, 959 (N.D. Cal. 2019); *Doan v. Singh*, 617 F. App'x 684, 685–86 (9th Cir. 2015) (affirming dismissal where complaint did not show how defendants "functioned together as a continuing unit"). Indeed, Plaintiffs' allegations of Defendants' actions—evaluating, directing, and paying (or disputing) project work—simply describe "the conduct of [a corporation] and its employees" furthering a shared business purpose, not the affairs of a RICO enterprise. *See Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 958 (9th Cir. 2023) (rejecting RICO claims where allegations centered on company and employees); *In re Jamster Mktg. Litig.*, No. 3:05-cv-00819-JM-CAB, 2009 WL 1456632, at *5 (S.D. Cal. May 22,

36

2009) (rejecting allegations showing ordinary business conduct and an ordinary business purpose).

The "London Fraud" that was absent from Plaintiffs' initial complaint but is included in the FAC further illustrates that Defendants were not directing the affairs of any singular enterprise. Plaintiffs allege that HBJ acquired the Forbes House, a personal property that McKillen helped renovate. FAC ¶¶ 168-69. Notably, none of the other Defendants are alleged to have participated in the "London Fraud," which could have only benefited HBJ as the alleged owner of the property. This undercuts any inference that Defendants functioned as a coordinated RICO enterprise.

The FAC's attempt to rehabilitate its enterprise theory for the "California Fraud" is equally unavailing. The FAC alleges that even though the Maybourne Beverly Hills "is run by entities owned by [HBK], including Dilmon," HBJ "affirmatively got involved in misrepresenting to Mr. McKillen that he would be paid." *Id.* ¶ 151. But the only allegation regarding HBJ's involvement in McKillen's payment for this project is that McKillen reached out to HBJ concerning the alleged nonpayment, and HBJ responded by stating "I am not aware of the details of your arrangements with Dilmon. However I will speak with them and try to find out about their thinking." *Id.* ¶ 149. HBJ's response, which expressed ignorance of the payment arrangements, is precisely the kind of routine business communication that courts have refused to convert into RICO allegations and wholly fails to establish any kind of "enterprise" with the other Defendants. *See Spotlight Ticket Mgmt.*, 2020 WL 4342260, at *5.

Plaintiffs have also failed to explain the enterprise's decision-making structure. Plaintiffs attribute to Defendants generic and high-level business roles, such as receiving updates and approving work or attending and organizing meetings. *See, e.g.*, FAC ¶ 124; *supra*, Section IV.B.2.a. Defendants are vaguely alleged to have "directed, facilitated, and participated" in the supposed schemes, but it is not

37

clear "what exactly each individual did, when they did it, or how they functioned together as a continuing unit." *See* FAC ¶¶ 13-20; *Doan*, 617 F. App'x at 685-86. For example, Plaintiffs claim "[o]n information and belief" that HBK directed payment refusals for the Maybourne Riviera, but there are no specific allegations about HBK's role in this or the other four alleged schemes. *See* FAC ¶¶ 78, 80. With respect to Sheikha Lulwah, there are no direct allegations of her control beyond requesting Plaintiffs' services, some overseas meetings, and phone and text exchanges where McKillen updated her on the status of the renovation. *See, e.g.*, *id.* ¶¶ 110, 112, 125. Similarly, Plaintiffs allege that HBJ "arrange[d] meetings at which work on the Maybourne Riviera was discussed and furthered," *id.* ¶ 85, but do not allege what specifically was discussed at these meetings or what HBJ's role was in "further[ing]" McKillen's work on the Maybourne Riviera. As for the four other alleged fraud schemes, Plaintiffs merely allege that HBJ engaged Mr. McKillen for his services and periodically discussed updates on those projects with McKillen. *Id.* ¶¶ 89-92, 118, 124, 128, 143, 158, 168, 179. There are also no specific allegations about Beverly Hills Acquisition LLC's role in the alleged "enterprise," and the only allegation about Maybourne Hotels Limited's role is that the Board of Directors allegedly responded to McKillen's request for payment and stated that the Board would "consider[]" it. *Id.* ¶ 153. As such, Plaintiffs have not alleged that the Defendants "play[ed] any part in directing the affairs of the enterprise." *Baumer v. Pachl*, 8 F.3d 1341, 1344 (9th Cir. 1993).

### 3. Plaintiffs Do Not Allege a "Pattern" of Racketeering

To establish a RICO claim, Plaintiffs must show a pattern through "proof that the racketeering predicates are related and [] amount to or pose a threat of continued criminal activity." *Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004). "As to the continuity requirement, continuity is 'both a closed-and open-ended concept, referring either to a closed period of repeated conduct or to past conduct that by its nature projects into the future with a threat of repetition.'" *Makarem v. Get Buzzed*

38

*LLC*, No. 2:25-cv-02357-MWC-ASX, 2025 WL 3030580, at *6 (C.D. Cal. Sept. 23, 2025) (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989)).

Plaintiffs cannot establish closed-ended continuity. For closed-ended continuity, courts in the Ninth Circuit generally require that predicate activity last at least one year and consider factors such as "(1) the number and variety of predicate acts; (2) the presence of separate schemes; (3) the number of victims; and (4) the occurrence of distinct injuries." *See McGowan v. Weinstein*, 562 F. Supp. 3d 744, 751 (C.D. Cal. 2021) (internal quotations omitted); *Bobulinski v. Dickson*, No. 2:24-cv-02600-MWF-JPR, 2025 WL 863462, at *13 (C.D. Cal. Feb. 20, 2025). Where, as here, "a plaintiff alleges only a single scheme with a single victim[,] it cuts against a finding of both closed-ended as well as open-ended continuity." *Metaxas v. Lee*, 503 F. Supp. 3d 923, 941 (N.D. Cal. 2020).

The FAC pleads a single victim (McKillen and his wholly owned entity HSMC) and a single overarching objective (to avoid paying fees for services), across projects with the same counterparties. FAC ¶¶ 1, 6, 7. Courts deem such "one scheme, one victim" allegations inadequate to establish a RICO pattern. *See Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1535 (9th Cir. 1992) (no continuity where defendant's conduct amounted to "a single episode having the singular purpose of impoverishing [the plaintiff]"); *R. Prasad Indus. v. Flat Irons Env't Sols. Corp.*, No. 3:12-cv-08261-JAT, 2013 WL 2217831, at *17 (D. Ariz. May 20, 2013) (dismissing RICO claim where "both the alleged mail and wire fraud were simply steps taken to further the Defendants' single alleged fraud scheme, which it targeted only at [plaintiff]"). While the FAC alleges that "[i]t was not just Mr. McKillen and/or HSMC that were victimized by this fraud" because "[p]rojects like this involve private contractors, designers, and artists, who were all harmed as well," FAC ¶ 58; *see also id.* ¶ 218, the FAC alleges no facts to show that such third parties were harmed. Plaintiffs do not allege Defendants refused to pay the third parties. They do not even allege that the third parties were not paid. The FAC simply states, in

39

conclusory fashion, that third parties "were all harmed as well." *Id.* ¶ 58. These bare assertions are precisely the kind of "[t]hreadbare recitals" that *Iqbal* requires the Court to disregard. 556 U.S. at 678.

Further, even accepting Plaintiffs' allegations as true, the specific predicate acts alleged—scattered communications over multi-year projects among long-term business associates—do not constitute a long-term criminal endeavor that RICO was designed to address. *See Bobulinski*, 2025 WL 863462, at *13 ("Congress was concerned in RICO with long-term criminal conduct."); *Kan-Di-Ki, LLC v. Sorenson*, 723 F. App'x 432, 434 (9th Cir. 2018) (finding "alleged scheme was too limited and short in duration to sufficiently establish closed-ended continuity" where there was a "limited number of participants and a limited number of alleged actual victims").

Plaintiffs also cannot establish open-ended continuity. Open-ended continuity requires "past conduct that by its nature projects into the future with a threat of repetition." *Kan-Di-Ki, LLC*, 723 F. App'x at 434 (citing *H.J. Inc.*, 492 U.S. at 241). Plaintiffs summarily state that "each of [the five] frauds is ongoing" because "there is no indication that the Al Thani Enterprise intends to . . . compensate[] Plaintiffs at any point." FAC ¶ 219. But "the fact that Defendants continue to reap the benefits of their alleged illegal activity and/or that . . . [Plaintiffs] continue[] to suffer the effects thereof, is of no import to the Court's 'continuity' determination." *Concorde Equity II, LLC v. Miller*, 732 F. Supp. 2d 990, 999 (N.D. Cal. 2010). The FAC is devoid of any allegations that McKillen will once again fall victim to a supposed fraudulent scheme and provide free services to Defendants. An alleged "scheme with a singular goal poses no threat of continuing criminal activity once that goal is achieved." *Metaxas*, 503 F. Supp. 3d at 941.

### 4. The FAC Does Not State an Actionable Claim for RICO Conspiracy Against Defendants

For RICO conspiracy claims under Section 1962(d), Plaintiffs must allege

40

either an agreement to commit a substantive RICO violation or an agreement to commit two predicate offenses, with the defendant being aware of the enterprise's nature and intending to participate. *Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000); *see also Sanford*, 625 F.3d at 557, 559. "Plaintiffs cannot claim that a conspiracy to violate RICO existed if they do not adequately plead a substantive violation of RICO." *Howard*, 208 F.3d at 751. The FAC's amendments have not altered the core reality that these are compensation disputes arising from informal business arrangements, not racketeering. Because Plaintiffs fail to adequately allege a violation of Section 1962(c), they fail to allege a conspiracy to violate RICO. *See id.*; *Yagman v. Gabbert*, 684 F. App'x 625, 627 (9th Cir. 2017).

> **D.    Alternatively, the Court Should Dismiss the FAC for *Forum Non Conveniens* or Stay the Case**

To prevail on a motion to dismiss based upon *forum non conveniens*, Defendants must show that (1) there is "an adequate alternative forum" and (2) "that the balance of private and public interest factors favors dismissal." *Cooper*, 860 F.3d at 1210. Both factors are met here.

There are adequate alternative forums for Plaintiffs. Since 2022, Plaintiffs have filed lawsuits in France, New York, and England, as well as California—many of which have been dismissed or ruled against Plaintiffs—all arising from the same underlying commercial disputes they now seek to repackage as federal racketeering claims. *See supra*, Section II.A. In France alone, Plaintiffs have initiated at least five separate proceedings based on the underlying contractual disputes regarding the Maybourne Riviera and Îlot Saint Germain—both of which Plaintiffs now allege form part of Defendants' alleged RICO conspiracy. *See supra*, Section II.A. The Maybourne Beverly Hills and the New York residence have also been the subject of Plaintiffs' lawsuits in California and New York. *See supra*, Section II.A. The FAC's addition of the London Fraud scheme, which involves the renovation of Forbes House in London, further demonstrates why dismissal (or a stay at minimum) is

41

appropriate. As the FAC admits, this dispute is already being litigated in the High Court of London. FAC ¶ 167. The High Court judge dismissed HSMC's request to serve out of jurisdiction, noting that the underlying claim was not "serious" and "despite many attempts and sophisticated legal representation, HSMC [] c[a]me nowhere near" pleading a sufficient claim, citing "very vague contractual arrangements." Dkt. 48-9, at 94. After that dismissal, McKillen filed a near-identical suit against HBJ and others in the High Court. *See supra*, Section II.A. By adding a fifth fraudulent "scheme" that is already being litigated in England, Plaintiffs have only further demonstrated that adequate alternative forums exist to adjudicate their claims. *See Vivendi SA v. T-Mobile USA Inc.*, 586 F.3d 689, 695 (9th Cir. 2009) (holding that "the district court did not abuse its discretion when it concluded that [the plaintiff] was engaging in forum shopping by filing suit in the United States" in light of "the actions [the plaintiff] ha[d] filed across Europe").

The private and public interest factors also favor dismissal. The private factors are:

> (1) the residence of the parties and the witnesses; (2) the forum's convenience to the litigants; (3) access to physical evidence and other sources of proof; (4) whether unwilling witnesses can be compelled to testify; (5) the cost of bringing witnesses to trial; (6) the enforceability of the judgment; and (7) all other practical problems that make trial of a case easy, expeditious and inexpensive.

*Cooper*, 860 F.3d at 1211. Here, the parties are all Irish, Qatari, or English citizens (with the exception of a single Delaware LLC that is not alleged to have had any role in the alleged misconduct). FAC ¶¶ 11-20. Only one of the alleged five fraud schemes occurred in any part in California, and any of the relevant documents or physical evidence (like the alleged emails and WhatsApp messages) would be located in Qatar, where the Qatari Royals reside, or England, where the Dilmon executives reside. Plaintiffs do not allege any witnesses in California.

The public interest factors also favor dismissal. These factors include "(1) the

42

local interest in the lawsuit, (2) the court's familiarity with the governing law, (3) the burden on local courts and juries, (4) congestion in the court, and (5) the costs of resolving a dispute unrelated to a particular forum." *Cooper*, 860 F.3d at 1211. Here, the local interest in the lawsuit is low because none of the Plaintiffs or Defendants are California residents or even reside in the United States. *See Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1147 (9th Cir. 2001). While the Court would be applying United States law, this case is merely Plaintiffs' attempt to repackage contested commercial disputes (governed by local laws) as "racketeering." This Court should not countenance such gamesmanship.

If the Court does not dismiss this case outright, it should stay the case pending resolution of Plaintiffs' pending French, English, New York, and California state litigations. *See Colo. River*, 424 U.S. at 817-18 (allowing stays over parallel actions in furtherance of "wise judicial administration."); *see also Alcon Ent.*, 2021 WL 2792435, at *4. The stay doctrine is designed for cases such as this, where "proceedings are 'substantially similar.'" *See Nakash*, 882 F.2d at 1416. In the Ninth Circuit, courts consider many of the same factors relevant to *forum non conveniens* in deciding whether to stay a case. *See Colo. River*, 424 U.S. at 817-18 (factors include which court first assumed jurisdiction and the order in which the actions were filed, the convenience of the forums, and the need to avoid piecemeal litigation). Here, as explained above, the factors weigh strongly in favor of a stay.

All of Plaintiffs' lawsuits involve the same factual disputes—whether Plaintiffs are owed further fees for their work on various development projects under various claimed oral agreements. *See supra*, Section II.A-B. There is no dispute over which was filed first. This case was filed in September 2025. The French Maybourne Riviera cases were initiated between 2022 and 2024. *See* Dkt. 48-4, at 8; Dkt. 48-5, at 23; Dkt. 48-10, at 99. The French Îlot Saint Germain cases were initiated between 2023 and 2024. *See* Bina Decl., Ex. C, at 106; *id.*, Ex. D, at 194. The Forbes House litigation was initiated in 2024 and June 2025. *See* Dkt. 48-9, at

43

89; Dkt. 48-14 at 232.  The Maybourne Beverly Hills litigation was initiated in 2022.  *See* Dkt. 48-8, at 85.  And the New York Residence litigation was initiated in 2024.  *See* Dkt. 48-13, at 202.  The other forums, where advanced litigation is already proceeding, are clearly more convenient for the majority of the witnesses who will need to testify.  There is no need to adjudicate disputes regarding French properties or English properties or New York properties in California.  *See supra*, Section II.A.  Further, the need to avoid piecemeal litigation and the avoidance of forum shopping weigh heavily in favor of a stay to prevent the endless forum shopping Plaintiffs have subjected Defendants to around the world.  *See United InvestexUSA 7 Inc. v. Miller*, No. 820CV02308JVSADS, 2021 WL 6804224, at *3 (C.D. Cal. Nov. 10, 2021).

**E.     The Court Should Strike Prejudicial and Speculative Allegations Unrelated to Plaintiffs' Claims**

Plaintiffs' RICO claims are based entirely on their allegations of uncompensated work for five specific redevelopment projects.  FAC ¶¶ 7, 218, 226.  Nonetheless, Plaintiffs devote numerous pages of their complaint to alleging "additional racketeering" that is wholly irrelevant to the claims—including alleged "corruption" by the Qatari Royals in their organization of the 2022 FIFA World Cup Games, purported "support for terrorist groups," and unrelated "criminal inquiries" Plaintiffs allege Faissola has faced overseas.  *See, e.g.*, *id.* ¶¶ 195-98, 206-07.  Plaintiffs also claim that the Qatari Royals used Quintet, a Luxembourg bank they allege is beneficially owned by HBJ, to "intimidate" McKillen merely by enforcing the terms of its loan.  *Id.* ¶¶ 8, 29, 186-93.  These allegations do not serve as the basis of Plaintiffs' civil RICO claims against Defendants and are included in an apparent attempt to prejudice Defendants with salacious and irrelevant allegations.  The "additional racketeering" allegations "involve[] different victims," different "methods" to allegedly carry out the scheme, and "do[] not show a purpose or result similar to" the allegations of uncompensated work.  *Does 1-60 v. Republic Health*

44

*Corp.*, 669 F. Supp. 1511, 1515 (D. Nev. 1987). Both the additional racketeering and Quintet scheme allegations "are too unrelated" to the alleged pattern of racketeering and are therefore "immaterial and impertinent." *Id.* Accordingly, Defendants move to strike paragraphs 8, 29, and 186-210 of Plaintiffs' FAC, which are included "solely to prejudice [Defendants] by painting [Defendants] as [] bad actor[s]." *See Beasley v. Lucky Stores, Inc.*, 400 F. Supp. 3d 942, 963 (N.D. Cal. 2019).

## V.    CONCLUSION

For the foregoing reasons, Defendants request that this Court **DISMISS** Plaintiffs' claims or otherwise **STAY** Plaintiffs' claims, and **STRIKE** irrelevant and prejudicial portions of the FAC.

Dated:  April 17, 2026

Respectfully submitted,

LATHAM & WATKINS LLP
  Marvin S. Putnam
  Jessica Stebbins Bina
  Alexander C.K. Wyman

By */s/ Jessica Stebbins Bina*
  Jessica Stebbins Bina

*Attorneys for Defendants Sheikh Hamad bin Khalifa bin Hamad bin Abdullah bin Jassim bin Mohammed Al Thani, Sheikh Hamad bin Jassim bin Jaber bin Mohammed bin Thani Al Thani, Sheikha Lulwah bint Hamad bin Khalifa Al Thani, Michele Faissola, Marc Socker, Dilmon LLC, Maybourne Hotels Limited, and Beverly Hills Acquisition LLC*

45

# CERTIFICATE OF COMPLIANCE

The undersigned counsel of record for Defendants Sheikh Hamad bin Khalifa bin Hamad bin Abdullah bin Jassim bin Mohammed Al Thani, Sheikh Hamad bin Jassim bin Jaber bin Mohammed bin Thani Al Thani, Sheikha Lulwah bint Hamad bin Khalifa Al Thani, Michele Faissola, Marc Socker, Dilmon LLC, Maybourne Hotels Limited, and Beverly Hills Acquisition LLC certifies that this brief contains 45 pages, which:

   \_\_    complies with the word limit of L.R. 11-6.1.

   X    complies with the page limit set by court order dated March 10, 2026 (Dkt. No. 52).

Dated: April 17, 2026

By: */s/ Jessica Stebbins Bina*
Jessica Stebbins Bina

*Counsel for Defendants Sheikh Hamad bin Khalifa bin Hamad bin Abdullah bin Jassim bin Mohammed Al Thani, Sheikh Hamad bin Jassim bin Jaber bin Mohammed bin Thani Al Thani, Sheikha Lulwah bint Hamad bin Khalifa Al Thani, Michele Faissola, Marc Socker, Dilmon LLC, Maybourne Hotels Limited, and Beverly Hills Acquisition LLC*